# **EXHIBIT B**

STATE OF NEW YORK
SUPREME COURT          COUNTY OF MONROE

_____

Allentown Towne Center Allentown, Pa.
Limited Partnership,
270 Commerce Drive
Rochester, New York  14623-3506,                                **SUMMONS**

                    Plaintiff,                                Index No. _____

          -vs.-

Saucon Fitness LLC d/b/a Orange Theory Fitness,
Brian Bolcar, Ned Bolcar, Carolyn Bolcar and
Michael DeGaetano,

                    Defendants.

_____

        **YOU ARE HEREBY SUMMONED** to answer the complaint in this action and to serve
a copy of your answer on the Plaintiff's attorney within twenty (20) days after the service of this
summons, exclusive of the day of service (or within thirty (30) days after the service is complete
if this summons was not personally delivered to you within the State of New York); and in the
case of your failure to answer, judgment will be taken against you by default for the relief
demanded in the complaint.

        Plaintiff designates State of New York, Supreme Court, County of Monroe, as the place
of trial.  The basis of venue is agreement by the parties and Plaintiff's principal place of business
located at 270 Commerce Drive, Rochester, New York.

Dated: May 21, 2020                         **HARRIS BEACH PLLC**

                                            _____
                                            Dale A. Worrall, Esq.
                                            *Attorneys for Plaintiff*
                                            99 Garnsey Road
                                            Pittsford, New York 14534
                                            (585) 419-8800

HARRIS BEACH PLLC
ATTORNEYS AT LAW

Case 6:20-cv-06488-EAW   Document 1-2   Filed 07/09/20   Page 3 of 83

STATE OF NEW YORK
SUPREME COURT          COUNTY OF MONROE

_____

Allentown Towne Center Allentown, Pa.
Limited Partnership,

                          Plaintiff,

          -vs.-

Saucon Fitness LLC d/b/a Orange Theory Fitness,
Brian Bolcar, Ned Bolcar, Carolyn Bolcar and
Michael DeGaetano,

                          Defendants.

_____

**VERIFIED COMPLAINT**

Index No. _____

        Plaintiff, Allentown Towne Center Allentown, Pa. Limited Partnership ("Allentown") by and through its attorneys, Harris Beach PLLC, as and for its Verified Complaint against Saucon Fitness LLC d/b/a Orange Theory Fitness, Brian Bolcar, Ned Bolcar, Carolyn Bolcar and Michael DeGaetano states as follows:

***The Parties.***

        1.      Allentown is a limited partnership licensed and doing business in the State of New York, having its principal office and principal place of business at 270 Commerce Drive, Rochester, New York.

        2.      Allentown is the Owner of the Allentown Towne Center located in Allentown, Pennsylvania (the "Shopping Center").

        3.      Saucon Fitness LLC d/b/a Orange Theory Fitness ("Tenant") is limited liability company operating in the State of Pennsylvania.

**HARRIS BEACH** PLLC
ATTORNEYS AT LAW

4.      Brian Bolcar, Ned Bolcar, Carolyn Bolcar and Michael DeGaetano (collectively, "Guarantors") are individuals residing, upon information and belief, in the State of Pennsylvania.

**The Lease and Guaranty.**

5.      Allentown and Tenant are parties to a Lease and Rider to Lease made June 21, 2018 (collectively, the "Lease").  A copy of that Lease is attached as **Exhibit "A."**

6.      The term of the Lease expires on August 31, 2029 ("Lease Term").

7.      Pursuant to the Lease, Tenant occupies approximately 7,000 square feet of space at the Shopping Center for the purpose of operating a group personal training fitness studio (the "Leased Premises").

8.      The Lease requires Tenant to timely pay rent as defined by the Lease.

9.      As incentive for the Lease, Allentown and Guarantors entered into a Lease Guaranty made June 21, 2018 (the "Guaranty").   A copy of the Guaranty is attached as **Exhibit "B."**

10.      Pursuant to the Guaranty, Guarantors jointly and severally guaranteed the satisfaction and performance of all of the terms and conditions of the Lease, including Tenant's obligation to pay rent and continuously operate its business at the Leased Premises.

**Breach of Lease.**

11.      Tenant has failed to pay rent as required by the Lease.

12.      Tenant has failed to pay rent as required by the Lease for at least April 2020 and May 2020.

13.      By notices dated April 27, 2020 and May 15, 2020, Allentown provided Tenant and Guarantors with notice of default and demanded payment.  Copies of said notices are attached as **Exhibit "C."**

14.     Despite demand, Tenant remains in default of the Lease, and rent for the months of April 2020 and May 2020 remain unpaid.

## FIRST CAUSE OF ACTION
### (breach of Lease)

15.     Allentown restates and re-alleges paragraphs 1 through 14 as if fully stated herein.

16.     Allentown has fully satisfied its obligations under the Lease.

17.     Tenant has breached the Lease by failing to pay rent as required by the Lease.

18.     As a result of Tenant's breach of the Lease, Allentown has been damaged in the amount of $1,149,500.04.

19.     Allentown is entitled to judgment as against Tenant, jointly and severally with Guarantors, in the amount of $1,149,500.04.

## SECOND CAUSE OF ACTION
### (breach of Guaranty )

20.     Allentown restates and re-alleges paragraphs 1 through 19 as if fully stated herein.

21.     Allentown has fully satisfied its obligations under the Guaranty.

22.     Pursuant to the Guaranty, Guarantors are jointly and severally liable for all damages resulting from Tenant's breach of the Lease.

23.     As a result, Allentown is entitled to judgment as against Guarantors, jointly and severally, in the amount of $1,149,500.04.

## THIRD CAUSE OF ACTION
### (attorneys' fees and expenses)

24.     Allentown restates and re-alleges paragraphs 1 through 23 as if fully stated herein.

25.     Under the terms of the Lease and Guaranty, defendants are jointly and severally liable to Allentown for any and all reasonable expenses resulting from the breach of said Lease

and Guaranty, including attorneys' fees. As such, Allentown is entitled to reimbursement of its attorneys' fees and expenses to be calculated at the conclusion of this litigation.

26.     WHEREFORE, Plaintiff, Allentown Towne Center Allentown, Pa. Limited Partnership, demands judgment as against defendants, jointly and severally, as follows:

i)      On the First Cause of Action in the amount of $1,149,500.04;

ii)     On the Second Cause of Action in the amount of $1,149,500.04;

iii)    On the Third Cause of Action, reasonable attorneys' fees and expenses to be determined upon completion of this litigation; and

iv)     Costs and disbursements of this action, as well as statutory interest;

v)      Such other and further relief as this Court may deem just and proper.

Dated: May 21, 2020

HARRIS BEACH PLLC

Dale A. Worrall
*Attorneys for Plaintiff*
99 Garnsey Road
Pittsford, New York 14534
(585) 419-8800

## VERIFICATION

STATE OF NEW YORK )
COUNTY OF MONROE ) ss.:

Greg Farrell, being duly sworn, deposes and says: that he is the representative for the Plaintiff in this action; that he has read the foregoing Verified Complaint and knows the contents thereof; that the same is true to the knowledge of the deponent, except as to the matters therein stated to be alleged on information and belief; and that as to those matters he believes them to be true.

_____
Greg Farrell

Sworn to before me this 21st
day of ___May___, 2020.

_____
Notary Public

**NICHOLE SEARS**
NOTARY PUBLIC-STATE OF NEW YORK
No. 01SE6406679
Qualified in Wayne County
My Commission Expires 04-06-2024

234045 4832-3513-9261 v2

HARRIS BEACH
ATTORNEYS AT LAW

5

MONROE COUNTY CLERK'S OFFICE

THIS IS NOT A BILL. THIS IS YOUR RECEIPT.

Receipt #

Book    Page

Return To:
DALE A. WORRALL

No. Pages: 29

Instrument: EXHIBIT(S)

Control #:         Unrecorded #8085361
Index #:           Unassigned-1440974

Date:

Allentown Towne Center Allentown, Pa. Limited Partnership

Time:

Saucon Fitness LLC
Bolcar, Brian
Bolcar, Ned
Bolcar, Carolyn
DeGaetano, Michael

Total Fees Paid:                    $0.00

Employee:

State of New York

MONROE COUNTY CLERK'S OFFICE
WARNING – THIS SHEET CONSTITUTES THE CLERKS
ENDORSEMENT, REQUIRED BY SECTION 317-a(5) &
SECTION 319 OF THE REAL PROPERTY LAW OF THE
STATE OF NEW YORK. DO NOT DETACH OR REMOVE.

JAMIE ROMEO

MONROE COUNTY CLERK



# EXHIBIT A

**LEASE**

THIS INDENTURE OF LEASE (this "Lease"), made as of the __21__ day of __June__, 20__18__ by **Allentown Towne Center Allentown, Pa. Limited Partnership** with its principal office located at **270 Commerce Drive, Rochester, New York 14623** herein called "**Owner**", and **Saucon Fitness LLC d/b/a Orange Theory Fitness doing business at 4713 West Tilghman Street, Allentown, Pennsylvania 18104, bbolcar@yahoo.com, nbolcar@orangetheoryfitness.com** herein called "**Tenant**".

## W I T N E S S E T H :

### ARTICLE I - GRANT AND TERM

**SECTION 1.01.**  **Leased Premises.**

In consideration of the rents, covenants and agreements hereinafter reserved and contained on the part of Tenant to be observed and performed, Owner demises and leases to Tenant, and Tenant rents from Owner, those certain premises, now or hereafter to be erected in the shopping center owned by Owner and known as **Allentown Towne Center**, which shopping center is outlined in green on Exhibit "A" attached hereto and made a part hereof (herein called the "**Shopping Center**") in __Allentown__ (City), __Lehigh__ (County), __Pennsylvania__ (State), which premises consists of a store containing an area of approximately __7,000__ square feet, herein collectively called the "**leased premises**". The above measurements are computed from exterior front wall, back wall, and any side exterior wall and from center line of demising walls. The boundaries and location of the leased premises are outlined in red on the site plan of the Shopping Center, which is marked Exhibit "A" attached hereto and made a part hereof.

**SECTION 1.02.**  **Use of Additional Areas.**

The use and occupation by Tenant of the leased premises shall include the use in common with others entitled thereto of the common areas of the Shopping Center, as such common areas may be designated from time to time by Owner, subject, however, to the terms and conditions of this agreement and to reasonable rules and regulations for the use thereof as prescribed from time to time by Owner.

**SECTION 1.03.**  **Commencement and Ending Date of Term.**

The terms and conditions of this Lease shall be effective from the date of execution of this Lease by Owner and Tenant. The date that Owner delivers possession of the leased premises to Tenant shall be referred to in this Lease as the "Possession Date." The term of this Lease shall commence upon the __two hundred forty first__ (__241st__) day following the Possession Date (the "**Commencement Date**"); provided, however, that if such date is not the first day of a calendar month, then the Commencement Date shall automatically be deferred until the first day of the next month (and Tenant shall pay on the Commencement Date a prorated portion of the initial Fixed Minimum Rent for the partial month immediately preceding the Commencement Date). The term of this Lease shall end on the day immediately preceding the __tenth__ (__10th__) anniversary of the Commencement Date (the "**Termination Date**").

**SECTION 1.04.**  **Lease Year Defined.**

The term "**lease year**" as used herein shall mean a period of twelve (12) consecutive full calendar months; provided, however, that the first lease year shall begin on the Commencement Date and shall end on the day prior to the first (1st) anniversary of the Possession Date, except that if the Possession Date is not the 1st of the month, then the first lease year shall end on the last day of the month in which the first anniversary of the Possession Date occurs. Each succeeding lease year shall commence upon the first day after the end of the previous lease year.

**SECTION 1.05.**  **Holding Over.**

If Tenant shall be in possession of the leased premises beyond the Termination Date or earlier Termination of the Lease, the tenancy under this Lease shall become that of "month to month", terminable by either party upon thirty (30) days' prior written notice, at a monthly rental equal to twice the sum of (i) the monthly installment of Fixed Minimum Rent as defined in SECTION 2.01, payable through the last month of the term, ~~and (ii) one twelfth (1/12) of the highest Percentage Rent, as defined in SECTION 2.02, for the last three (3) lease years, or with respect to a term of less than three (3) years, each complete lease year preceding the Termination Date.~~ Tenant shall also pay all other charges payable under the terms of this Lease, pro rated for each month during which Tenant remains in possession. Such "month to month" tenancy shall also be subject to all other conditions, provisions, and obligations of this Lease. Tenant shall not interpose any counterclaim or counterclaims in a summary proceeding or other action based upon such holding over.

**SECTION 1.06.**  **Excuse of Owner's Performance.**

Anything in this agreement to the contrary notwithstanding, Owner shall be relieved of its obligations and shall not be deemed in default with respect to the performance of any of the terms, covenants and conditions of this Lease if same shall be due to any strike, lockout, civil commotion, warlike operation, invasion, rebellion, hostilities, military or usurped power, sabotage, governmental regulations or controls, inability to obtain any material, service or financing, through Act of God or other cause beyond the control of Owner.

### ARTICLE II - RENT

**SECTION 2.01.**  **Minimum Rent.**

> second

Tenant agrees to pay to Owner at the office of Owner, or at such other place designated by Owner, without any prior demand therefor and without any deduction or set-off whatsoever, and as fixed minimum rent (the "**Fixed Minimum Rent**") the sum of $ __5,833.33__ in advance upon the first day of each calendar month commencing on the Commencement Date through the last day of the ~~first~~ lease year; $ __69,999.96__ per annum. Effective as of the first day of the ~~second~~ (2nd) lease year and as of the first day of each lease year thereafter during the term hereof, the Fixed Minimum Rent then in effect shall be increased by the product of (i) ~~four percent (4%)~~ and (ii) the Fixed Minimum Rent in effect immediately prior to such increase, and the monthly installments of Fixed Minimum Rent shall be upwardly adjusted accordingly.

> third (3rd)
> three percent (3%)

To secure payment of said Fixed Minimum Rent (as well as all ~~percentage rent and~~ additional rent due hereunder), this Lease constitutes a security agreement under the Uniform Commercial Code in effect in the State of Pennsylvania, as same may be amended from time to time (the "UCC"). As security for the performance of Tenant's obligations hereunder, Tenant grants to Owner a lien upon and a security interest in Tenant's existing or hereafter acquired furniture, inventory, trade fixtures, personal property and equipment which are located in the Premises or used in connection with the business to be conducted in the Premises and in the proceeds thereof. Such lien shall be in addition to Owner's rights of distraint. Tenant shall from time to time and promptly upon request from Owner, provide Owner with a detailed inventory of all such furniture, inventory, trade fixtures, personal property and equipment. Additionally, within five (5) days after request, Tenant shall execute, acknowledge and deliver to Owner a security agreement, financing statement or any other document submitted to Tenant evidencing or establishing such lien and security interest. In addition, Owner may, in its discretion, file any such financing statement without any signature from Tenant. In addition to Owner's remedies hereunder, Owner shall have all enforcement rights available under the UCC. Tenant agrees not to remove any property of any kind including but not limited to furniture, fixtures and equipment, from the Premises without the prior written consent of Owner.

Notwithstanding anything in this Lease to the contrary, upon receipt of written demand from Owner at any time during the term hereof, Tenant shall be obligated to make all subsequent payments of Fixed Minimum Rent, ~~percentage rent~~ and additional rent, as defined within the Lease, by way of automatic electronic funds transfer or an automated clearing house (ACH) to an account specified by Owner. Tenant shall immediately notify Owner of any changes to their bank account that will alter the transfer or the ACH process. Failure for the automatic transfer or ACH to be completed on the due date will result in a late charge as outlined in Section 2.05 of the Lease.

{2211907: }

**Page 1 of 48**

INITIAL HERE
OWNER    TENANT

**SECTION 2.02.** ~~Percentage Rent.~~

~~(a)  In addition to the Fixed Minimum Rent aforesaid, Tenant agrees to pay to Owner, in the manner and upon the conditions and at the times hereinafter set forth, commencing on the Possession Date and continuing throughout the entire term of this Lease, as percentage rent hereunder, six percent (6%) of the gross receipts in excess of $_____ ("Breakpoint") during each lease year.~~  Said percentage rent shall be ~~payable as hereinafter provided at the office of Owner or at such other place as Owner may designate without any prior demand therefor and, except as~~ provided in clause (b) of this SECTION, without any set-off or deduction whatsoever.

(b)  Said percentage rent shall be paid quarter-annually.  The first payment of percentage rent shall ~~be paid on or before the fifteenth (15th)~~ day after the last day of the first three (3) calendar months of the first lease year of the term hereof, and ~~another~~ payment of percentage rent shall be paid on or before the fifteenth (15th) day after the end of each successive three (3) month calendar period thereafter.  The amount of each payment of percentage rent shall be 6% of gross receipts in excess of $_____ during ~~each~~ lease year.  If at the end of any lease year, the total amount of percentage rent paid by Tenant exceeds the total amount of percentage ~~rent~~ required to be paid by Tenant during such lease year, Tenant shall receive a credit equivalent to such excess which may be deducted by Tenant from the next payment of percentage rent due under the foregoing provisions hereof.  The Breakpoint for computing percentage rent payable ~~for~~ a period extending beyond the last lease year, if any, shall be prorated based upon the number of months that extend beyond the last lease year.

(c)  For the purpose of computing the percentage rent payable hereunder with respect to the first lease year of the term hereof, the gross receipts received during any period between the Possession Date and the Commencement Date shall be added to the gross receipts for the first three (3) month period of the first lease year of the term hereof.  For any lease year during the term hereof that is less than a full twelve (12) months, the Breakpoint for such lease year ~~shall be appropriately downwardly adjusted by Owner to properly reflect such partial year.~~

**SECTION 2.03.**       **Gross Receipts Defined.**

The term **"gross receipts"** as used herein is hereby defined to mean receipts from gross sales of Tenant and of all licensees, concessionaires and assignees of Tenant, from all business conducted upon or from the leased premises by Tenant and all others, and whether such sales be evidenced by check, credit, charge account, exchange or otherwise, and shall include, but not be limited to the amounts received from the sale of goods, wares and merchandise and for services performed on or at the leased premises, together with the amount of all orders taken or received at the leased premises, whether such orders be filled from the leased premises or elsewhere, and whether such sales be made by means of merchandise or other vending devices in the leased premises.  If any one or more departments or other divisions of Tenant's business shall be subleased or licensed by Tenant or conducted by any person, firm or corporation other than Tenant, then there shall be included in gross receipts ~~for the purpose of fixing the percentage rent payable hereunder~~ all the gross sales of such departments or divisions, whether such sales be made at the leased premises or elsewhere, in the same manner and with the same effect as if the business or sales of such departments and divisions of Tenant's business had been conducted by Tenant itself.  Gross sales shall not include sales of merchandise which has been refunded, or allowances made on merchandise claimed to be defective or unsatisfactory; provided they shall have been included in gross sales; and there shall be deducted from gross sales the sales price of merchandise returned by customers for exchange, provided that the sales price of merchandise delivered to the customer in exchange shall be included in gross sales.  Gross receipts shall not include the amount of any sales, use or gross receipts tax imposed by any federal, state, municipal or governmental authority directly on sales and collected from customers, provided that the amount thereof is added to the selling price or absorbed therein, and paid by Tenant to such governmental authority.  No franchise or capital stock tax and no income or similar tax based upon income or profits as such shall be deducted from gross receipts in any event whatever.  Each charge or sale upon installment or credit shall be treated as a sale for the full price in the month during which such charge or sale shall be made, irrespective of the time when Tenant shall receive payment (whether full or partial) therefor.

**SECTION 2.04.**       **Additional Rent.**

Tenant shall pay as additional rent any money required to be paid pursuant to SECTIONS 2.05, 2.06, 5.01, 7.01, 11.01, 13.01, 13.02, 14.02, 14.04, 14.05 and 15.01, and all other sums of money or charges required to be paid by Tenant under this Lease, whether or not the same be designated "additional rent".  If such amounts or charges are not paid at the time provided in this Lease, they shall nevertheless, if not paid when due, be collectible as additional rent with the next installment of rent thereafter falling due hereunder, but nothing herein contained shall be deemed to suspend or delay the payment of any amount of money or charge at the time the same becomes due and payable hereunder, or limit any other remedy of Owner.

**SECTION 2.05.**       Late Charge.  **(Continued in the Rider to the Lease)**
→5th
Tenant shall pay a "late charge" of $     729.17     per month on any Fixed Minimum Rent, ~~percentage rent,~~ additional rent, amount or ~~charges of the character~~ described in SECTION 2.04 hereof when said sums are not RECEIVED BY OWNER AT THE ADDRESS IT HAS GIVEN TENANT FOR PAYMENT by the ~~14th~~ of the month, to cover the extra expenses which may include, but are not limited to, administrative and accounting efforts and expenditures, collection efforts by Owner's collection department and correspondence with Tenant and efforts to obtain and insure performance of Tenant's obligations hereunder.  The parties acknowledge that the foregoing efforts and changes are not capable of exact determination, and that the late charge provided for in this Section represents a reasonable estimate of the amounts necessary to compensate Owner for its efforts and expenditures in handling late payments by Tenant.  As such, the parties hereto agree that the said late charges are enforceable liquidated damages and are not penalties.

**SECTION 2.06.**       Rent and Additional Rent More Than Thirty (30) Days Overdue.

If Tenant shall fail to pay within thirty (30) days of receipted notice or when the same is due and payable, any Fixed Minimum Rent, ~~percentage rent,~~ additional rent, amount or charges of the character described in SECTIONS 2.04 and 2.05 hereof, such unpaid amounts shall bear interest from thirty (30) days after receipted notice or when the same is due and payable to the date of payment at a rate equal to ~~the maximum interest rate permitted by law~~ for the overdue amounts or charges of the character described in SECTIONS 2.04 and 2.05 hereof.    → **twelve percent (12%)**

**ARTICLE III - RECORDS AND BOOKS OF ACCOUNT**

**SECTION 3.01.** ~~Tenant's Records.~~

~~For the purpose of ascertaining the amount payable as percentage rent, Tenant agrees to prepare and keep on the leased premises for a period of not less than two (2) years following the end of each lease year adequate records which shall show inventories and receipts of merchandise at the leased premises, and daily receipts from all sales and other transactions on or from the leased premises by Tenant and any other persons conducting any business upon or from said premises.  Tenant shall record at the time of sale, in the presence of the customer, all receipts from sales or other transactions whether for cash or credit in a cash register or in cash registers having a cumulative total which shall be sealed in a manner approved by Owner, and having such other features as shall be approved by Owner.  Tenant further agrees to keep on the leased premises for at least two (2) years following the end of each lease year the gross income sales and occupation tax returns with respect to said lease years and all pertinent original sales records.  Pertinent original sales records shall include:  (a) cash register tapes, including tapes from temporary registers; (b) serially numbered sales slips; (c) the original of all mail orders at and to the leased premises; (d) the original records of all telephone orders at and to the leased premises; (e) settlement report sheets of transactions with sub-tenants, concessionaires and licensees; (f) the original records showing that merchandise returned by customers was purchased at the leased premises by such customers; (g) memorandum receipts or other records of merchandise taken out on approval; (h) state and federal income tax returns; (i) records from credit card companies showing all credit card sales; (j) such other sales records, if any, which would normally be examined by an independent accountant pursuant to accepted auditing standards in performing an audit of Tenant's sales; and (k) the records specified in (a) to (j) above of sub-tenants, assignees, concessionaires or licensees.  Owner and Owner's authorized representative shall have the right to examine Tenant's records aforesaid during regular business hours.~~

**Page 2 of 48**

{2211907: }



| INITIAL | HERE |
|---|---|
| OWNER | TENANT |

**SECTION 3.02.**          **Reports by Tenant.**

Tenant shall submit to Owner on or before the fifteenth (15th) day following each three (3) month period during the term hereof (including the fifteenth (15th) day of the month following the end of the term) at the place then fixed for the payment of rent, ~~together with the remittance of quarterly percentage rent,~~ a written statement signed by Tenant, and certified by it to be true and correct showing in reasonably accurate detail, the amount of gross receipts for each month during the preceding three months and fractional month, if any, prior to the commencement of the first lease year. Tenant shall submit to Owner on or before the sixtieth (60th) day following the end of each lease year at the place then fixed for the payment of rent a written statement signed by Tenant, and certified to be true and correct showing in reasonable accurate detail satisfactory in scope to Owner the amount of gross receipts during the preceding lease year, and duly certified by independent certified public accountants of recognized standing, which certification shall be one which is satisfactory to Owner in scope and substance. The statements referred to herein shall be in such form and style and contain such details and breakdown as Owner may reasonably determine. Tenant shall pay a Two Hundred Dollar ($200.00) late submission fee for each month that Tenant has not furnished to Owner a copy of such report by the due date listed above. Such fee shall continue to accrue monthly at the rate as listed above until such time as Tenant shall have furnished such report.

**ARTICLE IV - AUDIT**

**SECTION 4.01.**          **Right to Examine Books.**

The acceptance by Owner of payments of percentage rent shall be without prejudice to Owner's right to an examination of Tenant's books and records of its gross receipts and inventories of merchandise at the leased premises in order to verify the amount of annual gross receipts received by Tenant in and from the leased premises.

**SECTION 4.02.**          **Audit.**

At its option, Owner may cause, at any reasonable time upon forty eight (48) hours prior written notice to Tenant, a complete audit to be made of Tenant's entire business affairs and records relating to the leased premises for the period covered by any statement issued by Tenant as above set forth. If such audit shall disclose a liability for rent to the extent of two percent (2%) or more in excess of the rentals therefore computed and paid by Tenant for such period, Tenant shall promptly pay to Owner the cost of said audit in addition to the deficiency, which deficiency shall be payable in any event, and in addition, Owner, at Owner's option, may terminate this Lease upon five (5) days' notice to Tenant of Owner's election to do so. Any information obtained by Owner as a result of such audit shall be held in strict confidence by Owner.

**ARTICLE V - TAXES**

**SECTION 5.01.**          **Taxes.**

Commencing on the Possession Date and continuing throughout the entire term of this Lease, Tenant agrees to pay its proportionate share of Real Property Taxes (as defined below). Tenant shall pay that portion of such Real Property Taxes equal to the product obtained by multiplying the total Real Property Taxes by a fraction, the numerator being the square foot area of the leased premises, and the denominator of which shall be the total square footage, ~~minus the first floor area of the tenant with the largest first floor,~~ of all ~~leased~~ first floor area in the Shopping Center. *is leasable*

Notwithstanding anything in this Article V to the contrary, if any tenant of the Shopping Center pays directly for the Real Property Taxes on a separately assessed tax parcel within the Shopping Center (whether such payment is made to Owner or directly to the taxing authority) rather than paying a pro rata share of Real Property Taxes, then the real property taxes for such separately assessed parcel shall be deemed excluded from the definition of Real Property Taxes under this Lease and the square footage of such tenant's premises shall be excluded from the denominator in the immediately preceding paragraph for purposes of computing Tenant's proportionate share of Real Property Taxes.

Tenant will make monthly escrow payments towards its proportionate share of all Real Property Taxes, such amount to be set by Owner. Owner will bill Tenant periodically for its proportionate share of said Real Property Taxes, accompanied by copies of the appropriate tax bills. The total billing for Tenant's proportionate share of Real Property Taxes less the amount previously paid by Tenant will result in an adjustment whereby Tenant will either receive a credit equivalent to the excess of Real Property Taxes paid which may be deducted by Tenant from the next monthly payment of Real Property Taxes or shall pay the balance due to Owner for additional taxes within ten (10) days of receipt of the bill. The monthly amount to be paid on account will be revised each year by Owner to more closely reflect one twelfth (1/12) of Tenant's share of Real Property Taxes due for the next tax year. Tenant shall, on or before the Possession Date, reimburse Owner for its proportionate share of the then current tax year's Real Property Taxes covering the period from the Possession Date through the end of the then current tax year, together with an amount sufficient to bring current its Real Property Taxes escrow fund as aforesaid. During any year, Owner, from time to time, may revise its estimate of the Real Property Taxes which will be due for that year and the monthly payments to be made by Tenant on account thereof.

For any period for which Taxes are due hereunder which is less than a full calendar year, the allocation of Real Property Taxes shall be further reduced to limit such charge to a corresponding pro rata portion of such year.

For purposes of this Lease, "Real Property Taxes" shall mean all real property taxes and assessments and any other charges and fees which may be levied or assessed by any lawful authority against the land and improvements in the Shopping Center. If due to a change in the method of taxation, any franchise, income, profit tax or any other tax which may be levied against Owner in substitution for or in lieu of any tax which would otherwise constitute a real estate tax, such franchise, income, profit tax or any other tax shall be deemed to be a Real Property Tax for the purpose hereof. ~~Real Property Taxes shall further include any "gross receipts tax" on revenue received from the Shopping Center.~~ Also included in real estate taxes shall be any taxes charged to Owner or the Shopping Center pursuant to any cross easements or other similar agreements affecting the Shopping Center. If the Real Property Taxes are increased because of Tenant's improvements, use or occupancy, either prior to or during the term of the Lease, then Tenant shall be responsible for one hundred percent (100%) of such increase.

Tenant further covenants that if this Lease is terminated by reason of default on its part, or if it fails to take possession of its leased premises for any reason, that it shall remain liable to pay such share of such Real Property Taxes. Tenant agrees that this is not to be construed as a penalty.

Included above in Real Property Taxes shall be any and all expenses incurred by Owner, at its discretion, in reducing or maintaining the existing level of such tax obligations to the taxing authorities.

For the purposes of this agreement, the periods applicable to the payment of Real Property Taxes shall be determined at Owner's sole discretion to be either on the basis of the calendar year in which Owner pays the taxes or the period as may be stated within the tax bill. The selected method will be applied consistently during the term of the Lease.

For the first partial calendar year for which Taxes are due under this Lease, Tenant will pay its pro rata share of the Real Property Taxes as provided for in this SECTION for the entire year multiplied by a fraction consisting of the number of days in the calendar year for which Tenant is responsible for the Taxes, divided by the number of days in that calendar year.

**ARTICLE VI - CONSTRUCTION, ALTERATION, AND CONFIGURATION**

**SECTION 6.01.**          **Changes and Additions to Buildings.**

Owner hereby reserves the right at any time to make alterations or additions to and to build additional stories on the building in which the leased premises are contained and to build adjoining the same. Owner also reserves the right to construct other buildings or improvements in the Shopping Center from time to time and to make alterations thereof or additions thereto and to build adjoining same and to construct parking facilities.

INITIAL   HERE
[signature]   [signature]
OWNER   TENANT

SECTION 6.02.        Configuration of Sh_ _ping Center.

Owner reserves the right in its sole discretion at any time to modify the size, configuration, boundaries and common areas of the Shopping Center, as well as the improvements thereon.

ARTICLE VII - CONDUCT OF BUSINESS BY TENANT

SECTION 7.01.        Use of the Leased Premises.

Tenant shall use the leased premises solely for the purpose of conducting the business of: **a group personal training fitness studio with ancillary retail sales of related nutritional, food, beverage and clothing items**

and for no other purpose whatsoever.

Tenant shall occupy the leased premises provided for in SECTION 1.01 hereof, and shall conduct continuously in the entirety of the leased premises the business above stated. Tenant will not use or permit, or suffer the use of the leased premises for any other business or purpose. Tenant shall not conduct catalogue sales in or from the leased premises except of merchandise which Tenant is permitted to sell "over the counter" in or at the leased premises pursuant to the provisions of this SECTION. Notwithstanding anything contained in this Lease to the contrary, Tenant's use as hereinabove provided for or occupancy of the leased premises shall not conflict with any exclusive use provisions or any restrictive covenants of any other leases within the Shopping Center.

In the event that Tenant fails to pay rent, vacates and/or abandons the leased premises during the term of this Lease, or fails to take possession and continuously operate its business as stated in this Section and in Section 7.02 below, the whole sum to be paid as rental and additional rental throughout the entire term of this Lease including the Fixed Minimum Rent herein provided for, plus the highest average monthly percentage rental earned during any prior lease year, shall immediately become due and payable. Owner, at its option, may re-enter the leased premises and relet the same and it is expressly agreed that Tenant shall not be entitled to credit for the rents so received until the sum due from Tenant to Owner, including damages, expenses, attorneys' fees, cost of alterations and repairs as herein provided shall have been fully paid, and nothing in this paragraph shall be deemed to have waived any other right or remedy of Owner.

SECTION 7.02.        Operation of Business.
⌐► **two hundred fortieth (240th)**
Tenant hereby covenants and agrees to complete all of Tenant's improvements to the leased premises and to commence normal business operations in the leased premises by no later than the ~~ninetieth (90th)~~ day following the Possession Date (the "Required Opening Date"). If Tenant fails to have commenced normal business operations in the entirety of the leased premises (and to have provided written certification thereof to Owner) by the Required Opening Date for any reason whatsoever, then Tenant shall be in default of the Lease, and, in addition to all other remedies available to Owner under the Lease, if the Commencement Date is subsequent to the Required Opening Date, then Tenant shall be obligated to pay to Owner rent, payable in advance upon the first day of each calendar month, at the rate payable during the first lease year, for each day between the Required Opening Date and the Commencement Date for which Tenant is not open for business to the general public and has not provided the written certification to Owner referred to above.
⌐►**normal business hours of an Orange Theory Fitness.**
Tenant recognizes that the Shopping Center, other occupants and Owner will suffer severe harm if Tenant is not open for business when required under this Lease. Therefore, Tenant shall operate all of the leased premises during the entire term of this Lease with due diligence and efficiency so as to produce all of the gross sales which may be produced by such manner of operation, unless prevented from doing so by causes beyond Tenant's control. Tenant shall open and keep the leased premises fully stocked, staffed, lighted and open for business and shall operate one hundred percent (100%) of the leased premises during the entire term of this Lease. Subject to inability by reason of strikes or labor disputes, Tenant shall carry at all times in the leased premises a stock of merchandise of such size, character and quality as shall be reasonably designed to produce the maximum return to Owner and Tenant. Tenant shall conduct its business in the leased premises during the regular customary days and hours for such type of business in the city or trade area in which the Shopping Center is located, and will keep the leased premises open for business during the ~~same days, nights and hours as the majority of the stores located in the Shopping Center.~~ Tenant shall install and maintain at all times displays of merchandise in the display windows (if any), of the leased premises. Tenant shall keep the display windows and signs, if any, in the leased premises well lighted during the hours from sundown to 11:00 p.m., unless prevented by causes beyond the control of Tenant. Each failure of Tenant to keep the leased premises open for business as herein required shall be deemed a breach of this Lease. Notwithstanding anything in this Lease to the contrary, if Tenant ceases to continuously operate its business in the entirety of the leased premises as required by Section 7.01 and by this Section 7.02 at any time during the term hereof, then ~~(a)~~ the monthly installment of Fixed Minimum Rent shall change to ~~the same amount as would be payable in the case of a holdover under Section 1.05~~ for the remainder of the lease term or until Tenant re-opens and conducts business to Owner's sole satisfaction, ~~and (b) Tenant shall be obligated to pay to Owner, within ten (10) days after demand therefor, an amount equal to (i) all Fixed Minimum Rent and additional rent that would have been payable under this Lease for any period for which Tenant was granted an abatement of rent under this Lease had such abatement not been granted and (ii) all Fixed Minimum Rent that would have been payable between the Possession Date and the Commencement Date had Fixed Minimum Rent been due during such period (assuming Fixed Minimum Rent would have been payable at the rate in effect during the first lease year).~~ The foregoing payments shall be in addition to all other rights and remedies that Owner may have on account of Tenant's failure to continuously operate its business, including the right to declare a default under this Lease, it being hereby acknowledged by Tenant that Owner will suffer damages for Tenant's failure to open and operate Tenant's business, that the actual damages would be difficult to calculate, and that the liquidated damages set forth above represents a fair and reasonable approximation of Owner's actual damages. Tenant further acknowledges that all abatements provided in this Lease are specifically conditioned upon Tenant's covenant to continuously operate its business as required by Section 7.01 and by this Section 7.02 for the entirety of the term hereof.
⌐►**one hundred ten percent (110%) of the Fixed Minimum Rent.**

SECTION 7.03.        Competition.

During the term of this Lease, Tenant shall not directly or indirectly engage in any similar or competing business within a radius of three (3) miles from the outside boundary of the Shopping Center. Tenant shall not perform any acts or carry on any practices which may injure the building or be a nuisance or menace to other tenants in the Shopping Center.

SECTION 7.04.        Storage, Office Space.

Tenant shall warehouse, store and/or stock in the leased premises only such goods, wares and merchandise as Tenant intends to offer for sale at retail at, in, from or upon the leased premises. This shall not preclude occasional emergency transfers of merchandise to the other stores of Tenant, if any, not located in the Shopping Center. Tenant shall use for office, clerical or other non-selling purposes only such space in the leased premises as is from time to time reasonably required for Tenant's business in the leased premises. No auction, fire or bankruptcy sales may be conducted in the leased premises without the previous written consent of Owner.

SECTION 7.05.        Sale of Alcoholic Beverages.

Notwithstanding anything in this Lease to the contrary, if Tenant is permitted to sell alcoholic beverages from the leased premises pursuant to Section 7.01 above, then Tenant's right to sell such alcoholic beverages shall be specifically conditioned on Tenant first satisfying the following conditions; (i) Tenant shall obtain all governmental and other licenses, permits and approvals required for the sale of alcoholic beverages from the leased premises at its sole cost and expense; and (ii) Tenant shall carry Dram Shop insurance in amounts and with coverages satisfactory to Owner in its sole and absolute discretion and which shall name Owner as an additional insured (and shall provide evidence thereof to Owner's satisfaction). Tenant's insurance carrier shall be a responsible insurance company authorized to do business in the State where the Shopping Center is located and shall have a policy holder rating of no less than "A" in the most current edition of Best's Insurance Report. Tenant hereby indemnifies, defends and holds Owner harmless from and against any and all losses, costs, damages (including consequential damages), expenses (including attorneys' fees and court costs), claims or causes of action directly or indirectly arising out of or related in any way to Tenant's use or occupancy of the leased premises, including but not limited to the sale or distribution of alcoholic beverages on or from the leased premises (sometimes known as Civil Damage Act of Dram Shop Law). Nothing in this Section 7.05 shall be construed to authorize Tenant to sell alcoholic beverages from the leased premises, unless such right is specifically provided for in Section 7.01 above.

{2211907: }

INITIAL HERE

OWNER    TENANT

This Lease shall constitute a security agreement and Tenant hereby grants to Owner a security interest in any liquor or alcoholic beverage license issued by any governmental authority or board (the "Control Board") to Tenant for use at the leased premises and to all renewals, replacements or extensions of such license (each, a "Liquor License"), as collateral security for performance of all of Tenant's obligations and liabilities under this Lease, all in accordance with the provisions of the Uniform Commercial Code in effect in the jurisdiction where the leased premises are located, and the rules and regulations of the Control Board (the "Security Interest"). Tenant hereby authorizes Owner to (i) provide notice of the Security Interest to the Control Board, (ii) file financing statements in order to perfect the Security Interest, and (iii) file any financing statement amendments and/or continuation statements in order to maintain the perfection of the Security Interest. The Security Interest shall remain in effect throughout the entire term of this Lease, and any subsequent extension, replacements, and/or renewal terms of this Lease.

The Liquor License shall be available for use only at the leased premises and may not be transferred to any other location without the prior written consent of Owner, which consent Owner may withhold at its sole discretion. Tenant shall cause the Liquor License to be maintained in full force and effect and in good standing at all times throughout the term of this Lease and shall comply with any and all rules, regulations and requirements of the Control Board. Tenant shall pay in a timely manner all fees and assessments in connection with the Liquor License, shall pay in a timely manner all taxes that may in any way interfere with the Liquor License, its renewal or transfer, and shall operate its business in such a manner so as to not jeopardize the Liquor License. Failure of Tenant to comply with the provisions of this Section 7.05 shall constitute a default under this Lease. Tenant hereby indemnifies, defends and saves harmless Owner, and its agents, from and against any and all loss, cost, damage, liability, expense (including attorneys' fees), cause of action and suits, arising out of or in connection with, Tenant's operations under authority of the Liquor License.

Upon the expiration or earlier termination of the term of this Lease Tenant, at its sole cost and expense, shall take all action required to promptly assign and transfer over to Owner or, at Owner's option, Owner's designee, all of Tenant's right, title and interest in the Liquor License, including without limitation taking all measures necessary to obtain any governmental or administrative approvals required in connection with such assignment and transfer, and shall turn over physical possession of the Liquor License to Owner. Tenant shall execute such additional instruments as may be required to give effect to the transfer to Owner of the Liquor License, including, without limitation, instruments of conveyance of ownership of the Liquor License, all at no expense to Owner.

## ARTICLE VIII - OPERATION OF CONCESSIONS

**SECTION 8.01.**          **Consent to Owner.**

Tenant shall not permit any business to be operated in or from the leased premises by any concessionaire or licensee without the prior written consent of Owner.

## ARTICLE IX - SECURITY DEPOSIT

**SECTION 9.01.**          **Amount of Deposit.**

Tenant, contemporaneously with the execution of this Lease, shall deposit with Owner the sum of **Eleven Thousand Six Hundred Sixty Six and 66/100** Dollars ($**11,666.66**). Said deposit shall be held by Owner, without liability for interest, as security for the faithful performance by Tenant of all of the terms, covenants, and conditions of this Lease by said Tenant to be kept and performed during the term hereof. If at any time during the term of this Lease any of the rent herein reserved shall be overdue and unpaid, or any other sum payable by Tenant to Owner hereunder shall be overdue and unpaid, then Owner may, at the option of Owner (but Owner shall not be required to), appropriate and apply any portion of said deposit to the payment of any such overdue rent or other sum.

**SECTION 9.02.**          **Use and Return of Deposit.**

In the event of the failure of Tenant to keep and perform any of the terms, covenants and conditions of this Lease to be kept and performed by Tenant, then Owner at its option may appropriate and apply said entire deposit, or so much thereof as may be necessary, to compensate Owner for loss or damage sustained or suffered by Owner due to such breach on the part of Tenant. Should the entire deposit, or any portion thereof, be appropriated and applied by Owner for the payment of overdue rent or other sums due and payable to Owner by Tenant hereunder, then Tenant shall, upon the written demand of Owner, forthwith remit to Owner a sufficient amount in cash to restore said security to the original sum deposited, and Tenant's failure to do so within five (5) days after receipt of such demand shall constitute a breach of this Lease. Should Tenant comply with all of said terms, covenants and conditions and promptly pay all of the rental herein provided for as it falls due, and all other sums payable by Tenant to Owner hereunder, the said deposit shall be returned in full to Tenant at the end of the term of this Lease, or upon the earlier termination of this Lease.

**SECTION 9.03.**          **Transfer of Deposit.**

Owner may deliver the funds deposited hereunder by Tenant to the purchaser of Owner's interest in the leased premises, in the event that such interest be sold and thereupon Owner shall be discharged from any further liability with respect to such deposit.

## ARTICLE X - PARKING AND COMMON USE AREAS AND FACILITIES

**SECTION 10.01.**          **Control of Common Areas by Owner.**

All automobile parking areas, driveways, entrances and exits thereto, and other facilities furnished by Owner in or near the Shopping Center, including employee parking areas, the truck way or ways, loading docks, package pick-up stations, pedestrian sidewalks and ramps, landscaped areas, exterior stairways, first-aid stations, comfort stations and other areas and improvements provided by Owner for the general use, in common, of tenants, their officers, agents, employees and customers, shall at all times be subject to the exclusive control and management of Owner, and Owner shall have the right from time to time to establish, modify and enforce reasonable rules and regulations with respect to all facilities and areas mentioned in this ARTICLE. Owner shall have the right to construct, maintain and operate lighting facilities on all said areas and improvements; to police the same; from time to time to change the area, level, location and arrangement of parking areas and other facilities herein above referred to; to restrict parking by tenants, their officers, agents and employees to employee parking areas; ~~to enforce parking charges (by operation of meters or otherwise)~~ to close all or any portion of said areas or facilities to such extent as may, in the opinion of Owner's counsel, be legally sufficient to prevent a dedication thereof or the accrual of any rights to any person or the public therein; to close temporarily all or any portion of the parking areas or of facilities; to discourage non-customer parking; and to do and perform such other acts in said areas and improvements as, in the use of good business judgment, Owner shall determine to be advisable with a view to the improvement of the convenience and use thereof by Tenant, its officers, agents, employees and customers. Owner will operate and maintain the common facilities referred to above in such manner as Owner, in its sole discretion, shall determine from time to time. Without limiting the scope of such discretion, Owner shall have full right and authority to employ all personnel and to make all rules and regulations pertaining to and necessary for the proper operation and maintenance of the common areas and facilities. **Notwithstanding the foregoing, Owner will make a reasonable effort to minimize interference with Tenant's ability to operate.**

**SECTION 10.02.**          **License.**

Notwithstanding anything in this Lease to the contrary, all common areas and facilities not within the leased premises, which Tenant may be permitted to use and occupy, are to be used and occupied under a revocable license, and if such areas shall be modified or the amount of such areas be diminished, Owner shall not be subject to any liability nor shall Tenant be entitled to any compensation or diminution or abatement of rent, nor shall such diminution of such areas be deemed constructive or actual eviction. **Notwithstanding the foregoing, Owner will ensure that parking will at all times be sufficient to meet the lesser of: (i) current municipal code, or (ii) the number of spaces required under a pre-existing, non-conforming use/code.**

INITIAL          HERE

OWNER          TENANT

### ARTICLE XI - COST OF MAINTENANCE OF COMMON AREAS

**SECTION 11.01.**          **Tenant's Payments.**

Commencing on the Possession Date and continuing throughout the entire term of this Lease, Tenant shall pay to Owner as additional rent, Tenant's proportionate share of Common Charges for each year or portion thereof. Tenant's proportionate share of Common Charges shall be equal to a fraction, the numerator of which being equal to the floor area of the leased premises and the denominator of which being equal to the total ~~leased~~ first floor area, ~~minus the first floor area of the tenant with the largest first floor,~~ of the Shopping Center. Notwithstanding anything in this Article XI to the contrary, if any tenant of the Shopping Center pays directly for any particular service or cost that is a component of Common Charges within the Shopping Center (whether such payment is made to Owner or directly to any third party service provider) rather than paying a pro rata share of the cost of such component of Common Charges, then, with respect to such particular component of Common Charges only, the amount expended by such tenant shall be excluded from the definition of Common Charges under this Lease and the square footage of such tenant's premises shall be excluded from the denominator in the immediately preceding sentence for purposes of computing Tenant's proportionate share of such component of Common Charges. Floor area shall be measured to the exterior faces of all exterior walls and internal corridors, including any fire corridors, and to the center line of demising walls.
→ **(such reserves to be applied towards the replacement and improvement of the existing Shopping**

**SECTION 11.02.**          **Definition of Common Charges.**          **Center and common areas)**

"**Common Charges**" shall mean all costs and expenses incurred by Owner or Owner's employees, agents or contractors, either pursuant to this Lease or otherwise, arising from or in connection with or as a result of the operating, equipping, policing, protecting, lighting, heating, air conditioning, providing sanitation, sewer, fire protection and other services, improving, insuring, maintaining, repairing and replacing the common areas and, all buildings and improvements within the Shopping Center. Common Charges shall include, but shall not be limited to: (i) the maintenance, repair, painting and replacement of all roofs, exterior walls and other structural and exterior portions of the Shopping Center, curbs, gutters, sidewalks, pylons and signs, drainage and irrigation ditches, conduits and pipes, utility systems (permanent and temporary), sewage disposal or treatment systems, public toilets and sound systems whether within or without the Shopping Center; (ii) the removal of trash, snow and ice; (iii) landscaping; (iv) supplies; (v) licensing, permits, management fees, service and usage charges; (vi) all insurance carried by Owner and the cost of any insured event deductible amounts under such insurance policies; (vii) the settlement or disposition of any claims against Owner to the extent the same are not covered by insurance; (viii) ~~all capital expenditures together with~~ reserves for capital improvements; (ix) the repaving, replacing, restriping, regrading and general maintenance of parking areas; (x) compliance with all laws, rules, regulations and orders of governmental authorities pertaining to the Shopping Center including those pertaining to traffic control, engineering and environmental issues, the American with Disabilities Act and any engineering, design and legal expenses related thereto, air pollution control and the cost of monitoring air quality; (xi) any environmental cleanup undertaken by Owner whether or not the same is pursuant to any rule, regulation or order of governmental authority; (xii) personal property taxes; (xiii) licensing and permit fees and taxes; (xiv) costs and expenses of enforcing the rules and regulations established by Owner for the Shopping Center; (xv) the cost, lease payment or depreciation of any equipment used in the operation or maintenance of the Shopping Center; (xvi) total compensation and benefits (including premiums for worker's compensation or any other insurance or other retirement or employee benefits, and including all costs incurred in providing such benefits paid to or on behalf of employees otherwise providing service to tenants or customers of the Shopping Center whether on or off site including compensation paid for the promotion of the Shopping Center by any employee or independent contractor; (xvii) the maintenance, repair and operation of any mall or enclosed common area; (xviii) the costs of performance or all of Owner's obligations pursuant to this Lease or as contemplated herein; (xix) travel costs incurred during any inspections of the Shopping Center; (xx) any amounts charged to Owner or the Shopping Center pursuant to any cross-easement or other similar agreements affecting the Shopping Center; (xxi) any costs or expenses incurred by or allocable to Owner or the Shopping Center pursuant to any cross easements, maintenance or other similar agreements between Owner and owner(s) with properties adjacent to the Shopping Center, whether any such maintenance is conducted by Owner or such other Owner; (xxii) all accounting or legal fees, (xxiii) costs of renovating or otherwise improving space for new tenants or in renovating space vacated by any tenant or any other similar work which Owner performs for any tenant; (xxiv) bank charges, offices expenses and reasonable allocation of salaries of the management company; (xxv) all other costs and expenses incurred in connection with the operation and management of the Shopping Center; plus (xxvi) the amount equal to five percent (5%) of the total annual gross revenue of the Shopping Center during each lease year ~~and an amount equal to fifteen percent (15%) of all the foregoing costs and expenses~~ to compensate Owner for administrative and overhead expenses. Common Charges shall include costs and expenses for services, equipment or materials furnished by Owner or its affiliates, including management fees, provided the same are furnished at rates similar to those generally paid.

**SECTION 11.03.**          **Estimated Payments.**

On or before the first day of each calendar month, Tenant shall pay Owner an amount equal to one twelfth (1/12) of the estimated Common Charges (as determined by Owner) for the calendar year in which such payment is made. Owner shall provide Tenant with a statement setting forth the amount due from Tenant on account, the Common Charges for the preceding calendar year and the amount of estimated Common Charges paid by Tenant during such year. If the amount due from Tenant exceeds the amount of the estimated payments, Tenant shall pay the difference to Owner within ten (10) days of the receipt of such statement. If the amount of estimated payments exceeds the amount due, Owner shall credit such difference to the next installment or installments of estimated payments due under this SECTION. Tenant shall have twelve (12) months after receiving notice to apply such credit to amounts owed or such credit shall become null and void. Tenant shall have the right to examine vouchers, bills and supporting data at Owner's office to determine the accuracy of such statements submitted by Owner pursuant to this paragraph for a period of 180 days after the statement is sent by Owner. Tenant's failure to give Owner written notice of any objection to the statement within such 180-day period shall constitute a waiver of any objection or inquiry Tenant may have about the statement and a waiver of any right to examine Owner's records with respect to the time period covered by such records. During any year, Owner, from time to time, may revise its estimate of the Common Charges which will be due for that year and the monthly payments to be made by Tenant on account thereof, in which event Tenant shall thereafter make monthly payments on account of Common Charges in the amount specified in such estimate.

### ARTICLE XII - SIGNS, AWNINGS, CANOPIES, FIXTURES, ALTERATIONS

**SECTION 12.01.**          **Installation by Tenant.**   **(Continued in the Rider to the Lease)**

All fixtures installed by Tenant shall be new or completely reconditioned. Tenant shall not make or cause to be made any alterations, additions or improvements or install or cause to be installed any trade fixture, exterior signs, floor covering, interior or exterior lighting, plumbing fixtures, shades or awnings or make any changes to the store front (any such work being referred to herein as "Tenant Improvements") without first obtaining Owner's written approval and consent. Any such Tenant Improvements which Owner permits Tenant to make shall be made: (a) in a good, workmanlike, first-class and prompt manner; (b) using new materials only; (c) by properly licensed contractors, general contractors and construction managers (hereinafter referred to as "Contractors") approved in writing by Owner and in accordance with plans and specifications approved in writing by Owner; (d) in accordance with legal requirements (including, without limitation, the obtaining of all necessary permits and licenses) and requirements of any insurance company insuring the Shopping Center; (e) after obtaining a workmen's compensation insurance policy approved in writing by Owner; (f) after delivering to Owner written, unconditional waivers of mechanics' and materialmen's liens against the leased premises and the Shopping Center from all proposed Contractors, subcontractors, laborers and material suppliers for all work and materials in connection with such work, and (g) in compliance with such other requirements as Owner might impose. ~~In addition, at Owner's option and within ten (10) days after Owner's delivery of notice thereof to Tenant, Tenant shall post a performance bond or letter of credit in the amount of the value of Tenant Improvements, which value shall be as determined by Owner. The performance bond or letter of Credit shall name Owner as a beneficiary and the form and substance of the performance bond or letter of credit shall be subject to Owner's written approval prior to the commencement of any Tenant Improvements.~~ If Owner determines that Tenant Improvements are not being properly performed (which may include but not be limited to their timeliness and quality), such failure shall constitute a default of this Lease. If Tenant fails to cure any such default within ten (10) days after written notice thereof is delivered to Tenant, Owner may, in addition to exercising its default remedies specified elsewhere in this Lease, do one or more of the following: (i) by written notice to Tenant require that Tenant and its Contractors immediately cease work, (ii) take over the performance of the Tenant Improvements and engage the necessary contractors and construction experts to perform the Tenant Improvements and in such an event Tenant shall reimburse Owner all such costs Owner may thereby incur, and/or (iii) Owner may draw upon any posted performance bond or letter of credit. If any lien (or a petition to establish a lien) is filed in connection with any Tenant Improvements, then such lien (or petition) shall be discharged by Tenant at Tenant's expense within ten (10) days thereafter by the payment thereof or filing of a bond acceptable to Owner. Owner's consent to the making of any Tenant Improvements shall be deemed not to constitute Owner's consent to subject its interest in the leased premises or the Shopping Center to liens which may be filed in connection therewith. If Tenant elects to install a new storefront, the framing of the storefront shall be constructed of brown anodized aluminum. Tenant shall present to Owner plans and specifications for such work at the time approval is sought. Tenant shall install, at its expense, an identification sign on the facade in front of the leased premises during the term of the Lease in accordance with the specifications listed on Exhibit "B" attached hereto and made a part hereof (the "Building Sign"). Tenant agrees, within twenty (20) days of receiving notice from Owner, to change the color(s) of its Building Sign (which may include the sign face and/or internal lighting components) to the color(s) set forth in Owner's notice. In the event Owner wishes to perform any repairs or maintenance to the facade of the Shopping Center that necessitates the removal of the Building Sign, Tenant, at its

| INITIAL | HERE |
|---|---|
| OWNER | TENANT |

sole cost and expense shall immediately remove such sign upon Owner's request and shall immediately re-install such sign when Owner has completed such repairs or maintenance; or, at Owner's option, Owner shall have the right to remove, store, reinstall and make such repairs to the Building Sign as may be necessitated as a result of such removal, storage and reinstallation, all at the Tenant's expense. Upon expiration of this Lease or earlier termination thereof, Tenant shall remove its Building Sign and repair any damage to the façade to the sole satisfaction of Owner.

**SECTION 12.02.          Removal and Restoration by Tenant.**
and

All trade fixtures, equipment, alterations, decorations, additions and improvements made by Tenant, or made by Owner on Tenant's behalf by agreement under this Lease, shall remain the property of Tenant for the term of this Lease, or any extension or renewal thereof. Such trade fixtures, equipment, alterations, decorations, additions and improvements shall not be removed from the premises prior to the end of the term hereof without consent in writing from Owner. Upon expiration of this Lease or any renewal term thereof, Tenant shall remove all such trade fixtures, equipment, alterations, decorations, additions and improvements, and restore the leased premises as provided in SECTION 13.03 hereof. If Tenant fails to remove such trade fixtures, equipment, alterations, decorations, additions and improvements and restore the leased premises, then upon the expiration of this Lease or any renewal thereof, and upon Tenant's removal from the leased premises, all such trade fixtures, equipment, alterations, decorations, additions and improvements shall become the property of Owner.

Owner shall grant Tenant a license during the term of this Lease to use any furniture, fixtures, equipment and inventory which are located in the leased premises on the date Owner delivers the leased premises to Tenant ("Products"), upon and subject to the following conditions and limitations: (i) the Products shall remain the property of Owner throughout the term of this Lease and, upon the lease expiration or termination, Tenant shall leave the Products in the leased premises in good condition and repair; (ii) the use of the Products is subject to any liens or claims made by former tenants or lenders; (iii) Tenant accepts the Products in their "as is/where is" condition as of the date Owner delivers possession of the leased premises to Tenant with no warranties or representations; (iv) Tenant is required to pay any expenses related to the Products, including but not limited to any personal property or use taxes, preventative maintenance and upkeep and the cost to insure; (v) If any item of the Products becomes out of repair or obsolete, Tenant shall immediately replace such item of the Products with a replacement item of equal or better quality and any such replacement item shall be considered part of the Products and shall be deemed the property of Owner; and (vi) If any item(s) of the Products is not left in the leased premises in such condition, Owner may repair or replace such items at Tenant's sole cost and expense. In the event any former tenant or any lender removes any of the Products from the leased premises, Tenant shall have no claim against Owner in connection therewith and Tenant's obligations hereunder shall be unaffected.

**SECTION 12.03.          Tenant Shall Discharge all Liens.**

Tenant shall promptly pay all contractors and materialmen, so as to minimize the possibility of a lien attaching to the leased premises, and should any such lien be made or filed, Tenant shall bond against or discharge the same within ten (10) days after written request by Owner. Tenant authorizes Owner at any time during the term of this Lease, or anytime thereafter in the event of a Tenant default, or during any extensions thereof, to obtain a consumer report ("Credit History") of Tenant from a consumer reporting agency ("Credit Bureau") or any other credit source. If Tenant becomes in default of this Lease or fails to pay any rent, additional rent, percentage rent or any other charges hereunder, Owner reserves the right to obtain a Credit History.

**SECTION 12.04.          Signs, Awnings and Canopies.   (Continued in the Rider to the Lease)**

Tenant will not place or suffer to be placed or maintained on any exterior door, wall, common use areas or window of the leased premises any sign, awning or canopy, or advertising matter or other thing of any kind, and will not place or maintain any decoration, lettering or advertising matter on the glass of any window or door of the leased premises without first obtaining Owner's written approval and consent. Tenant further agrees to maintain such sign, awning, canopy, decoration, lettering, advertising matter or other thing, as may be approved, in good condition and repair at all times.

**ARTICLE XIII - MAINTENANCE OF LEASED PREMISES**

**SECTION 13.01.          Maintenance by Tenant.**

Tenant shall at all times keep the leased premises (including, but not limited to, maintenance of exterior entrances, all glass and show window moldings, exterior and interior signs) and all partitions, doors, fixtures, equipment and appurtenances thereof (including, but not limited to, lighting, heating and plumbing fixtures, fire protection devices, escalators, elevators, and heating, ventilating and any air conditioning systems, hereinafter referred to as "HVAC") in good order, condition and repair, (including, but not limited to, reasonably periodic painting as determined by Owner), except for structural portions of the leased premises, which shall be maintained by Owner, but if Owner is required to make repairs to structural portions by reason of Tenant's negligent acts or omission to act, Owner may add the cost of such repairs to the rent which shall thereafter become due. Tenant shall be responsible for replacement of any of the aforesaid items, fixtures and equipment. Tenant agrees to sweep and clean, and remove snow and ice from the sidewalk and any handicapped ramps in front of the leased premises. If Tenant prepares food in the leased premises, Tenant shall install grease catching equipment, which must be approved by Owner, on all plumbing, exhaust, and HVAC units serving the leased premises. Tenant shall keep the grease catching equipment in good operating condition and shall maintain, repair or replace the equipment upon Owner's request. Tenant shall be solely responsible for any roof or structural damage resulting from Tenant's occupancy. Tenant shall be responsible for the maintenance, replacement and repair of all undercanopy lights in front of the leased premises. Tenant shall, at all times during the term of this Lease have and keep in force maintenance contract(s), in form and with a contractor approved by Owner, providing for inspection, maintenance, and repair or replacement as necessary, at intervals determined by Owner, but in no event shall said intervals be less than quarterly, for all equipment (including, but not limited to, plumbing, electrical, and HVAC). Tenant shall send to Owner a copy of all contracts within 30 days of the Possession Date, and annually thereafter or at anytime upon request of Owner. The contracts referred to herein shall be in such form and style and contain such details and breakdown as Owner may reasonably determine or require. Tenant shall pay a Two Hundred Dollar ($200.00) late submission fee for each month that Tenant has not furnished to Owner a copy of any such contract by the due date listed above. Such fee shall continue to accrue monthly at the rate as listed above until such time as Tenant shall have furnished such contract to Owner.
be deemed to be in default of the Lease if

**SECTION 13.02.          Maintenance by Owner.**

If Tenant refuses or neglects to repair property as required hereunder and to the reasonable satisfaction of Owner as soon as reasonably possible after written demand, Owner may make such repairs without liability to Tenant for any loss or damage that may occur to Tenant's merchandise, fixtures or other property or to Tenant's business by reason thereof, and upon completion thereof, Tenant shall pay Owner's costs for making such repairs plus twenty percent (20%) for overhead, upon presentation of a bill therefor, as additional rent. **(Continued in the Rider to the Lease)**

**SECTION 13.03.          Surrender of Premises. (Continued in the Rider to the Lease)**

At Owner's request, at the expiration of the tenancy hereby created, Tenant shall surrender the leased premises in a vanilla shell condition as described herein. All interior partition walls removed except for the restrooms; tape, mud and float walls to repair any damage, fire caulk, sand and paint all walls white; strip all floor coverings down to the concrete slab and float all floors to a smooth level concrete finish which is ready for final floor preparation; HVAC unit(s) and all components thereof to be in good working order to Owner's sole satisfaction and code compliant; all electric, gas and water services and all components thereof to be in good working order to Owner's sole satisfaction and code compliant; if leased premises currently has a drop ceiling, all damaged or water stained tiles are to be replaced; all light fixtures and sprinkler heads to be fully operational and code compliant. In the event Owner determines the HVAC unit(s) are not surrendered in good working order or had not been replaced in compliance with Section 13.01 hereof, Tenant shall be required, at Owner's sole cost and expense, to replace said HVAC unit(s) with new commercial grade HVAC unit(s) of equal or greater cooling and heating capacity. Notwithstanding the foregoing, in the event Tenant occupies the leased premises for more than five (5) calendar years, Tenant shall be required to replace the HVAC unit(s) to the leased premises with new commercial grade HVAC unit(s) of equal or greater cooling and heating capacity within sixty (60) days of the Termination Date of the Lease, unless said HVAC unit(s) had already been replaced within three (3) years prior to the Termination Date. If Tenant fails to leave the leased premises in a vanilla shell condition (as required by the previous three (3) sentences) as of the expiration or earlier termination of the term hereof, then, at Owner's option, Tenant shall be treated as a holdover tenant (subject to the terms of Section 1.05 hereof) until the date that Tenant has completed any work necessary to return the leased premises to the required vanilla shell condition and has provided written notice

INITIAL          HERE

OWNER          TENANT

thereof to Owner. Notwithstanding the foregoi_ _wner shall have the right, but not the obligation, at any time after the expiration or earlier termination of the term hereof, to perform on Tenant's behalf the work necessary to restore the leased premises to the required vanilla shell condition, in which event Tenant shall reimburse Owner for all such expenses within ten (10) days after demand therefor. Tenant shall surrender all keys for the leased premises to Owner at the place specified by Owner and shall inform Owner of all combinations on locks, safes and vaults, if any, in the leased premises. At Owner's request, Tenant shall remove all its trade fixtures and any alterations or improvements as provided in SECTION 12.02 hereof, before surrendering the leased premises as aforesaid and shall repair any damage to the leased premises caused thereby. Tenant's obligation to observe or perform this covenant shall survive the expiration or other termination of the term of this Lease. It is agreed and understood that Owner has the right to make such requests before or after the expiration or earlier termination of the term of this Lease.

In the event that Tenant obtains one or more liquor licenses in connection with its business operations at the leased premises, then Tenant shall maintain such liquor licenses in good standing throughout the term of this Lease and shall comply with any and all rules, regulations and requirements of any applicable authorities in connection therewith. Upon the expiration or earlier termination of the term of this Lease, Tenant shall assign and transfer over to Owner or, at Owner's option, Owner's designee, all of Tenant's right, title and interest in any such liquor licenses and shall turn over physical possession of any such licenses to Owner. In addition, Tenant shall, at Tenant's expense, take all measures necessary to obtain any governmental or administrative approvals required in connection with such assignment and transfer.

**SECTION 13.04.          Rules and Regulations.**

The rules and regulations appended to this Lease are hereby made a part of this Lease, and Tenant agrees to comply with and observe the same. Tenant's failure to keep and observe said rules and regulations shall constitute a breach of the terms of this Lease in the manner as if the same were contained herein as covenants. Owner reserves the right from time to time to amend or supplement said rules and regulations and to adopt and promulgate additional rules and regulations applicable to the leased premises and the Shopping Center. Notice of such additional rules and regulations, and amendments and supplements, if any, shall be given to Tenant, and Tenant agrees thereupon to comply with and observe all such rules and regulations, and amendments thereto and supplements thereof.

**ARTICLE XIV - INSURANCE AND INDEMNITY**

**SECTION 14.01.          Tenant's Insurance.**

Commencing on the Possession Date and continuing throughout the entire term of this Lease, Tenant shall maintain broad form comprehensive general liability insurance with respect to the leased premises, as well as the sidewalks in front of same, and the business operated by Tenant and any subtenants of Tenant in the leased premises in minimum amounts carried by prudent tenants engaged in similar operations, but in no event in an amount less than $2,000,000.00 combined single limit per occurrence. Such liability insurance shall be written on an occurrence basis and shall include contractual liability coverage. Tenant shall also maintain an all risk full replacement cost property insurance policy covering all of Tenant's personal property, trade fixtures, equipment and inventory, with coverage including, but not limited to, business personal property, business interruption covering loss of revenues, sprinkler leakage, boiler, mechanical breakdown, tenant's improvements and betterments, inventory and plate glass. Tenant's property insurance shall also cover, on a full replacement cost basis, all leasehold improvements in the leased premises (regardless of whether installed by Owner or Tenant), including but not limited to any partitions, non-demising walls, and other leasehold improvements. The policy or policies shall name Owner, any person, firms, or corporations designated by Owner, and Tenant as insured, and shall contain a clause that the insurer will not cancel or change the insurance without first giving Owner at least thirty (30) days prior written notice. The insurance shall be placed only with responsible insurance carriers (i) which have a rating equal to or exceeding "A" in the most current edition of Best's Insurance Guide, (ii) which are authorized to do business in the State in which the leased premises is located and (iii) which have been approved by Owner in advance. Owner reserves the right from time to time to require Tenant to obtain higher minimum amounts and/or different types of insurance by providing written notice thereof to Tenant, and tenant shall provide Owner with satisfactory evidence of such additional coverage within ten (10) days after Owner's delivery of notice to Tenant of such requirement. Upon execution of this Lease, and thereafter at least thirty (30) days prior to each policy expiration date, Tenant shall arrange to have its insurance company deliver the insurance policies or certificates thereof to Owner, which policies or certificates must be satisfactory to Owner, together with proof that all premiums have been prepaid for at least one (1) year. Tenant's failure to deliver the policies or certificates shall constitute a default. All policies of insurance required of Tenant shall have terms of not less than one (1) year.

**SECTION 14.02.          Increase in Fire Insurance Premium.**

Tenant agrees that it will not keep, use, sell or offer for sale in or upon the leased premises any article which may be prohibited by the standard form of fire insurance policy. Tenant agrees to pay any increase in premiums for fire and extended coverage insurance that may be charged during the term of this Lease on the amount of such insurance which may be carried by Owner on the leased premises or the building of which they are a part, resulting from the type of merchandise sold by Tenant in the leased premises, whether or not Owner has consented to the same. In determining whether increased premiums are the result of Tenant's use of the leased premises, a schedule, issued by the organization making the insurance rate on the leased premises, showing the various components of such rate, shall be conclusive evidence of several items and charges which make up the fire insurance coverage on the leased premises. Tenant shall comply with all recommendations made by Owner's insurance carrier. In the event Tenant's occupancy causes any increase of premium for the fire, boiler and/or casualty rates on the leased premises or any part thereof above the rate for the least hazardous type of occupancy legally permitted in the leased premises, Tenant also shall pay in such event, any additional premium on the rent insurance policy that may be carried by Owner for its protection against rent loss through fire. Bills for such additional premiums shall be rendered by Owner to Tenant at such times as Owner may elect, and shall be due from, and payable by Tenant when rendered, and the amount thereof shall be deemed to be, and be paid as additional rent.

**SECTION 14.03.          Indemnification of Owner.**
→ while inside the leased premises

Tenant will indemnify, defend and save Owner harmless from and against any and all claims, actions, damages, liability and expense in connection with loss of life, personal injury and/or damage to property arising from or out of any occurrence in, upon or at the leased premises, or the occupancy or use by Tenant of the leased premises or any part thereof, or occasioned wholly or in part by any act or omission of Tenant, its agents, contractors, employees, servants, customers, lessees or concessionaires. In case Owner shall, without fault on its part, be made a party to any litigation commenced by or against Tenant, Tenant shall protect, defend and hold Owner harmless and shall pay all costs, expenses and attorneys' fees incurred or paid by Owner in enforcing the covenants and agreements in this Lease. Tenant shall accept full responsibility for and protect, defend, indemnify and save harmless Owner, its officers, agents and employees from and against any and all claims, actions, suits, losses, damages, liability and expenses of any character including, but not limited to, costs of investigation, remediation, consequential damages, including loss of rent with respect to the leased premises or with respect to any other portion of the Shopping Center, fines or penalties, and legal fees in connection with (but not limited to): loss of life, personal or bodily injury, disease, sickness, mental distress and/or damage to any property (including the loss of use resulting therefrom) or to the environment arising or resulting during or subsequent to the lease term from or out of any conduct, activity, act, omission or operation involving the use, handling, generation, treatment, storage, disposal, other management or release of any hazardous substances or waste at or from the leased premises.

**SECTION 14.04.          Plate Glass.**

Tenant shall replace, at its expense, any and all plate and other glass damaged or broken from any cause whatsoever in and about the leased premises. Tenant shall insure, and keep insured, at its expense, all plate and other glass in the leased premises for and in the name of Owner.

**SECTION 14.05.          Waiver of Subrogation Rights.**

Tenant and all parties claiming under Tenant release and discharge Owner from all claims and liabilities arising from or caused by any casualty or hazard covered or required hereunder to be covered in whole or in part by insurance on the leased premises or in connection with property on or activities conducted on the leased premises, and waive any right of subrogation which might otherwise exist in or accrue to any person on account thereof, and evidence such waiver by endorsement to the required insurance policies.

{2211907: }                    Page 8 of 48



## ARTICLE XV - UTILITIES

**SECTION 15.01.**          **Utility Charges.**

Commencing on the Possession Date and continuing throughout the entire term of this Lease, Tenant shall be solely responsible for and promptly pay all charges for heat, water, gas, electricity, air conditioning or any other utility used or consumed in the leased premises.  Should Owner elect to supply the water, gas, heat, electricity, air conditioning or any other utility used or consumed in the leased premises or if any of the aforesaid utilities  serving the leased premises are not separately metered, Tenant agrees to purchase and pay for the same as additional rent at the rates determined by Owner.  In no event shall Owner be liable for an interruption or failure in the supply of any such utilities to the leased premises.  Tenant shall be responsible for all sewer charges, sewer taxes or sewer rent irrespective of the manner billed or assessed.  At Owners request, Tenant shall, at its expense, install a separate utility service for all utilities serving the leased premises. Tenant shall be responsible for installing and maintaining the utility meters in the leased premises.

## ARTICLE XVI - OFFSET STATEMENT, ATTORNMENT, SUBORDINATION

**SECTION 16.01.**          **Offset Statement.**

From time to time upon five (5) days' prior written notice, Tenant and each subtenant, assignee or occupant of Tenant shall execute, acknowledge and deliver to Owner and any designee of Owner a written statement certifying:  (a) that this Lease is unmodified and in full force and effect (or that this Lease is in full force and effect as modified and stating the modifications); (b) the dates to which rent and any other charges have been paid; (c) that Owner is not in default in the performance of any obligation (or specifying the nature of any default); (d) the address to which notices are to be sent; (e) that this Lease is subject and subordinate to all mortgages affecting the Shopping Center; (f) that Tenant has accepted the leased premises and all work thereto has been completed (or specifying the incomplete work); and (g) such other matters as Owner may request.  Any such statement may be relied upon by any owner of the leased premises, any prospective purchaser of the leased premises or the Shopping Center, the holder or prospective holder of a mortgage affecting the Shopping Center or any other person or entity.  Tenant acknowledges that time is of the essence to the delivery of such statements and Tenant's failure to deliver timely such statements may cause substantial damages resulting from, for example, delays in obtaining financing secured by the premises.

**SECTION 16.02.**          **Attornment.**

Tenant shall, in the event any proceedings are brought for the foreclosure of, or in the event of exercise of the power of sale under any mortgage made by Owner covering the leased premises, attorn to the purchaser upon any such foreclosure or sale and recognize such purchaser as Owner under this Lease.

**SECTION 16.03.**          **Subordination.  (Continued in the Rider to the Lease)**

This Lease is hereby made subject and subordinate to any future or present mortgages.  Tenant agrees to confirm the subordination in a written instrument upon request of Owner.

**SECTION 16.04.**          **Attorney-in-Fact.**

Tenant, upon request of any party in interest, shall execute promptly such instruments or certificates to carry out the intent of SECTIONS 16.01, 16.02 and 16.03 above as shall be requested by Owner.  Tenant hereby irrevocably appoints Owner as attorney-in-fact for Tenant with full power and authority to execute and deliver in the name of Tenant any such instruments or certificates.  If fifteen (15) days after the date of a written request by Owner to execute such instruments, Tenant shall not have executed the same, Owner may, at its option, cancel this Lease without incurring any liability on account thereof, and the term hereby granted is expressly limited accordingly.

## ARTICLE XVII - ASSIGNMENT AND SUBLETTING

**SECTION 17.01.**          **Assignment and Subletting.**
→ **(Continued in the Rider to the Lease)**
Tenant shall not assign this Lease or any interest therein or sublet the leased premises or any portion thereof without the prior written consent of Owner, which consent may be granted or withheld in the sole discretion of Owner, and no permitted assignment or subletting shall relieve Tenant of Tenant's covenants and agreements hereunder.  The consent of Owner to any one assignment or sublease pursuant hereto shall not be deemed to be a waiver of the provisions of this SECTION with respect to any subsequent assignment or sublease.  Each such permitted sublease shall expressly be made subject to the provisions of this Lease.  If Tenant assigns any of its rights and interests under this Lease, the assignee under such assignment shall expressly assume all of the obligations of Tenant hereunder in a written instrument satisfactory to Owner at the time of such assignment.  No assignment or sublease shall relieve Tenant of its obligations hereunder, and all such obligations shall continue in full effect as obligations of a principal and not as obligations of a guarantor or surety to the same extent as though no assignment or subletting has been made.  In the event Tenant shall assign this Lease or sublease the leased premises for rent or other consideration in excess of the rent payable hereunder, Owner shall receive all such excess rent or other consideration as additional rent hereunder.  The assignee or sublessee shall be required to make all payments due to Owner.  Tenant shall, concurrently with the execution and delivery of any such permitted assignment or sublease, deliver a duplicate original thereof to Owner.  A change in the beneficial or record ownership of any class of capital stock of Tenant, a transfer of partnership interests of the beneficial interest in Tenant, and a sale of substantially all of the merchandise on the leased premises to one purchaser shall be treated as and deemed to be an event of assignment of this Lease within the foregoing provisions of this SECTION, if the effect of same shall be to result in a change in management or control of Tenant which shall be subject to the terms hereof.  In the event Tenant seeks to assign this Lease under Section 365 of the Bankruptcy Code or any other provisions relating to the assignment of leases, Owner shall have the option at its sole discretion, to purchase Tenant's interest in this Lease at the same price as is approved by final order of the Bankruptcy Court, for assignment of this Lease.  Tenant further agrees that it will reimburse Owner for Owner's fees and expenses arising out of said assignment and sublet, including reasonable attorneys' fees, whether approved by Owner or not.

**SECTION 17.02.**          **Criteria for Assigning and Subletting.**

Owner has retained the prior right of consent to proposed assignment or sublease for several substantial business and equity reasons which were considerations for this Lease, including, without limitation, the fact that the success and continuation thereof the Shopping Center is directly related to the use and operation of each particular store in the concept of the overall and integrated merchandising scheme of the Shopping Center; the obligations of Owner to mortgages, major tenants, other nearby shopping centers and the public; the direct economic benefits to be derived to Owner in the form of percentage rent based on gross sales, and the reputation and expertise of Tenant.  In evaluating and determining whether or not to consent to a requested assignment or sublease of the leased premises by Tenant, Owner must be satisfied in its sole determination that the criteria elements set forth above must continue to be satisfied and Owner must receive adequate assurance of the financial condition and stability of the proposed assignee, sublease or subtenant ("assignee"); the reputation and expertise of the assignee, the ability and likelihood of payment of rents and other amounts due hereunder including the expectation of percentage rent in amounts no less than that previously received from Tenant and expected to be received in the future based upon increased reasonable sales projection, and such other assurances as Owner requires including those assurances that Owner has the right to receive in accordance with Section 365 (b)(3) of the Bankruptcy Reform Act of 1978.

**SECTION 17.03.**          **Encumbrances.**

Neither this Lease nor any additional term of this Lease shall be mortgaged, pledged or encumbered by Tenant, nor shall Tenant mortgage, pledge or encumber the interest of Tenant in and to any sublease of the leased premises or the rental payable hereunder, without the prior written consent of Owner, which consent may be granted or withheld in the sole discretion of Owner, and Tenant shall not allow or permit any transfer of this Lease or any interest hereunder or operation of law.  Any such mortgage, pledge, encumbrance, sublease or assignment made in violation of this SECTION shall be void.



**SECTION 17.04.**          Corporate Ownership.

If at any time during the term of this Lease any part or all of the corporate shares of Tenant shall be transferred by sale, assignment, bequest, inheritance, operation of law or other disposition so as to result in a change in the present effective voting control of Tenant by the person or persons owning a majority of said corporate shares on the date of this Lease, Tenant shall promptly notify Owner in writing of such change, and such change shall be deemed an assignment of Lease and subject to the terms and conditions of Section 17.01 above.  Owner may terminate this Lease at any time after such change in control by giving Tenant ninety (90) days' prior written notice of such termination.

**SECTION 17.05.**          Franchise Arrangements.

If Tenant is associated with or is part of a franchise or chain operation (the "Franchise"), then, whether or not Tenant is a separate legal entity, Tenant shall fully comply with any agreement governing such Franchise (the Franchise Agreement") and shall remain a part of said Franchise, and the leased premises shall continue to be operated as an integral part of Tenant's Franchise.  Tenant shall not enter into any action which would sever Tenant's business operation from said Franchise.  In the event Tenant receives any notice of default under Tenant's Franchise Agreement, Tenant shall immediately notify Owner thereof.

## ARTICLE XVIII - WASTE, GOVERNMENTAL REGULATIONS

**SECTION 18.01.**          Waste or Nuisance.

Tenant shall not commit or suffer to be committed any waste upon the leased premises or any nuisance or other act or thing which: (i) may disturb the quiet enjoyment of any other tenant in the building in which the leased premises may be located, or in the Shopping Center; or (ii) which may disturb the quiet enjoyment of any person within five hundred (500) feet of the boundaries of the Shopping Center in either case as determined by Owner in Owner's sole discretion.          →reasonably

~~If required by Owner, Tenant agrees to provide at its own cost and expense a Uniformed Security Guard either in and/or outside the leased premises to~~ maintain the necessary supervision of its operation.  It is further understood and agreed that if there are any complaints from other tenants in the Shopping Center or from ~~residents and property owners in the~~ neighborhood, Owner will have the right to cancel this Lease upon thirty (30) days written notice to ~~Tenant and this Lease shall become null and void.~~

**SECTION 18.02.**                    Governmental Regulations.

Tenant shall, at Tenant's sole cost and expense, comply with all of the requirements of all county, municipal, state, federal and other applicable governmental authorities, now in force, or which may hereafter be in force, pertaining to the leased premises, and shall faithfully observe in the use of the leased premises all municipal and county ordinances and state and federal statutes now in force or which may hereafter be in force.

## ARTICLE XIX - ADVERTISING

**SECTION 19.01.**          Change of Name.

Tenant agrees not to change the advertising name of the business operated in the leased premises without the prior written permission of Owner.

**SECTION 19.02.**          Solicitation of Business.

Tenant and Tenant's employees and agents shall not solicit business in the parking or other common areas, nor shall Tenant distribute any handbills or other advertising matter in automobiles parked in the parking area or in other common areas.

## ARTICLE XX - DESTRUCTION OF LEASED PREMISES

**SECTION 20.01.**          Total or Partial Destruction.

If the leased premises or any part thereof are damaged or destroyed by fire or other cause, Tenant shall immediately notify Owner thereof.  If the leased premises are damaged or destroyed by fire or other cause, the damages shall be repaired by the Owner, at its own expense; provided, however, that if Owner determines that any damage or destruction was caused by the act or omission of Tenant or any employee, agent or invitee of Tenant, then Tenant shall pay the amount by which such expenses exceed the net insurance proceeds actually received by Owner on account of such damage or destruction; and provided further, however, that Tenant shall be responsible for any additional expenses incurred by Owner as a result of Tenant's failure to provide immediate notice of any damage or destruction of the leased premises.  Owner shall only be obligated to restore the leased premises to a vanilla shell condition (including the restoration of lighting fixtures, HVAC equipment and dropped ceilings, to extent any of same were in the leased premises prior to the date of the casualty), and Tenant, at Tenant's expense, shall be obligated to make any other required improvements to the leased premises (including but not limited to any partitions, non-demising walls, floor coverings, wall coverings, storefront glass and glazing, exterior and interior doors, restroom fixtures and other leasehold improvements) and any equipment, fixtures, furnishings or decorations.  Owner is not responsible for delays due to settling insurance claims, obtaining estimates, labor and supply problems or any other cause not fully under Owner's control.  Notwithstanding any of the foregoing to the contrary, if more than fifty percent (50%) of the leased premises are rendered untenantable by fire or other cause or a casualty occurs and Owner determines that the repair and restoration of the leased premises will take more than sixty (60) days, Owner shall have and is hereby given the option to terminate this Lease by notifying Tenant in writing thereof within sixty (60) days of the date of the casualty, and, in that event, this Lease shall be deemed to be terminated as of the date of Owner's notice, and payments of Rent and Additional Rent shall be apportioned as of that date.  Notwithstanding anything contained herein to the contrary, Owner shall also have the right, by written notice to Tenant, to terminate this Lease if (a) Owner's insurance is insufficient to pay the full cost of such repair and restoration; (b) the holder of any mortgage encumbering the leased premises fails or refuses to make such insurance proceeds available for such repair and restoration; or (c) zoning or other applicable laws or regulations do not permit such repair and restoration.  If Owner does not elect to terminate this Lease pursuant to the terms of this Article XX and if the leased premises are rendered wholly or partially untenantable as a result of such destruction, then the Fixed Minimum Rent shall partially abate (in proportion to the percentage of the leased premises that has been rendered untenantable) until Owner has substantially completed the restoration, unless such damage or destruction was caused by Tenant or any employee, agent or invitee of Tenant, in which case there shall be no abatement of rent.  ~~Nothing in this Section shall be construed to permit the abatement in whole or in part of the percentage rent, but for the purpose of Section 2.02 hereof, the computation of percentage rent shall be based upon the revised Fixed Minimum Rent as the same may be abated pursuant to this Section.~~

**SECTION 20.02.**          Partial Destruction of Shopping Center.

In the event that fifty percent (50%) or more of the rentable area of the Shopping Center shall be damaged or destroyed by fire or other cause, notwithstanding that the leased premises may be unaffected by such fire or other cause, Owner may terminate this Lease and the tenancy hereby created by giving to Tenant five (5) days prior written notice of its election to do so; which notice shall be given, if at all, within thirty (30) days following the date of said occurrence.  Rent shall be adjusted as of the date of such termination.

## ARTICLE XXI - EMINENT DOMAIN

**SECTION 21.01.**          Total Condemnation of Leased Premises.

If the whole of the leased premises shall be acquired or condemned by eminent domain for any public or quasi-public use or purpose, then the term of this Lease shall cease and terminate as of the date of title vesting in such proceeding and all rentals shall be paid up to that date and Tenant shall have no claim against Owner for the value of any unexpired term of this Lease.  The date of title vesting, whenever used herein shall mean the date in which Owner no longer has use of the facilities which have been condemned or acquired.

{2211907: }          **Page 10 of 48**



INITIAL HERE

OWNER  TENANT

**SECTION 21.02.**          **Partial Condemnation.**

If any part of the leased premises shall be acquired or condemned by eminent domain for any public or quasi-public use or purpose, then Owner, at its option, shall have the right to terminate this Lease by providing written notice thereof to Tenant, in which event this Lease shall cease and terminate as of the date of title vesting in such proceeding. Tenant shall have no claim against Owner for the value of any unexpired term of this Lease and rent shall be adjusted to the date of such termination. In the event of a partial taking or condemnation for which Owner does not so terminate this Lease, then Owner shall promptly restore the leased premises to a condition comparable to its condition at the time of such condemnation, less the portion lost in the taking, and this Lease shall continue in full force and effect without any reduction or abatement of rent.

**SECTION 21.03.**          **Total or Partial Condemnation of Parking Area.**

If whole or part of the parking area in the Shopping Center shall be acquired or condemned by eminent domain for any public or quasi-public use or purpose, then Owner, at its option, shall have the right to terminate this Lease by providing written notice thereof to Tenant. In the event of termination of this Lease as aforesaid, Tenant shall have no claim against Owner nor the condemning authority for the value of any unexpired term of this Lease and rent shall be adjusted to the date of termination specified in Owner's notice.

**SECTION 21.04.**          **Damages.**

All awards, damages and other compensation paid by any applicable governmental or quasi-governmental authority on account of such condemnation shall belong to Owner, and Tenant assigns to Owner all rights to such awards, damages and compensation. Tenant shall not make any claim against Owner or any applicable authority for any portion of such award, damages or compensation attributable to damage to the leased premises, value of the unexpired portion of the term of this Lease, loss of profits or goodwill, leasehold improvements or severance damages. Nothing contained herein, however, shall prevent Tenant from pursuing a separate claim against the applicable authority for the value of furnishings and trade fixtures installed in the leased premises at Tenant's expense and for relocation expenses, provided that such claim is stated separately from any award to Owner and provided further that such claim shall in no way diminish the award, damages or compensation otherwise payable to Owner in connection with such condemnation.

## ARTICLE XXII - DEFAULT OF THE TENANT

**SECTION 22.01.**          **Default.**

An Event of Default shall be deemed to have occurred under this Lease if (i) Owner has not received from Tenant any rental due hereunder within ten (10) days after the same shall be due, or (ii) Tenant or an agent of Tenant shall falsify any report required to be furnished to Owner pursuant to the terms of this Lease, or (iii) Tenant or any guarantor of this Lease shall become bankrupt or insolvent, or file any debtor proceedings or take or have taken against Tenant or any guarantor of this Lease in any court pursuant to any statute either of the United States or of any state a petition in bankruptcy or insolvency or for reorganization or for the appointment of a receiver or trustee of all or a portion of Tenant's or any such guarantor's property, or (iv) Tenant or any such guarantor makes an assignment for the benefit of creditors, or petitions for or enters into an arrangement, or (v) Tenant shall default under or terminate any Franchise Agreement, (vi) Tenant shall discontinue doing its business in the leased premises as defined in SECTION 7.01 of this Lease, or (vii) Tenant shall abandon the leased premises, or suffer this Lease to be taken under any writ of execution, or (viii) Tenant defaults or fails to perform any other of the terms, conditions or covenants of this Lease to be observed or performed by Tenant not specified above in subsections (i) through (vii) of this Section 22.01 for more than ten (10) days after written notice of such default shall have been given to Tenant. **(Continued in the Rider to the Lease)**

**SECTION 22.02.**          **Remedies.**

If an Event of Default shall occur, then the provisions of this Section 22.02 shall apply. The provisions of this Article shall operate as a notice to quit, any other notice to quit or to Owner's intention to re-enter the Premises being expressly waived. ~~Notwithstanding anything in this Lease to the contrary, upon the occurrence of an Event of Default, the monthly installments of Fixed Minimum Rent due thereafter under this Lease shall change to the same amount as would be payable in the case of a holdover under Section 1.05 for the remainder of the stated term of this Lease.~~ Owner, besides other rights or remedies it may have, shall have the immediate right of re-entry using such force as may be necessary, may re-key any locks on any or all doors to the leased premises, and may remove all persons and property from the leased premises and such property may be removed and stored in a public warehouse or elsewhere at the cost of, and for the account of Tenant, all without service of notice or resort to legal process and without being deemed guilty of trespass, or becoming liable for any loss damage which may be occasioned thereby. Should Owner elect to re-enter, as herein provided, or should it take possession pursuant to any legal proceedings or pursuant to any notice provided for by law, it may either terminate this Lease or it may from time to time without terminating this Lease, make such alterations and repairs as may be necessary in order to relet the leased premises or any part thereof for such term or terms (which may be for a term extending beyond the term of this Lease) and at such rental or rentals and upon such other terms and conditions as Owner at its sole discretion may deem advisable; upon each such reletting, all rentals received by Owner from such reletting shall be applied; first, to the payment of any costs and expenses of such reletting, including brokerage fees and attorneys' fees and of costs of such alterations and repairs; second, to the payment of any indebtedness other than rent due hereunder from Tenant to Owner; third, the payment of rent then due and unpaid hereunder; and the residue, if any, shall be held by Owner for its own account. Tenant shall not be entitled to any credit for any rental amounts received by Owner from such reletting that are in excess of the monthly rent that was due by Tenant under this Lease. If such rentals received from such reletting during any month be less than that to be paid during that month by Tenant hereunder, Tenant shall pay any such deficiency to Owner. Such deficiency shall be calculated and paid monthly; provided, however, that Owner shall have the right, at Owner's sole option, to require that Tenant pay the entirety of such anticipated deficiency in a single lump sum, which amount shall be due and payable in full immediately after Owner notifies Tenant that Owner has relet the leased premises and determined the amount thereof. No such re-entry or taking possession of the leased premises by Owner shall be construed as an election on its part to terminate this Lease unless a written notice of such intention be given to Tenant or unless the termination thereof be decreed by a court of competent jurisdiction. Notwithstanding any such reletting without termination, Owner may at any time thereafter elect to terminate this Lease for such previous breach. Whether or not Owner has terminated this Lease for any breach, in addition to any other remedies it may have, Owner may recover from Tenant all damages it may incur by reason of such breach, including the cost of recovering the leased premises, attorneys' fees, and the amount of rent, additional rent and any other charges due, as reserved in this Lease, for the remaining term of this Lease and any extensions thereof, all of which amounts shall be immediately due and payable from Tenant to Owner. Tenant shall also be liable to Owner for (i) all Fixed Minimum Rent and additional rent that would have been payable under this Lease for any period for which Tenant was granted an abatement of rent under this Lease had such abatement not been granted,(ii) all Fixed Minimum Rent that would have been payable between the Possession Date and the Commencement Date had Fixed Minimum Rent been due during such period (assuming Fixed Minimum Rent would have been payable at the rate in effect during the first lease year) and (iii) all tenant improvement costs and repair costs, brokerage fees, attorneys' fees and other out of pocket costs incurred by Owner in connection with entering into this Lease, all of which amounts shall be immediately due and payable from Tenant to Owner. The parties agree that a termination of this Lease by summary ejectment and/or eviction of Tenant by Owner or for any reason that may otherwise cause this Lease to terminate shall not relieve Tenant from any liabilities that would have accrued in the future under this Lease, including rent and other amounts due during the entire term of this Lease as specified herein. More specifically, Tenant agrees that it shall be liable for any and all future rent and other sums due under this Lease for the stated term of this Lease regardless of whether this Lease is terminated early by any process including, but not limited to, summary ejectment or eviction of Tenant or for any other reason that may otherwise cause this Lease to terminate. Whether or not this Lease or Tenant's right of possession of the leased premises is terminated, if an Event of Default shall occur, then, notwithstanding anything in this Lease that may be to the contrary, (i) any renewal, expansion or early termination options shall automatically be nullified and of no further force or effect, and (ii) Owner may grant or withhold any consent or approval pursuant to this Lease in its sole and absolute discretion.

**SECTION 22.03.**          **Governing Law and Jurisdiction.** **(Continued in the Rider to the Lease)**

Owner and Tenant agree that this Lease shall be governed by and construed in accordance with the domestic laws of the State of New York without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of New York.

Owner and Tenant further agree that any action, suit or proceeding arising out of or relating to this Lease, or the parties' relationship arising out of this Lease, shall be adjudicated exclusively in New York State Supreme Court, Monroe County, New York, and the parties expressly, specifically, and irrevocably

INITIAL   HERE

OWNER   TENANT

consent to the personal jurisdiction and venue of such court. Tenant further acknowledges that Tenant transacted business in New York State by entering into this Lease. In the event of an action, suit or proceeding arising out of or relating to this Lease, or the parties' relationship arising out of the Lease, Tenant waives all objections to venue on the grounds of forum non conveniens or for any other reason. Tenant appoints Lynx Development Corporation as its agent for the service of process for any action commenced by Owner.

Notwithstanding anything in the immediately preceding two (2) paragraphs to the contrary, upon Owner's delivery of written notice to Tenant that Owner has relocated Owner's principal office to a jurisdiction other than Monroe County, New York, then, with immediate effect following delivery of such notice (i) this Lease shall be governed by the laws of such jurisdiction, (ii) all references to "New York" in the immediately preceding two (2) paragraphs shall immediately be changed to such jurisdiction, and (iii) the venue for any dispute shall be the State Court located in the County where Owner's new principal place of business is located.

Owner may change, from time to time, the agent for service of process by written notification to Tenant giving the name and address of such new agent and the appointment thereof shall be effective 30 days after the date after receipt by the Tenant of such written notice.

Notwithstanding the foregoing, the parties agree that, solely with respect to actions and or proceedings by Owner seeking possession of the leased premises, including, but not limited to, actions and/or proceedings seeking to evict or eject Tenant, such actions and/or proceedings shall be venued in the jurisdiction in which the leased premises are located and shall be governed by the laws of the state in which the leased premises are located.

**SECTION 22.04.**          **Legal Expense.**

In case suit or demand shall be brought for recovery of possession of the leased premises, for the recovery of rent or any other amount due under the provisions of this Lease, or because of the breach of any other covenant herein contained on the part of Tenant to be kept or performed, Tenant shall pay to Owner all expenses incurred therefor, including attorneys' fees.

**SECTION 22.05.**          **WAIVER OF JURY TRIAL AND COUNTERCLAIMS.**

THE PARTIES HERETO SHALL AND THEY HEREBY DO WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER OF THE PARTIES HERETO AGAINST THE OTHER ON ANY MATTERS WHATSOEVER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS LEASE, THE RELATIONSHIP OF OWNER AND TENANT, TENANT'S USE OR OCCUPANCY OF THE LEASED PREMISES, AND/OR ANY CLAIM OF INJURY OR DAMAGE. IN THE EVENT OWNER COMMENCES ANY PROCEEDINGS FOR NON-PAYMENT OF RENT, FIXED MINIMUM RENT, ~~PERCENTAGE RENT~~ OR ADDITIONAL RENT, TENANT WILL NOT INTERPOSE ANY COUNTERCLAIM OF WHATEVER NATURE OR DESCRIPTION IN ANY SUCH PROCEEDINGS. THIS SHALL NOT, HOWEVER, BE CONSTRUED AS A WAIVER OF TENANT'S RIGHT TO ASSERT SUCH CLAIMS IN ANY SEPARATE ACTION OR ACTIONS BROUGHT BY TENANT.

**SECTION 22.06.**          **Waiver of Rights of Redemption.**

Tenant hereby expressly waives any and all rights of redemption granted by or under any present or future laws in the event of Tenant being evicted or dispossessed for any cause, or in the event of Owner obtaining possession of the leased premises, by reason of the violation by Tenant of any of the covenants or conditions of this Lease, or otherwise.

**SECTION 22.07.**          **Dispute Resolution.**

In the event of an unresolved dispute between Owner and Tenant regarding the performance by either party of an obligation or condition of this Lease, the non-performance of which constitutes a default under this Lease, then Owner may, at its sole option, have the matter referred to an arbitrator for final determination in accordance with the rules of the American Arbitration Association or any successor and both parties agree that the final determination of such arbitrator shall be binding. Pending submission of the matter to arbitration and the arbitrator's final determination, no default shall be deemed to have occurred, and any time limit relative to such default shall commence from the date of the final determination of the arbitrator. This Section shall not, however, prevent Owner from seeking preliminary injunctive relief pending the outcome of such arbitration. Any arbitration shall be venued in Monroe County, New York, and Tenant irrevocably waives the right to challenge said venue on the grounds of forum non conveniens or for any other reason.

**ARTICLE XXIII - ACCESS BY OWNER**

**SECTION 23.01.**          **Right of Entry.**

Owner or Owner's agents shall have the right to enter the leased premises at all times to examine the same, and to show them to prospective purchasers or lessees of the building, and to make such repairs, alterations, improvements or additions as Owner may deem necessary or desirable, and Owner shall be allowed to take all material into and upon the leased premises that may be required therefor without the same constituting an eviction of Tenant in whole or in part and the rent reserved shall in no way abate while said repairs, alterations, improvements or additions are being made, by reason of loss or interruption of business of Tenant, or otherwise. Owner may exhibit the leased premises to prospective tenants or purchasers at any time, and may, during the six (6) months prior to the expiration of the term of this Lease or any renewal or extension term, place upon the leased premises the usual "For Lease" or "For Sale" notices, which notices Tenant shall permit to remain thereon without interference or molestation. If Tenant shall not be personally present to open and permit an entry into the leased premises, at any time, when for any reason an entry therein shall be necessary or permissible, Owner or Owner's agent may enter the same by a master key, or may forcibly enter the same, without rendering Owner of such agents liable therefor, and without in any manner affecting the obligations and covenants of this Lease. Nothing herein contained, however, shall be deemed or construed to impose upon Owner any obligation, responsibility or liability whatsoever, for the care, maintenance or repair of the building or any part thereof, except as otherwise herein specifically provided.

**SECTION 23.02.**          **Excavation.**

If an excavation shall be made upon land adjacent to the leased premises, or shall be authorized to be made, Tenant shall afford to the person causing or authorized to cause such excavation, license to enter upon the leased premises for the purpose of doing such work as Owner shall deem necessary to preserve the wall or the building of which the leased premises form a part from injury or damage and to support the same by proper foundations, without any claim for damages or indemnification against Owner or diminution or abatement of rent.

**ARTICLE XXIV - TENANT'S PROPERTY**

**SECTION 24.01.**          **Taxes on Leasehold.**

Tenant shall be responsible for and shall pay before delinquency all municipal, county or state taxes assessed during the term of this Lease against any leasehold interest or personal property of any kind, owned by or placed in, upon or about the leased premises by Tenant.

**SECTION 24.02.**          **Loss and Damage.**

Owner shall not be liable for any damage to property of Tenant or of others located on the leased premises, nor for the loss of or damage to any property of Tenant or of others by theft or otherwise. Owner shall not be liable for any injury or damage to persons or property resulting from fire, explosion, falling plaster, steam, gas, electricity, water, rain or snow or leaks from any part of the leased premises or from the pipes, appliances or plumbing works or from the roof, street or sub-surface or from any other place or by dampness or by any other cause of whatsoever nature. Owner shall not be liable for any such damage caused by other tenants or persons in the leased premises, occupants of adjacent property, of the Shopping Center, or the public, or caused by operations in construction of any private, public or quasi-public work. Owner shall not be liable for any latent defect in the leased premises or in the building of which they form a part. All property of Tenant kept or stored on the leased premises shall be so kept or stored at the risk of Tenant only and Tenant shall indemnify, defend and hold Owner harmless from any claims by Tenant's insurance carrier.



**SECTION 24.03.**          **Notice by Tenant.**

Tenant shall give immediate notice to Owner in case of any defects, fire or accidents in the leased premises or in the building of which the leased premises are a part.

**ARTICLE XXV - SUCCESSORS**

**SECTION 25.01.**          **Successors.**

All rights and liabilities herein given to, or imposed upon, the respective parties hereto shall extend to and bind the several respective heirs, executors, administrators, successors and assigns of the said parties; and if there shall be more than one Tenant, they shall all be bound jointly and severally by the terms, covenants and agreements herein. No rights, however, shall inure to the benefit of any assignee of Tenant unless the assignment to such assignee has been approved by Owner in writing as provided in SECTION 17.01 hereof.

**ARTICLE XXVI - QUIET ENJOYMENT**

**SECTION 26.01.**          **Owner's Covenant.**

Upon timely payment by Tenant of all rents herein provided, and upon the full and faithful observance and performance of all the covenants, terms and conditions on Tenant's part to be observed and performed, Tenant shall peaceably and quietly hold and enjoy the leased premises for the term hereby demised without hindrance or interruption by Owner or any other person or persons lawfully or equitably claiming by, through or under Owner, subject, nevertheless, to the terms and conditions of this Lease.

**ARTICLE XXVII - LIMITATION ON RIGHT OF RECOVERY AGAINST OWNER**

**SECTION 27.01.**          **Limitation on Right of Recovery Against Owner.**

Tenant acknowledges and agrees that the amount of recovery for any claim by Tenant under this Lease shall be limited to Owner's equity interest in the Shopping Center. Any judgments rendered shall be satisfied solely out of the proceeds of sale by Owner's sale of its equity interest in the Shopping Center, limited as aforesaid. No personal judgment shall lie against Owner upon extinguishment of its rights in the Shopping Center and any judgment so rendered shall not give rise to any right of execution or levy against Owner's assets. The provisions hereof shall inure to Owner's successors and assigns including any mortgagee and its respective directors, officers, principals and stockholders.

**ARTICLE XXVIII - MISCELLANEOUS**

**SECTION 28.01.**          **Waiver.**

The waiver by Owner of any breach of any term, covenant or condition herein contained shall not be deemed to be a waiver of any subsequent breach of the same or any other term, covenant or condition herein contained. The subsequent acceptance of rent hereunder by Owner shall not be deemed to be a waiver of any preceding breach by Tenant of any term, covenant or condition of this Lease, other than the failure of Tenant to pay the particular rental so accepted, regardless of Owner's knowledge of such preceding breach at the time of acceptance of such rent. No covenant, term or condition of this Lease shall be deemed to have been waived by Owner, unless such waiver be in writing by Owner.

**SECTION 28.02.**          **Accord and Satisfaction.**

No payment by Tenant or receipt by Owner of a lesser amount than the monthly rent herein stipulated shall be deemed to be other than on account of the earliest stipulated rent, nor shall any endorsement or statement on any check or any letter accompanying any check or payment as rent be deemed an accord and satisfaction, and Owner may accept such check or payment without prejudice to Owner's right to recover the balance of such rent or pursue any other remedy in this Lease provided.

**SECTION 28.03.**          **Entire Agreement.**

This Lease, the Exhibits and Rider, if any, attached hereto and forming a part hereof, set forth all the covenants, promises, agreements, conditions and understandings between Owner and Tenant concerning the leased premises and there are no covenants, promises, agreements, conditions and understandings, either oral or written, between them other than herein set forth. Except as herein otherwise provided, no subsequent alteration, amendment, change or addition to this Lease shall be binding upon Owner or Tenant unless reduced to writing and signed by them.

**SECTION 28.04.**          **No Partnership.**

Owner does not, in any way or for any purpose, become a partner of Tenant in the conduct of its business, or otherwise, or joint venture or a member of a joint enterprise with Tenant. ~~The provisions of this Lease relating to the percentage rent payable hereunder are included solely for the purpose of providing a method whereby the rent is to be measured and ascertained.~~

**SECTION 28.05.**          **Force Majeure.**

In the event that either party hereto shall be delayed or hindered in or prevented from the performance of any act required hereunder by reason of strikes, lock-outs, labor troubles, inability to procure materials, failure of power, restrictive governmental laws or regulation, riots, insurrection, war or other reason of a like nature not the fault of the party delayed in performing work or doing acts required under the terms of this Lease, then performance of such act shall be excused for the period of the delay and the period for the performance of any such act shall be extended for a period equivalent to the period of such delay. The provisions of this SECTION shall not operate to excuse Tenant from prompt payment of rent, ~~percentage rent,~~ additional rent or any other payments required by the terms of this Lease.

**SECTION 28.06.**          **Notices.**

≯ **2761 Milan St., Easton, PA 18045**

Any notice, demand, request or other instrument which may be or are required to be given under this Lease shall be delivered in person or sent by United States certified mail, postage prepaid return receipt requested or sent by overnight mail by a recognized national carrier and shall be addressed (a) if to Owner at the address first hereinabove given or at such other address as Owner may designate by written notice and (b) if to Tenant at ~~the leased premises~~ (or, at Owner's option, Owner may use the address on file with Owner). Notwithstanding the foregoing provisions: (i) if an option to renew this Lease is provided for herein, and if Tenant wishes to exercise its right to renew such option, it shall do so by sending Owner notice of its intent to renew by United States registered mail; and (ii) in addition to the notification methods set forth above, Owner may send to Tenant via electronic mail (at the email address on file with Owner and in the event Tenant's email address changes from the one on file with the Owner, Tenant agrees to immediately provide Owner with its new email address,) any notice, demand, request or other instrument which may be or is required to be given under this Lease. If Owner chooses to send notice to Tenant via electronic mail, it will be deemed to have been received when the authorized electronic mail agent of the Tenant accepted that email message, with the delivery status of at least "delivered," as stated in the "Receipt" received by Owner. Tenant may not send notice to Owner, via electronic mail.

INITIAL | HERE

OWNER | TENANT

SECTION 28.07.          Captions and Section Numbers.

The captions, section numbers and article numbers appearing in this Lease are inserted only as a matter of convenience and in no way define, limit construe or describe the scope or intent of such sections or articles of this Lease nor in any way affect this Lease.

SECTION 28.08.          Tenant Defined, Use of Pronoun.

The word **"Tenant"** shall be deemed and taken to mean each and every person or party mentioned as Tenant herein, be the same one or more; and if there shall be more than one Tenant, any notice required or permitted by the terms of this Lease may be given by or to any one thereof, and shall have the same force and effect as if given by or to all thereof. The use of the neuter singular pronoun to refer to Owner or Tenant shall be deemed a proper reference even though Owner or Tenant may be an individual, a partnership, a corporation or a group of two or more individuals or corporations. The necessary grammatical changes required to make the provisions of this Lease apply in the plural sense where there is more than one Owner or Tenant and to either corporations, associations, partnerships or individuals, males or females, shall in all instances be assumed as though in each case fully expressed.

SECTION 28.09.          Broker's Commission.

Each of the parties represents and warrants that it has not engaged or dealt with any broker, agent or finder in connection with this Lease and that there are no claims for brokerage commissions or finder's fees in connection with the execution of this Lease, except for __Metro Commercial Real Estate_____("Broker"), and each of the parties agrees to indemnify the other against and hold it harmless from all liabilities arising from any such claim (including, without limitation, the cost of counsel fees in connection therewith). In addition, Tenant represents and warrants that if Tenant so chooses to hire a real estate broker and/or brokerage firm (including Broker) in connection with the exercise of any renewal option granted to Tenant under this Lease or to negotiate any extensions, amendments (including but not limited to an amendment related to an expansion of the leased premises) or renewals to the Lease on Tenant's behalf, then Tenant shall be responsible to reimburse Owner for any and all of the real estate broker's commission that Owner is required to pay, regardless of whether Owner has entered into any direct agreement with such real estate broker and/or brokerage firm (including Broker).

SECTION 28.10.          Partial Invalidity.

If any term, covenant or condition of this Lease or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Lease, or the application of such term, covenant or condition to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby and each term, covenant or condition of this Lease shall be valid and be enforced to the fullest extent permitted by law.

SECTION 28.11.          No Option.

The submission of this Lease for examination does not constitute a reservation of or option for the leased premises and this Lease becomes effective as a lease only upon execution and delivery thereof by Owner and Tenant.

SECTION 28.12.          Recording.

Tenant shall not record this Lease or a memorandum or so-called "short form" of the Lease.

SECTION 28.13.          Survival.

Tenant's liabilities and obligations under this Lease existing as of the expiration or earlier termination of the term of this Lease shall survive such expiration or earlier termination.

SECTION 28.14.          Conduct of Business.

Tenant agrees not to use the leased premises for a use that would be detrimental to a Family Type Shopping Center. Tenant will not use or permit any person to use, in any manner whatsoever the leased premises for any purpose, trade, business, occupation or vocation whatever, which may be in any way disreputable, immoral or pornographic in nature. Tenant agrees that it will not sell, distribute, display or offer for sale any item which, in Owner's judgment, is inconsistent with the quality of operation of the Shopping Center or may tend to injure or detract from the moral character or image of the Shopping Center within such community. Without limiting the generality of the foregoing, Tenant will not sell, distribute, display or offer for sale (i) any roach clip, water pipe, bong, toke, coke spoon, cigarette papers, hypodermic syringe or other paraphernalia commonly used in the use or ingestion of illicit drugs, or (ii) any pornographic, lewd, suggestive or "adult" newspaper, book, magazine, film, picture, representation or merchandise of any kind. Tenant shall conduct the operation of its business in such a manner so as not to permit unreasonable disturbances or other inconveniences, directly or indirectly, to other tenants, customers or shoppers in the Shopping Center. Tenant shall not permit loitering in, on or about the leased premises.

SECTION 28.15.          Parking Lot Lights.

The parking lot lights are not in operation after the regular closing hours of the Shopping Center (11:00 p.m. is considered closing). Therefore, it is agreed that if Tenant's use requires the leased premises to be open past regular closing hours then Owner may require that the parking lot lights be illuminated as needed depending on Tenant's hours of operation. It is further agreed that Tenant will pay the cost incurred for keeping all the parking lot lights on in the Shopping Center since there is no separate metering or lighting applicable to Tenant's immediate parking area. Owner will use a reasonable method to compute the additional cost of the extended lighting period, such method of computation to be at the sole discretion of Owner. Tenant agrees to increase their monthly payment for common charges pursuant to Section 11.02 by the additional cost of the extended lighting and such additional cost of extended lighting shall be reconciled annually as set forth in Section 11.02. **Tenant's hours of 5:00 a.m. to 8:00 p.m. will not require any additional lighting.**

SECTION 28.16.          Relocation.

Owner reserves the right, ~~at its option,~~ to ~~either~~ relocate Tenant's leased premises within the Shopping Center at ↗**Owner's** ~~Tenant's~~ sole cost and expense ~~or to terminate this Lease, both upon~~ ~~two (2) weeks~~ →**sixty (60) days** prior notice from Owner.

~~Should Owner elect to relocate Tenant's leased premises as herein provided for, the Fixed Minimum Rent shall abate for a period of three (3) months following such relocation provided that Tenant has delivered possession of the leased premises to Owner by or before such two (2) week notice period.~~

~~Should Owner elect to terminate this Lease as herein provided for, Owner shall pay to Tenant an amount equal to the Fixed Minimum Rent received by Owner from Tenant for the prior three (3) months provided that Tenant has delivered possession of the leased premises to Owner by or before such two (2) week notice period.~~ **Such relocation space shall be of similar size, buildout and visibility as the leased premises and shall be in accordance with current Orange Theory Fitness specifications.** Tenant acknowledges and agrees that Owner is entitled to possession of the leased premises immediately upon ~~two (2) weeks~~ prior notice to Tenant of such relocation ~~or termination~~, that Tenant is wrongfully withholding possession beyond such ~~two (2) week~~ notice period and that Owner may file an action for possession of the leased premises in the court of appropriate jurisdiction of __Lehigh_____ County, __Pennsylvania_____. Tenant hereby consents to jurisdiction, waives service of said suit, and upon request from Owner shall direct its attorney or any legal representative of Tenant to file an appearance on its behalf in such suit and shall direct such attorney or legal representative to execute on its behalf, an agreed order for possession of the leased premises, which order shall contain the following terms: (i) judgment for possession of the leased premises shall be entered in favor of Owner and against Tenant; (ii) enforcement of the order for possession shall be stayed until the expiration of such ~~two (2) week~~ notice period and; (iii) in the event Tenant fails to surrender possession of the leased premises to Owner by or before such ~~two (2) week~~ notice period, judgment shall also be entered in favor of Owner and against Tenant for all damages Owner may incur, including the cost of recovering the leased premises, attorneys; fees, and the amount of rent, ~~percentage rent,~~ additional rent and any other charges due, as reserved in this Lease, for the remaining term of this Lease and any extensions thereof, all of which amounts shall be immediately due and payable from Tenant to Owner. The court of appropriate jurisdiction as aforesaid shall be applicable to the provisions of this Section only and the court of jurisdiction for any other action, suit or otherwise is defined in Section 22.03 of this Lease.

{2211907: }          **Page 14 of 48**

| INITIAL | HERE |
|---------|------|
| [signature] | [signature] |
| OWNER | TENANT |

**SECTION 28.17.          Rider.**

A rider consisting of <u>three</u> pages, with SECTIONS numbered consecutively <u>29.01</u> through <u>29.17</u> is attached hereto and made a part hereof.

**SECTION 28.18.          Computation.**

Notwithstanding anything to the contrary herein, for purposes of computing Tenant's pro-rata share of real estate taxes, common area maintenance and insurance expenses of the Shopping Center, Owner reserves the right to make such computations on a basis of a thirty (30) day month and a three hundred sixty (360) day year.

**SECTION 28.19.          Tenant Contribution.**

The initial Tenant contribution (common area maintenance, real estate taxes and fire and extended coverage) for partial months shall be prorated on a thirty (30) day month basis in all cases.

**SECTION 28.20.          Owner's Limited Liability.**

Anything to the contrary in this Lease notwithstanding, the covenants in this Lease to be performed by Owner, shall not be binding personally, but instead said covenants are made for the purpose of binding only the fee simple or leasehold estate which Owner owns in the leased premises.

**SECTION 28.21.          Consents.**

With respect to any provision of this Lease which provides or infers, in effect, that Owner shall not unreasonably withhold or unreasonably delay its consent or approval, Tenant, in no event, shall be entitled to make, nor shall Tenant make, any claim against Owner for money damages, and Tenant hereby waives any claim or assertion by Tenant that Owner has unreasonably withheld or unreasonably delayed any consent or approval, but Tenant's sole remedy shall be an action or proceeding to enforce any such provision of this Lease, or for specific performance, injunction or declaratory judgment.

**SECTION 28.22.          Confidentiality.**

**Tenant acknowledges and agrees the terms and conditions contained within the Lease are strictly confidential and Tenant will not disclose any of the terms or conditions of the Lease to any other tenants or prospective tenants of the Shopping Center, to any real estate broker or agent or to any other party whatsoever (except that Tenant may disclose such terms to its attorneys and accountants on a confidential basis) throughout the entire term on the Lease and any extensions thereof. Any breach by Tenant of this Section shall be a default of the Lease. If Tenant, Tenant's broker or any attorney or accountant of Tenant discloses any of the terms of the Lease to any other party, then the Fixed Minimum Rent (as then escalated) shall automatically be doubled for the remainder of the term of the Lease. In addition, Tenant hereby agrees to reimburse Owner for, and to indemnify, defend and hold Owner harmless from and against, any loss, cost, damage (including consequential damages) or expense (including attorneys' fees) incurred by Owner on account of any such breach by Tenant.**

**SECTION 28.23.          Utilities.**

Commencing on the Possession Date, with the exception of those utilities Owner may elect to provide as provided for in section 15.01 herein, all utilities serving the leased premises are to be in Tenant's name and Tenant is to pay bills directly to the utility company.

**SECTION 28.24.          Sprinkler System.**

In the event the leased premises is equipped with a sprinkler system, Tenant shall pay to Owner ten cents ($.10) per square foot of the leased premises per year commencing on the Possession Date and continuing during the term hereof toward Owner's cost of monitoring such sprinkler system. Said amount shall be considered as additional rental, but not Fixed Minimum Rent, and shall be payable in equal monthly installments in advance on the first day of each full calendar month during the term.

~~SECTION 28.25.          Demolition.~~

~~It is understood and agreed between the parties that Owner shall have the option to cancel and terminate this Lease at any time during the term hereof by giving to Tenant one hundred eighty (180) days prior written notice of its intention to do so and stating therein the date on which this Lease shall terminate. Owner agrees that such date of termination will not be between October 1 and January 31 of any year. Owner reserves this right to cancel and terminate this Lease solely for the purpose of demolition of the leased premises and for no other purpose. If this Lease is canceled and terminated as hereinabove provided, the rent for the last month of the term shall be prorated and Owner agrees to refund to Tenant any rent paid in advance. This provision applies to any renewal or extension of this Lease.~~

**SECTION 28.26.          Condition of Premises.**

Tenant's taking possession of the leased premises shall be conclusive evidence of Tenant's acceptance thereof in good order and satisfactory condition. Tenant agrees that it is taking possession of the leased premises "as is", that no representations respecting the condition of the leased premises or the existence or non-existence of hazardous materials in or about the leased premises, no warranties or guarantees, expressed or implied, with respect to workmanship or any defects in material, and no promise to decorate, alter, repair or improve the leased premises either before or after the execution hereof, have been made by Owner or its agents to Tenant unless the same are contained herein.

**SECTION 28.27.          Tenant's Work.**

All work performed by Tenant shall be at Tenant's own risk and expense and be subject to Owner's prior written approval, including, but not limited to, written approval of Tenant's plans and specifications as prepared by an independent professional and shall be in accordance with good construction practices, all applicable laws and Owner's insurance requirements as set forth in this Lease. Further, Owner shall have no responsibility or liability for any loss or damage to any property belonging to Tenant. Tenant shall obtain at Tenant's sole expense, all certificates, approvals and permits which may be required by any governmental municipality. Copies of all such certificates shall be delivered to Owner.

~~SECTION 28.28.          Right to Remeasure.~~

~~Tenant acknowledges that the number of square feet of rentable area of the leased premises as stated in Section 1.01 ("Estimated Square Footage") is an estimated amount, and agrees that Owner may conduct a remeasurement of the leased premises at any time after the date hereof. In the event such remeasurement determines that the actual number of square feet of rentable area of the leased premises ("Actual Square Footage") exceeds the Estimated Square Footage, the Estimated Square Footage stated in Section 1.01 shall be replaced with the Actual Square Footage, and the Fixed Minimum Rent, as well as Tenant's pro-rata share and any and all additional rent, shall be adjusted accordingly.~~

**SECTION 28.29.          Extermination.**

Tenant agrees that it shall hire a reputable pest control contractor (as approved by Owner) to treat both the leased premises as well as the adjoining tenants on either side of the leased premises if needed at Tenant's sole cost and expense. Tenant shall supply to Owner a copy of its pest control contract prior to the store opening and shall keep said pest extermination contract in full force and effect for the entire term of this Lease and any extensions thereof. Said contract shall allow for extermination service to be performed a minimum of once a month or as often as needed and shall include the extermination of all types of pests, insects and rodents. At Owner's sole discretion, if there is evidence of pest infestation, Tenant shall increase pest control treatment more frequently than monthly until the problem of pests or rodents is corrected. All additional costs shall be the sole responsibility of Tenant.

| INITIAL | HERE |
|---|---|
| OWNER | TENANT |

SECTION 28.30.          Early Possession.

It is understood that Tenant may be in occupancy of the leased premises prior to the Commencement Date. Except as otherwise provided in this Lease or in any Rider attached hereto, such occupancy prior to the Commencement Date shall be without obligation to pay Fixed Minimum Rent, but such early occupancy shall otherwise be subject to all of the terms and conditions of this Lease.

Tenant agrees to indemnify, defend and hold Owner harmless from any and all claims or liability of any nature whatsoever arising out of Tenant's occupancy of the leased premises prior to the Commencement Date.

SECTION 28.31.          Judgment By Confession.

Tenant covenants and agrees that if the rent and/or any charges reserved in this Lease as rent (including all accelerations of rent permissible under the provisions of this Lease) shall remain unpaid ten (10) days after the same is required to be paid, then and in that event, Owner may cause Judgment to be entered against Tenant and for that purpose Tenant hereby authorizes and empowers Owner or any Prothonotary, Clerk of Court, or Attorney of any Court of Record to appear for and confess judgment against Tenant and agrees that Owner may commence an action pursuant to Pennsylvania Rules of Civil Procedure No. 2950 et seq. for the recovery from Tenant of all rent hereunder (including all accelerations of rent permissible under the provisions of this Lease) and/or for all charges reserved hereunder as rent, as well as for interest and costs and attorneys' fees, for which authorization to confess judgment, this Lease, or a true and correct copy thereof, shall be sufficient warrant. Such Judgment may be confessed against Tenant for the amount of rent in arrears (including all accelerations of rent permissible under the provisions of this Lease) and/or for all charges reserved hereunder as rent or any other amount due under the provisions of this Lease, as well as for interest and costs; together with reasonable attorneys' fees. Neither the right to institute an action pursuant to Pennsylvania Rules of Civil Procedure No 2950 et seq. nor the authority to confess judgment granted herein shall be exhausted by one or more exercise thereof, but successive complaints may be filed and successive judgments be entered for the aforedescribed sums five days or more after they become due as well as after the expiration of any extension or renewal of this Lease.

Tenant covenants and agrees that if this Lease shall be terminated (either because of condition broken during the term of this Lease, including non payment of rent or any renewal or extension thereof and/or when the term hereby created or any extension thereof shall have expired) then, and in that event, Owner may cause a Judgment in Ejectment to be entered against Tenant for possession of the leased premises, and for that purpose Tenant hereby authorizes and empowers any Prothonotary, Clerk of Court, or Attorney of any Court of Record to appear for Tenant and to confess judgment against Tenant in Ejectment for possession of the leased premises, and agrees that Owner may commence an action pursuant to Pennsylvania Rules of Procedure No. 2970 et seq. for the entry of an order in Ejectment for the possession of real property, and Tenant further agrees that a Writ of Possession pursuant thereto may issue forthwith, for which authorization to confess judgment and for the issuance of a writ or writs of possession pursuant thereto, this Lease, or a true and correct copy thereof, shall be sufficient warrant. Tenant further covenants and agrees that if for any reason whatsoever, after said action shall have commenced the action shall be terminated and the possession of the leased premises hereunder shall remain in or be restored to Tenant, Owner shall have the right upon any subsequent default or defaults, or upon the termination of this Lease as above set forth to commence successive actions for possession of real property and to cause the entry of successive judgments by confessions in Ejectment for possession of the leased premises.

In any procedure or action to enter Judgment by Confessions for Money, or to enter Judgment by Confession in Ejectment for possession of real property, if Owner shall first cause to be filed in such action an affidavit or averment of the facts constituting the default or occurrence of the condition precedent, or event, the happening of which default, occurrence or event authorizes and empowers Owner to cause the entry of Judgment by Confession, such affidavit or averment shall be conclusive evidence of such facts, defaults, occurrences, conditions precedent, or events; and if a true copy of this Lease (and of the truth of which such affidavit or averment shall be sufficient evidence) be filed in such procedure or action, it shall not be necessary to file the original as a Warrant of Attorney, any rule of court, custom, or practice to the contrary notwithstanding.

Tenant hereby releases to Owner and to any and all attorneys who may appear for Tenant all errors in any procedure or action to enter Judgment by Confession by virtue of the warrants of attorney contained in this Lease, and all liability therefor.

SECTION 28.32.          Ansul System.

Tenant shall not permit, allow or cause any noxious disturbing odors, fumes or gases or any smoke or dust, steam or vapors, or any loud or disturbing noise, sound of vibration to originate in or to be emitted from the leased premises. If Tenant prepares food in the leased premises, it shall install an Ansul System with both a gas and electric shut off. With regard to the duct from the leased premises the same shall be protected by an Ansul System in conjunction with entire installation. In lieu of an Ansul System, an alternate installation which is acceptable is a Kiddie System. Said installation shall be approved by Fire Underwriters System and/or local fire ordinances.

SECTION 28.33.          Financials.

Tenant warrants that the financial statements attached to the Lease as Exhibit "C" are true, correct and complete. Tenant acknowledges that as a material inducement for entering into this Lease, Owner is relying on the accuracy of this information. In addition, Tenant shall provide Owner with annual financial statements of Tenant and all guarantors within one hundred twenty (120) days after the end of each fiscal year of Tenant or such guarantors, as applicable, which statements shall be certified by Tenant to be true, correct and complete.

*(signatures to follow on the next page)*



IN WITNESS WHEREOF, Owner and Tenant have signed and sealed this Lease as of the date first written.

**Owner:**

Allentown Towne Center Allentown, Pa. Limited Partnership

By: Allentown Towne Center Allentown, Pa. General Partner Corporation, its sole general partner

By: _____

William Sondericker, Vice President

Date: _____

**Tenant:**

Saucon Fitness LLC d/b/a Orange Theory Fitness

By: _____
(signature here)

Name: _____
(print name here)

Title: _____

Date: _6/11/18_____

STATE OF _New Jersey_ )
COUNTY OF _Somerset_ ) ss.:

On the _11th_ day of _June_ in the year 2018 before me, the undersigned, a Notary Public in and for said State, personally appeared _Michael De Gaetano_ personally known to me or proved to me on the basis of satisfactory evidence to be
(print name of signatory)
the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

NOTARY STAMP BELOW:

_____
Notary Public

SHOBHA SUDHAKAR
NOTARY PUBLIC OF NEW JERSEY
MY COMMISSION EXPIRES FEB. 4, 2019

*(Remainder of this page intentionally left blank)*

**Page 17 of 48**

{2211907: }

| INITIAL | HERE |
|---------|------|
| OWNER | TENANT |

## RULES AND REGULATIONS

Tenant agrees as follows:

(1)    All loading and unloading of goods shall be done only at such times, in the areas, through the entrances, designated for such purpose by Owner.

(2)    The delivery or shipping of merchandise, supplies and fixtures to and from the leased premises shall be subject to such rules and regulations as in the judgment of Owner are necessary for the proper operation of the leased premises of the Shopping Center.

(3)    All garbage and refuse shall be kept in the kind of container specified by Owner, and shall be placed outside of the leased premises prepared for collection in the manner and at the times and places specified by Owner.  If Owner shall provide or designate a service for picking up refuse and garbage, Tenant shall use same at Tenant's cost, so long as it does not exceed the normal container cartage in the area.  Tenant shall pay the cost of removal of any of Tenant's refuse or rubbish.

*↗ facing the common areas*

(4)    No radio or television or other similar device shall be installed without first obtaining in each instance Owner's consent in writing.  No aerial shall be erected on the roof or exterior walls of the leased premises, or on the grounds, without in each instance, the written consent of Owner.  Any aerial so installed without such written consent shall be subject to removal without notice at any time.

(5)    No loud speakers, televisions, phonographs, radios or other devices shall be used in a manner so as to be heard or seen outside of the premises without the prior written consent of Owner.

(6)    If the leased premises are equipped with heating facilities separate from those in the remainder of the Shopping Center, Tenant shall keep the leased premises at a temperature sufficiently high to prevent freezing of water in pipes and fixtures.

(7)    The outside areas immediately adjoining the leased premises shall be kept clean and free from snow, ice, dirt and rubbish by Tenant to the satisfaction of Owner, and Tenant shall not place or permit any obstruction or merchandise in such areas.

(8)    Tenant and Tenant's employees shall park their cars only in those portions of the parking areas designated for that purpose by Owner.  Tenant shall furnish Owner with state automobile license numbers assigned to Tenant's car or cars, and cars of Tenant's employees, and shall thereafter notify Owner of any changes within five (5) days after such changes occur.  In the event that Tenant or its employees fail to park their cars in designated parking areas as aforesaid, Owner at its option shall charge Tenant ~~one hundred dollars ($100.00)~~ *↳twenty five dollars ($25.00)* per day per car parked in any area other than those designated, as and for liquidated damages.

(9)    The plumbing facilities shall not be used for any other purpose than that for which they are constructed, and no foreign substance of any kind shall be thrown therein, and the expense of any breakage, stoppage or damage resulting from a violation of this provision shall be borne by Tenant, who shall, or whose employees, customers, agents or invitees shall have caused it.

(10)   Tenant shall use at Tenant's cost a pest extermination contractor at such intervals as Owner may require.

(11)   Tenant shall remove any hazardous waste and materials from the leased premises and shall keep the leased premises free and clear of any hazardous waste and materials.

(12)   Tenant shall not burn any trash or garbage of any kind in or about the leased premises, the Shopping Center, or within one mile outside property lines of the Shopping Center.

(13)   Tenant shall not install, and shall remove any security gates, roll-away doors or any other installations that are not considered a typical glass, aluminum frame store front.

(14)   The storefront of the leased premises shall be glass with an aluminum frame from the ground level to the facade and shall extend from the demising wall of one side of the leased premises to the demising wall at the other side of the leased premises.

(15)   Tenant shall not operate or have installed in the leased premises amusement devices such as; pinball machines, video games, electronic games and other similar player-operated amusement machines, games and devices.  NOTE: Devices include, but are not limited to pinball machines, flipper machines, video games, claw machines, shuffleboard, foosball, air hockey, coin operated pool tables, music boxes and children's rides.

(16)   Those Tenants who use exhaust fans and make-up air systems for the purpose of preparing food will have such systems professionally cleaned a minimum of every ninety (90) days.

| INITIAL | HERE |
|---------|------|
| OWNER | TENANT |

FILED: MONROE COUNTY CLERK 05/22/2020 10:41 AM
INDEX NO. E2020003327
RECEIVED NYSCEF: 05/22/2020

EXHIBIT "A"



ALLENTOWN TOWNE CENTER

ALLENTOWN, PA



## EXHIBIT "B"

## SIGN SPECIFICATIONS

1.  All building signs to be constructed using single channel letters.

2.  Each single channel letter shall be at a height that meets owner's approval. Generally, Owner requires the Tenant to install the largest/tallest sign as possible.

3.  The single channel letter sign cannot cover more than 75% of the front of the store unless approved by Owner.

4.  The sign "returns" must be 6" deep, .063 mil aluminum with a bronzetone finish. The trim caps must also have a bronzetone finish.

5.  The sign must be internally illuminated using red neon or red LED strip lighting specifically designed for illumination of single channel letters. The sign face must be red Rohm Haas color 2283, plexiglass and when illuminated the sign must show red.

6.  The letter style shall be Helvetica (upper case) unless otherwise approved by Owner.

7.  The width of the single channel letters shall as approved by Owner.

8.  Box signs are not permitted.

9.  Raceways are not permitted.

10. Trailer signs or any other temporary signs are strictly prohibited.

11. Tenant shall, at its sole cost and expense, erect its sign in accordance all governmental codes and obtain all necessary permits and approvals.

12. Tenant shall erect its sign within ~~thirty (30)~~ <ins>two hundred forty (240)</ins> days of this Lease.  In the event Tenant fails to erect its sign within ~~thirty (30)~~ <ins>two hundred forty (240)</ins> days after the date of this Lease, Tenant acknowledges that Owner will incur certain damages.  Therefore, Tenant shall pay to Owner, in addition to its minimum rent, ~~percentage rent,~~ additional rent and any other charges which may be due hereunder, $100.00 per day until the sign is erected.  Such $100.00 per day charge is not a penalty but Owner's recovery for such damages incurred.

13. The span of the sign/lettering must be centered in relation to Tenant's storefront horizontally and vertically in relation to the height of the façade or sign band.  Letters are to be located on signage area of building as determined by Owner.  The assigned position for each Tenant shall be as close to a center-of-store frontage location as possible, subject to allowance for positioning corner / "end cap" signs and suitable space between adjacent Tenant signs, as determined by Owner. Owner, at its sole discretion, may require building signs be positioned in a manner to miss or not be affixed upon or not impact the appearance of certain building or architectural elements.

14. All sign diagrams, which shall include all specifications, must be submitted to Owner and receive Owner's written approval prior to fabrication and/or installation.

15. Electrical service to Tenant's sign shall come from the Tenant's electrical panel. The sign must be controlled by a photocell to automatically illuminate the sign after sundown and through all hours of darkness.

16. If the Tenant wishes to install a sign to the canopy soffit, Tenant must likewise submit drawings and specifications of such sign design and obtain Owner's written consent prior to installation.

17. Availability of any panels on any pylon signs is at the sole discretion of Owner. Upon written approval of the Owner, if the Tenant wishes to install a panel on the pylon sign, Tenant must submit drawings and specifications of such sign design and obtain Owner's written consent prior to installation. Position on the pylon sign shall likewise be at the sole discretion of Owner. Ongoing maintenance of the Tenant's pylon sign panel shall be the obligation of the Tenant and Tenant agrees to maintain any pylon sign panel(s) in a first class manner. Additional one time or monthly fees payable to Owner may apply for the Tenant's sign panel installation and continued use of a pylon sign panel. Upon five (5) days written notice, Owner may revoke Tenant's right to have a pylon sign panel and upon such notice Tenant shall remove any panels identifying its business from the pylon sign(s).

18. Tenant shall install street address or suite numbers centered on the transom glass panel above the storefront door(s) using white opaque 3M 6" Helvetica bold vinyl letters.

19. Tenant shall apply 2" or 3" high vinyl die-cut letters to its rear door in either white or black vinyl identifying the Tenant's business name and address or suite number.

{2211907: }{2211907: }

**Page 20 of 48**



RIDER TO THE LEASE BETWEEN Allentown Towne Center Allentown, Pa. Limited Partnership and Saucon Fitness LLC d/b/a Orange Theory Fitness dated ___June 21, 2018___.

In so far as the following may be contrary to the provisions of the Lease, the following shall control:

#### SECTION 29.01

Owner hereby grants to Tenant the conditional right exercisable at Tenant's option, to renew the term of this Lease for one (1) term of five (5) years. If exercised, and if the conditions applicable thereto have been satisfied, the renewal term (the "Renewal Term") shall commence immediately following the end of the initial lease term. The rights of renewal herein granted to Tenant shall be subject to, and shall be exercised in accordance with, the following terms and conditions:

(a)   Tenant shall exercise its right of renewal with respect to the Renewal Term by giving Owner written notice, sent by United States certified mail, postage prepaid, return receipt requested, thereof not earlier than twelve (12) months or later than nine (9) months prior to the expiration of the initial lease term (the "Renewal Notice"). Provided Tenant has exercised its option, effective as of the first day of the one hundred twentieth (120th) month after the Commencement Date and as of the first day of each subsequent Lease Year thereafter during the option term hereof, the Fixed Minimum Rent then in effect shall be increased by the product of (i) three percent (3%) and (ii) the Fixed Minimum Rent in effect immediately prior to such increase, and the monthly installments of Fixed Minimum Rent shall be upwardly adjusted accordingly.

(b)   If the Renewal Notice is not given timely, then Tenant's rights of renewal pursuant to this Section shall lapse and be of no further force or effect.

(c)   If Tenant has defaulted under this Lease beyond any applicable cure period on or before the date the Renewal Notice is given to Owner or at any time thereafter prior to commencement of the Renewal Term, or there has been a material adverse change in Tenant's financial condition or liquidity, then, at Owner's option, the Renewal Term shall not commence and the term of this Lease shall expire at the expiration of the initial lease term.

#### SECTION 29.02

Owner shall deliver the leased premises to Tenant in "Vanilla Shell" condition, which shall be defined as:

- All existing utilities stubbed to the leased premises or located within the leased premises
- All of the previous tenant's personal fixtures, furnishings, and equipment to be removed from the space
- Provide and extend a new gas service and meter sized large enough to accommodate all the Owner supplied and installed HVAC units and one Tenant supplied insta-hot water heater panel that fires at 199,000 BTU/H
- Provide existing ten (10) ton HVAC unit in good working order and install a new ten (10) ton HVAC unit (Tenant shall be responsible for any related duct work)
- Provide existing 4" minimum diameter sanitary line
- Provide the existing working fire protection sprinkler system to the space
- Provide two (2) existing 200 amp, electrical panels in the space (one meter)
- Install a new 3'-0" by 7'-0" man door with panic hardware for egress out of the rear of the space

Notwithstanding anything in this Lease to the contrary, Owner shall not be obligated to commence the aforesaid "Vanilla Shell" work until either: (i) Owner receives written notice from Tenant that Tenant has obtained all the permits referred to in Section 29.05 and waives its lease termination right provided therein; or (ii) the ninety(90) day Tenant permitting period referred to in Section 29.05 has expired and Tenant's right to terminate the Lease, pursuant to that section, is nullified and of no further force or effect.

#### SECTION 29.03

Provided that Tenant is not or never has been in default of the Lease, Owner agrees not to lease a space within the Shopping Center to another tenant whose operating as a membership based fitness facility of any type, indoor/outdoor boot camp style fitness facility or instructional personal or group fitness studio, and heart rate monitoring as its primary use operating with equal square footage or less than Tenant. Notwithstanding the foregoing, this section shall not apply: (i) to existing tenants of the Shopping Center or the premises they occupy, and in addition certain existing leases do not specifically proscribe the tenant's use and/or give existing tenants the right to assign their lease or sublet their premises to any entity for any use whatsoever. This provision shall not apply to such leases; In the event of a breach by Owner of the terms of this Section (hereinafter called "Exclusive Breach", Owner shall have one hundred and eighty (180) days (the "Cure Period") from the date Tenant sends written notice to Owner (the "Breach Notice") of said violation to cure the Exclusive Breach. At the expiration of the Cure Period, if Owner is not able to cure the Exclusive Breach, Tenant shall receive a twenty five percent (25%) abatement of the then current Fixed Minimum Rent until the Exclusive Breach is cured. If the Exclusive Breach has not been cured for a period of three hundred and sixty five (365) days after the expiration of the Cure Period, Tenant may either (i) terminate the lease or (ii) resume paying the full Fixed Minimum Rent without any further abatement.

#### SECTION 29.04

In the event Tenant is unable to conduct the pre-sale of its memberships from within the leased premises and provided that Tenant obtains all necessary governmental approvals in advance then Tenant may place a table (table not to exceed 3'x8') directly in front of the leased premises for the sole purpose of conducting pre-sales of memberships to the leased premises (the "Pre-Sale Space") from the Possession Date until the earlier of: (i) the date on which Tenant opens for business within the leased premises; or (ii) ten (10) weeks following the Possession Date. The Pre-Sale Space shall be provided to Tenant in "as-is" condition and shall be surrendered by Tenant to Owner in the same condition as provided to Tenant by Owner. Tenant agrees to maintain the Pre-Sale Space at its sole cost and expense in a clean, presentable, and first class condition at all times. If Tenant at any time fails to maintain the Pre-Sale Space in the condition required by this Section and such failure is not remedied within 24 hours after Tenant receives notice of such failure from Owner, then Owner at its sole discretion shall have the absolute right to revoke Tenant's right to use the Pre-Sale Space by providing notice thereof to Tenant, in which event Tenant shall have no further right to use the Pre-Sale Space and Tenant's obligations under the Lease shall remain unaffected. Tenant shall carry with respect to the Pre-Sale Space the same insurance as Tenant is required by this Lease to be carried for the leased premises and Tenant shall provide evidence of such insurance to Owner prior to taking occupancy of the Pre-Sale Space. Tenant shall indemnify, defend, and hold Owner harmless from and against any loss, cost, damage or expense (including attorneys' fees) incurred by Owner on account of Tenant's use or occupancy of the Pre-Sale Space. Notwithstanding anything to the contrary contained above, Tenant shall not be permitted to use any banner type flags, inflatable advertisements or any other promotional materials in or around common areas.

#### SECTION 29.05

Tenant shall use its best efforts to obtain any permits and or license(s) required for Tenant's use, as described in Section 7.01 of the Lease, as quickly as possible and shall provide Owner with copies of all submissions made to the applicable governmental authorities promptly after submission. If, despite making such timely application and using such best efforts, Tenant is not able to obtain any such governmental permits and or license(s) as are necessary to use the leased premises for its intended purposes (excluding permits relating to signage, or exterior improvements), within ninety (90) days after the date Tenant signs this Lease, then Tenant shall have the right to terminate this Lease by providing written notice to Owner by such ninetieth 90th) day, which written notice shall include all information possessed by Tenant with regard to why such permits and or license(s) were disapproved; provided, however, that Owner shall have the right in the event Owner receives any such termination notice to attempt to obtain on Tenant's behalf the permits and or license(s) necessary for Tenant's intended use of the leased premises, and if Owner is able to obtain such permits and or license(s) within ninety (90) days after receiving such termination notice, then Tenant's right to terminate pursuant to this Section shall be immediately nullified and of no further force and effect. In the event Owner elects to attempt to obtain such permits pursuant to the immediately preceding sentence, Tenant shall cooperate with Owner in all respects (including, but not limited to providing any plans, filed applications, correspondence or other materials submitted in connection with the permits and/or licenses) in an effort to obtain the permits within such additional ninety (90) day period. If Tenant receives the permits and or licenses described above prior to the end of the 90-day period described above, Tenant shall immediately notify Owner thereof in writing. If Tenant does not validly exercise its termination option pursuant to this Section by the ninetieth



| INITIAL | HERE |
|---|---|
| OWNER | TENANT |

(90th)  day after the date of Tenant's execution of the Lease for any reason, then Tenant's right to terminate the Lease pursuant to this Section shall automatically be nullified and of no further force or effect.

### SECTION 29.06

As part of the Tenant's Improvements and prior to the Tenant opening for business in the leased premises, Tenant shall, at its sole cost and expense, make improvements to leased premises to prevent sound or odors from emanating into adjacent tenant spaces or the common areas. These improvements shall include but not be limited to sound proofing the demising walls from floor slab to ceiling, sound proofing ceilings, and the installation of fumigating or ventilating equipment to control odors. All work performed by Tenant shall be at Tenant's own risk and expense and be subject to Owner's prior written approval, including, but not limited to written approval of Tenant's plans and specifications as prepared by an independent professional and shall be in accordance with good construction practices, all applicable laws and Owner's insurance requirements as set forth in the Lease.  In the event that Owner determines, or is notified by any tenant or neighbor, that unreasonable noise or odors are emanating from the leased premises at any time during the term of the Lease, then Tenant shall be deemed to be in default of the Lease and Owner shall have the right, at its option and in addition to all other rights and remedies available under this Lease, to (i) require Tenant to immediately take all necessary steps, at Tenant's sole cost and expense, to cause such noise or odor to cease emanating from the leased premises, or (ii) enter the leased premises and take such measures as Owner determines is appropriate to cause such noise or odor to cease emanating from the leased premises, in which event Tenant shall be obligated to reimburse Owner for all expenses incurred by owner in connection therewith.

### SECTION 29.07 (Continued from Section 2.05 of the Lease)

Notwithstanding anything to the contrary contained in the Lease, Tenant shall be allowed one (1) late payment per twelve (12) month calendar year, provided that such late payment is received within five (5) days after the date such payment is due, in which case Tenant shall not be obligated to pay the late charge. Any subsequent payment within the twelve (12) month calendar year not received by the date such payment is due shall be subject to the late charge. Tenant's rights pursuant to this Paragraph are personal to Tenant and may not be exercised by any transferee or assignee of Tenant.

### SECTION 29.08 (Continued from Section 12.01 of the Lease)

Notwithstanding the forgoing, Owner agrees to allow Tenant to display professionally fabricated "Coming Soon" and "Grand Opening" banners on the leased premises, provided only one (1) banner is installed at a time and Tenant receives Owner's written approval prior to installation. Said "Coming Soon" banner may be displayed on the leased premises for no more than eight (8) weeks.  Said "Grand Opening" banner may be displayed on the leased premises for no more than eight (8) weeks. Tenant agrees to repair all damage to the building caused by the installation and removal of said banners, to Owner's sole satisfaction.

### SECTION 29.09 (Continued from Section 12.04 of the Lease)

Tenant shall have the right, without Owner's consent to install, to maintain and change from time to time non-illuminated professionally prepared signs, with dimensions that shall not exceed thirty two inches (32") by forty eight inches (48"), in the interior of the leased premises consistent with Tenant's standard signage and promotional programs. Tenant may display these signs in no more than two (2) of the storefront windows, with no more than one (1) sign per window and no such signs shall be displayed in the front doors of the leased premises. Tenant shall also be allowed to place a professionally prepared sign of their logo along with their hours of operation on the door of the leased premises. Additionally, Tenant shall be allowed to use professionally installed black-out film on the inside windows of the leased premises, provided however, at Owner's request, Tenant will be required to remove such black-out film upon the expiration or early termination of this Lease.

### SECTION 29.10 (Continued from Section 13.02 of the Lease)

Owner, at its sole cost and expense (subject to reimbursement pursuant to Article 11, if applicable), shall maintain, repair and replace the structural elements of the building, including the roof structure, the foundation, the slab, the exterior walls (except with respect to the leased premises plate glass; windows, doors and other exterior openings; window and door frames, molding, closure devices, locks and hardware; special store fronts; lighting, heating, air conditioning, plumbing and other electrical, mechanical and electromotive installation equipment and fixtures; signs, placards, decorations or other advertising media of any type; and interior painting or other treatment or interior walls, which the Tenant shall be responsible for the maintenance and repair thereof), exterior underground plumbing not installed or utilized exclusively by Tenant, exterior utilities not installed or utilized exclusively by Tenant and exterior sewer lines not installed or utilized exclusively by Tenant, provided any such maintenance, repairs and replacements are not caused by the acts or omissions of Tenant, its agents and contractors.

### SECTION 29.11 (Continued from Section 13.03 of the Lease)

At the expiration of the tenancy hereby created, Tenant shall surrender the leased premises in the same condition as the leased premises were in upon the date Tenant opened for business, reasonable wear and tear excepted and shall surrender all keys for the leased premises to Owner at the place specified by Owner and shall inform Owner of all combinations on locks, safes and vaults, if any, in the leased premises.  Tenant shall remove all its trade fixtures and any alterations or improvements as provided in SECTION 12.02 hereof, before surrendering the leased premises as aforesaid and shall repair any damage to the leased premises caused thereby.  Tenant's obligation to observe or perform this covenant shall survive the expiration or other termination of the term of this Lease.

### SECTION 29.12 (Continued from Section 16.03 of the Lease)

Upon Tenant's written request to Owner, Owner shall endeavor to provide to Tenant a non-disturbance agreement from Owner's existing mortgagee on such mortgagee's form.  Notwithstanding the foregoing, in the event Owner or Owner's mortgagee does not provide Tenant with said non-disturbance agreement for any reason whatsoever, such event shall not be considered an event of default or non-performance by Owner of the Lease.

### SECTION 29.13 (Continued from Section 17.01 of the Lease)

Notwithstanding the foregoing, Owner's consent to a requested assignment of the Lease shall not be unreasonably withheld or delayed, provided: (i) Tenant and Guarantor remain liable to the terms, covenants and conditions of this Lease; (ii) the use remains the same as provided for in Section 7.01 of this Lease; (iii) the  liquid net worth of such assignee, specifically excluding any retirement monies (whether in a 401(k), pension or other form) and other amounts that may be protected in whole or in part from creditors by law (i.e. personal residences), exceeds $1,000,000; (iv) the assignee (or each of the assignee's principals if the assignee is not an individual) has a credit rating of at least 750 (as determined by a credit bureau selected by Owner); (v) the assignee has two (2) or more wholly owned locations that are all currently open for business (and have been open for not less than five (5) years) and operating with the same use as provided for in Section 7.01 of the Lease; and (vi) the assignee is comprised of all of the individuals that are principals of the business to be operated by assignee and their spouses (or all of such principals and their spouses execute guaranties of the Lease in form prepared by Owner).

### SECTION 29.14 (Continued from Section 22.01 of the Lease)

(provided that if any such failure to observe or perform any non-monetary obligation cannot reasonably be cured within such ten (10) day period, such failure shall not be deemed an event of default under this Section if Tenant commences to cure such failure within said ten (10) day period and thereafter diligently and continuously prosecutes the curing of such failure until completion within a total of no more than twenty five (25) days from the date of such notice).

### SECTION 29.15 (Continued from Section 22.03 of the Lease)

Notwithstanding the foregoing, it is agreed that any action, suit or proceeding arising out of the Lease that is not for collection of rent or for other monetary matters shall be brought in the State where the Shopping Center is located.

INITIAL HERE

OWNER   TENANT

**SECTION 29.16**

Provided that Tenant has not defaulted hereunder Tenant shall receive an abatement of additional rent for the period commencing on the Possession Date and expiring upon three (3) months after the Possession Date.

**SECTION 29.17**

Owner recognizes that Tenant's use may require, from time to time, commercially reasonable noises within the interior of the leased premises due to television, music, and/or microphone usage. Notwithstanding the above, as part of the initial Tenant Improvements, Tenant shall submit plans and specifications which will include methods to perform soundproofing, additional support or other measures necessary to address noise produced within the leased premises such that noise does not emanate into adjacent tenant spaces, and Owner will have the right to approve such measures. Tenant will install, at its sole cost, the soundproofing in accordance with the approved plans and specifications. In the event Owner requires any further sound-proofing measures beyond what was installed per the approved plans and specifications, Owner shall provide notice to Tenant to ensure disruptive noise is not emanating into adjacent Tenant spaces, and Tenant shall within twenty (20) days, at Tenant's sole cost and expense, install additional sound-proofing measures.

Owner:                          Allentown Towne Center Allentown, Pa. Limited Partnership

                                By: Allentown Towne Center Allentown, Pa. General Partner Corporation,
                                its sole general partner

                                By: _____
                                    William Sondericker, Vice-President

                                Date: _____

Tenant:                         Saucon Fitness LLC d/b/a Orange Theory Fitness

                                By: _____
                                    (signature here)

                                Name: _____
                                      (print name here)

                                Title: _____

                                Date: _____

STATE OF New Jersey )
COUNTY OF Somerset ) ss.:

        On the 11th day of June in the year 2018 before me, the undersigned, a Notary Public in and for said State, personally appeared Michael DeGaetano personally known to me or proved to me on the basis of satisfactory evidence to be
        (print name of signatory)
the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

NOTARY STAMP BELOW:            _____
                                Notary Public

                                SHOBHA SUDHAKAR
                                NOTARY PUBLIC OF NEW JERSEY
                                MY COMMISSION EXPIRES FEB. 4, 2019

INITIAL HERE

OWNER   TENANT

## ADDENDUM TO LEASE

**THIS ADDENDUM TO LEASE AGREEMENT** (this "**Addendum**") is effective as of _June 21_, 2018 (the "**Effective Date**"), and is being signed simultaneously with the Lease (the "**Lease**") dated _June 21_, 2018 between Saucon Fitness LLC d/b/a Orange Theory Fitness (the "**Franchisee**" or "**Tenant**") and Allentown Towne Center Allentown, Pa. Limited Partnership (the "**Owner**") for the real property commonly known as Allentown Towne Center (the "**Premises**").

1.      **Incorporation and Precedence**.  This Addendum is incorporated into the Lease and supersedes any conflicting provisions in it.  Capitalized terms not otherwise defined in this Addendum have the meanings as defined in the Lease.

2.      **Background**.  The Tenant will operate an ORANGE THEORY® Studio at the Premises under a Franchise Agreement dated _Nov. 27_, 2017 (the "**Franchise Agreement**") with Ultimate Fitness Group, LLC (the "**Franchisor**").  By entering into a franchise relationship with the Franchisor, the Tenant has agreed to grant the Franchisor a security interest in the Lease (subordinate to the Owner), all of the furniture, fixtures, inventory and supplies located in the Premises as collateral for: (a) the payment of any obligation, liability or other amount owed by the Tenant or its affiliates to the Franchisor under the Franchise Agreement.  The Franchise Agreement also requires that the Lease contain certain provisions that the Tenant is requesting the Owner to include.

3.      **Marks**.  The Tenant has the right to display within the Premises, the trade and service marks set forth on Exhibit "A" to this Addendum and incorporated by reference herein in accordance with the specifications required by the Franchisor, subject only to the provisions of applicable law, for the term of the Lease.

4.      **Easement**.  The Owner grants to the Tenant during the term of the Lease a non-exclusive right and easement over that portion of the property as may be required by the Tenant to improve, renovate, repair, replace and maintain  its signage or its panel on the pylon sign (if applicable) for the property, all subject to Owner's prior written approval.  The Tenant has the right to change or alter the signage at any time during the term of the Lease provided the signage is in compliance with all applicable governmental codes and regulations and has been approved in writing by Owner.  The signage, subject to Owner's prior written approval, may include: (a) signage on the exterior front wall of the Premises; (b) signage on another exterior portion of the Premises; (d) a panel on the pylon sign for the property; and (e) other signage which may be required by the Franchisor or agreed upon by the Owner and the Tenant.

5.      **Access to Premises**.  During the term of the Lease, the Owner and Tenant acknowledge and agree that the Franchisor will have unrestricted access to the Premises (such access to be facilitated by Tenant) to inspect the Studio Premises and Tenant's business operations in accordance with the Franchise Agreement.

6.      **Notice of Default**.  The Owner will give written notice to the Franchisor (concurrently with the giving of such notice to the Tenant) of any defaults (a "**Default**") by the Tenant which entitles Owner to terminate Tenant's rights of possession under the Lease by certified mail, return receipt requested, or by nationally recognized overnight courier service, at the following address or to such other address as the Franchisor may provide to Owner from time to time:

Ultimate Fitness Group, LLC
6000 Broken Sound Road Suite 200
Boca Raton, FL 33487
Attention:  legal@orangetheoryfitness.com



FILED: MONROE COUNTY CLERK 05/22/2020 10:41 AM
NYSCEF DOC. NO. 2     Case 6:20-cv-06488-EAW   Document 1-2   Filed 07/09/20   Page 34 of 83

INDEX NO. E2020003327
RECEIVED NYSCEF: 05/22/2020

Such notice will grant the Franchisor the right, but not the obligation, to cure any Default, if the Tenant fails to do so, within 10 days after the expiration of the period in which the Tenant may cure the Default under the Lease.

7.     **Franchisor's Assumption of Lease**.  In the event of a default of the Lease by Tenant or the default of the Franchise Agreement by Tenant, and upon written notice by the Franchisor to have the Lease assigned to the Franchisor as lessee (the **"Assignment Notice"**), (i) the Franchisor will become the lessee of the Premises and will be liable for all obligations under the Lease and (ii) the Owner will recognize the Franchisor as the lessee of the Premises effective as of the date of the Assignment Notice all subject to the following conditions:

(a)   Franchisor shall notify Tenant and Owner in writing (the "Election Notice") within ten (10) days after termination or expiration of the Franchise Agreement, or Franchisor's receipt of any notice of default by Tenant under the Lease, if Franchisor elects to request the Owner's Consent to accept assignment of the Lease "Franchisor Request";

(b)   If Franchisor's request is made to Owner and the Owner's Consent is given to Franchisor, Franchisor shall take possession of the Premises as soon as reasonably possible, but no later than ten (10) days after the Owner's Consent, and Franchisor shall commence payment of rent and all other charges due under the Lease as of the date of the Owner's Consent;

(c)   Owner reserves the right to condition the Owner's Consent on Franchisor agreeing to pay any past due rents, additional rents or other charges due under the Lease to Owner within ten (10) days of the Owner's Consent;

(d)   Nothing herein shall affect Owner's right to require Tenant and Guarantor to remain liable as a guarantor for the remaining term of the Lease, to recover from Tenant and Guarantor any and all amounts due under the Lease or to exercise any rights of Owner against Tenant as provided under the Lease;

(e)   Notwithstanding anything to the contrary contained herein above, any such assignment to Franchisor shall be in accordance with the terms and conditions of the Lease.

8.     **Default Under Franchise Agreement**.  Any Default under the Lease which is not cured by Tenant within any applicable cure period also constitutes grounds for termination of the Franchise Agreement.

9.     **Benefits and Successors.**  The benefits of this Addendum inure to the Franchisor and to its successor and assigns.

10.     **Remaining Provisions Unaffected**.  Those parts of the Lease that are not expressly modified by this Addendum remain in full force and effect.



Intending to be bound, the Owner and the Tenant sign and deliver this Addendum effective on the Effective Date, regardless of the actual date of signature.

THE "Owner":

Allentown Towne Center Allentown, Pa L.P.
Address: 270 Commerce Drive
Rochester, New York 14623
Phone: (585) 359-3000

By: _____
Name: William Sondericker
Title: Vice President
Date: 6/28/18

THE "Tenant":

Saucon Fitness LLC d/b/a Orange Theory Fitness
Address: 2761 MilAN STReet
EASTon, PA 18045
Phone: 817-603-1184

By: _____
Name: MicHAel DeCaptain
Title: Managing Member
Date: 6/11/18


INITIAL HERE
OWNER  TENANT

EXHIBIT "A"

**Marks**

ORANGE THEORY®

OT FIT®

OTF®











# EXHIBIT B

FILED: MONROE COUNTY CLERK 05/22/2020 10:41 AM
NYSCEF DOC. NO. Case 6:20-cv-06488-EAW   Document 1-2   Filed 07/09/20   Page 38 of 83

INDEX NO. E2020003327
RECEIVED NYSCEF: 05/22/2020

## LEASE GUARANTY

This Guaranty is made as of _____ June 21 , 2018 by Brian Bolcar, Ned Bolcar, Carolyn Bolcar and Michael DeGaetano (collectively, "Guarantor"), to Allentown Towne Center Allentown, Pa. Limited Partnership ("Owner")

**WHEREAS**, Guarantor is materially benefited by the Lease between Owner and Saucon Fitness LLC d/b/a Orange Theory Fitness ("Tenant") dated June 21, 2018 (hereinafter called "Lease"), and Guarantor's executing this Guaranty is a material inducement to Owner to enter into the Lease.

NOW THEREFORE, Guarantor covenants and agrees with Owner as follows:

(a)  that the Guarantor, guarantees, unconditionally and absolutely, the full and faithful performance and observance of all the covenants, terms, and conditions of the Lease provided, to be performed and observed by Tenant, expressly including, without being limited to, the payment, when due, of Minimum Rent and Additional Rent payable under the Lease, as of the Possession Date of the Lease through the Termination Date of the Lease;

(b)  that, if the Lease were modified in any respect by agreement between Owner and Tenant, or if Tenant sublets the space or assigns the Lease, the obligations hereunder of Guarantor shall extend and apply with respect to the full and faithful performance and observance of all of the covenants, terms, and conditions of the Lease and of any such modifications thereof;

(c)  that, if the Lease shall be renewed, or its term extended, or if the Tenant holds over beyond the term of the Lease, the obligations hereunder of Guarantor shall extend and apply for any period beyond the date specified in the Lease for expiration of said term, either pursuant to any option granted under the Lease or otherwise, the obligations hereunder of Guarantor shall extend and apply with respect to the full and faithful performance and observance of all of the covenants, terms, and conditions of the Lease and of any such modification thereof;

(d)  that, the Guarantor does not require any notice of Tenant's nonpayment, nonperformance, or nonobservance of the covenants, terms, and conditions of the Lease.  Guarantor hereby expressly waives the right to receive such notice;

(e)  that, notwithstanding any rejection or modification of the Lease and/or Tenant's obligations thereunder which arise from, in or in connection with a bankruptcy or similar insolvency proceeding filed by or against Tenant, Guarantor's liability hereunder for amounts due or to become due under the Lease (including, without limitation, amounts which become due as a result of Owner's exercise of its right to accelerate damages following a default) shall not be limited, reduced or otherwise affected by any such proceeding, and Guarantor hereby expressly acknowledges and agrees that Guarantor's obligations hereunder shall not be diminished by operation of any such proceeding,  by any provision of the United States Bankruptcy Code or similar insolvency statute, or by any decision by a court interpreting the same.

(f)  that, until all of Tenant's obligations under the Lease are fully performed, Guarantor (a) waives any rights that Guarantor may have against Tenant by reason of any one or more payments or acts in compliance with the obligations of Guarantor under this Guaranty, and (b) subordinates any liability or indebtedness of Tenant held by Guarantor to the obligations of Tenant to Owner under his Lease;

(g)  Except as provided in paragraph (e) hereof, Guarantor's liability shall be primary and joint and several with that of Tenant.  Owner may proceed against Guarantor under this Guaranty without initiating or exhausting any remedy against Tenant, and may proceed against Tenant and Guarantor separately or concurrently.  If more than one natural person and/or entity shall constitute Guarantor, then the liability of each such person and/or entity shall be joint and several

(h)  that the Guarantor irrevocably appoints Lynx Development Corporation as its agent for service of process related to this Guaranty;

(i)  that the Guarantor hereby waives the right to trial by jury in any action or proceeding that may hereafter be instituted by Owner against Guarantor in respect of this Guaranty;

(j)  that the Guarantor will pay to Owner all of Owner's expenses- including, but not limited to, attorneys' fees- incurred in enforcing this Guaranty; and

(k)  Guarantor represents and warrants that this Guaranty has been duly authorized by all necessary corporate action on Guarantor's part, has been duly executed and delivered by a duly authorized officer, and constitutes Guarantor's valid and legally binding agreement in accordance with its terms.

(l)  Within five (5) days after Owner's written request, Guarantor shall execute and deliver to Owner a written statement certifying any matter concerning this Guaranty or the Lease as Owner may request.

(m)  Guarantor's financial statements, which Guarantor warrants to be true and correct, are attached to the Lease as Exhibit "C".  Within ten (10) days of any request by Owner, Guarantor shall provide Owner with



its most recent annual audited financial statements of Guarantor, which statements shall be certified by Guarantor to be true, complete and accurate.

(n) Guarantor authorizes Owner at any time during the term of this Guaranty, or anytime thereafter in the event of a Tenant default, or during any extensions thereof, to obtain a consumer report ("Credit History") of Guarantor from a consumer reporting agency ("Credit Bureau") or any other credit source.

(o) Owner and Guarantor agree that the Lease, this Guaranty, and any amendments or modifications to the Lease or this Guaranty shall be governed by and construed in accordance with the domestic laws of the State of New York without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of New York.

(p) Owner and Guarantor further agree that any action, suit or proceeding arising out of the Lease, this Guaranty, any amendments or modifications to the Lease or Guaranty, or the parties' relationship arising out of the Lease or this Guaranty, shall be adjudicated exclusively in New York State Supreme Court, Monroe County, New York, and the parties expressly, specifically, and irrevocably consent to the personal jurisdiction and venue of such court. Guarantor further acknowledges that Guarantor transacted business in New York State by entering into the Lease and/or this Guaranty. In the event of an action, suit or proceeding arising out of or relating to the Lease, this Guaranty, any amendments or modifications to the Lease or Guaranty, or otherwise, Guarantor waives all objections to venue on the grounds of forum non conveniens or for any other reason.

**Notwithstanding the foregoing, it is agreed that any action, suit or proceeding arising out of the Lease that is not for collection of rent or for other monetary matters shall be brought in the State where the Shopping Center is located.**

The use of the singular herein shall include the plural. Each term used in this Lease Guaranty, unless otherwise defined herein, shall have the same meaning as when used in the Lease.

**IN WITNESS WHEREOF,** the undersigned has caused this Lease Guaranty to be executed as of even date with the Lease.

Brian Bolcar

Date: 6/13/18

STATE OF North Carolina )
COUNTY OF Wake ) ss.:

On the 13th day of June in the year 2018 before me, the undersigned, a Notary Public in and for said State, personally appeared Brian Bolcar, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

NOTARY STAMP BELOW:

Notary Public

Patricia Madden Renouard

Patricia Madden Renouard
NOTARY PUBLIC
Wake County, NC
My Commission Expires May 8, 2021

Ned Bolcar

Date: 6-11-18

STATE OF New Jersey )
COUNTY OF Somerset ) ss.:

On the 11th day of June in the year 2018 before me, the undersigned, a Notary Public in and for said State, personally appeared Ned Bolcar, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

NOTARY STAMP BELOW:

Notary Public

SHOBHA SUDHAKAR
NOTARY PUBLIC OF NEW JERSEY
MY COMMISSION EXPIRES FEB. 4, 2019

| INITIAL | HERE |
|---|---|
| OWNER | TENANT |

Carolyn Bolcar

Date: _____

STATE OF _New Jersey_ )
COUNTY OF _Somerset_ ) ss.:

On the _11th_ day of _June_ in the year 2018 before me, the undersigned, a Notary Public in and for said State, personally appeared Carolyn Bolcar, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

NOTARY STAMP BELOW:

**SHOBHA SUDHAKAR**
**NOTARY PUBLIC OF NEW JERSEY**
**MY COMMISSION EXPIRES FEB. 4, 2019**

_____
Notary Public

_____
Michael DeGaetano

Date: _6/11/18_

STATE OF _New Jersey_ )
COUNTY OF _Somerset_ ) ss.:

On the _11th_ day of _June_ in the year 2018 before me, the undersigned, a Notary Public in and for said State, personally appeared Michael DeGaetano, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

NOTARY STAMP BELOW:

_____
Notary Public

**SHOBHA SUDHAKAR**
**NOTARY PUBLIC OF NEW JERSEY**
**MY COMMISSION EXPIRES FEB. 4, 2019**

| INITIAL | HERE |
|---------|------|
| OWNER | TENANT |

MONROE COUNTY CLERK'S OFFICE

THIS IS NOT A BILL. THIS IS YOUR RECEIPT.

Receipt # 2401508

Book    Page    CIVIL

Return To:
DALE A. WORRALL

No. Pages: 22

Instrument: EXHIBIT(S)

Control #:        202005220553
Index #:          E2020003327

Date: 05/22/2020

Allentown Towne Center Allentown, Pa. Limited Partnership

Time: 1:42:11 PM

Saucon Fitness LLC
Bolcar, Brian
Bolcar, Ned
Bolcar, Carolyn
DeGaetano, Michael

Total Fees Paid:                          $0.00

Employee:

State of New York

MONROE COUNTY CLERK'S OFFICE
WARNING – THIS SHEET CONSTITUTES THE CLERKS
ENDORSEMENT, REQUIRED BY SECTION 317-a(5) &
SECTION 319 OF THE REAL PROPERTY LAW OF THE
STATE OF NEW YORK. DO NOT DETACH OR REMOVE.

JAMIE ROMEO

MONROE COUNTY CLERK



# EXHIBIT C

# Allentown Towne Center Allentown, Pa. L.P.

*270 Commerce Drive, Rochester, New York 14623-3506*
*(585) 359-3000, Fax: (585) 359-4690*

April 27, 2020

Saucon Fitness LLC d/b/a Orange Theory Fitness
4713 W. Tilghman St.
Allentown, PA 18104

**U.S. FIRST CLASS MAIL**
**CERTIFIED MAIL (RETURN RECEIPT REQUESTED) 7018 1130 0000 1888 3034**

Dear Tenant,

Our records indicate a delinquent balance owed on your rental account of **$8,647.07**. Pursuant to Section 22.01 of the Lease, Tenant is in default for non-payment and hereby has ten (10) days to cure.

In the event said default is not cured, Owner may take self-help action to recover the space, in addition to all other rights afforded to it under the Lease and at law, including, but not limited to, commencing litigation against all responsible parties under the Lease.

Please be further advised that, pursuant to Section 22.04 of the Lease, Tenant is responsible for all of Owner's costs, expenses and attorney fees in pursuing its rights under the Lease.

Please contact me at the above number if you have any questions.

Owner reserves all rights under the Lease, at law and in equity.

Very truly yours,
ALLENTOWN TOWNE CENTER ALLENTOWN, PA. L.P.

David Vacca

Cc:     Legal Department
         Tenant File

**Allentown Center**
PO Box 93070

Rochester, NY, 14692

4/27/2020

Orange theory Fitness
Brian Bolcar
4713 West Tighlman Street
Allentown, PA  18104

| | |
|---|---|
| Day Due: | 1 |
| # Days to Delinquency: | 5 |
| Last Payment: | 8,647.07 |
| Payment Date: | 4/1/2020 |

Re:  Lease ALL-003081 at Allentown Center

Dear Tenant:

We are writing to inform you that your account is currently past due.  Our records show that as of the above date the following items are outstanding:

| Date | | Description | Charges | Payments | Balance Due |
|------|---|-------------|---------|----------|-------------|
| 4/1/2020 | AAA | BASE RENT | 5,833.33 | 0.00 | 5,833.33 |
| 4/1/2020 | CAM | CAM | 1,082.18 | 0.00 | 1,082.18 |
| 4/1/2020 | INS | INSURANCE | 172.36 | 0.00 | 172.36 |
| 4/1/2020 | SPR | SPRINKLER | 58.33 | 0.00 | 58.33 |
| 4/1/2020 | TAX | REAL ESTATE TAX | 880.79 | 0.00 | 880.79 |
| 4/1/2020 | WAT | WATER/SEWER | 620.08 | 0.00 | 620.08 |
| | | | | **Total Due** | **8,647.07** |

We would appreciate your prompt attention to this matter.  If you have any questions, please call our office at the above number.

Sincerely,

David Vacca

# Allentown Towne Center Allentown, Pa. L.P.

270 Commerce Drive, Rochester, New York 14623-3506
(585) 359-3000, Fax: (585) 359-4690

April 27, 2020

Brian Bolcar
Re: Saucon Fitness LLC d/b/a Orange Theory Fitness
780 Fallon Grove Way
Raleigh, NC 27608

## U.S. FIRST CLASS MAIL

Dear Guarantor,

Our records indicate a delinquent balance owed on your rental account of **$8,647.07**. Pursuant to Section 22.01 of the Lease. Tenant is in default for non-payment and hereby has ten (10) days to cure.

In the event said default is not cured. Owner may take self-help action to recover the space, in addition to all other rights afforded to it under the Lease and at law, including, but not limited to, commencing litigation against all responsible parties under the Lease.

Please be further advised that, pursuant to Section 22.04 of the Lease. Tenant is responsible for all of Owner's costs, expenses and attorney fees in pursuing its rights under the Lease.

Please contact me at the above number if you have any questions.

Owner reserves all rights under the Lease, at law and in equity.

Very truly yours,
ALLENTOWN TOWNE CENTER ALLENTOWN, PA. L.P.

David Vacca

Cc:   Legal Department
      Tenant File

**Allentown Center**
PO Box 93070

Rochester, NY, 14692

4/27/2020

Orange theory Fitness
Brian Bolcar
4713 West Tighlman Street
Allentown, PA  18104

Day Due:                          1
# Days to Delinquency:     5
Last Payment:   8,647.07
Payment Date:  4/1/2020

Re:  Lease ALL-003081 at Allentown Center

Dear Tenant:

We are writing to inform you that your account is currently past due.  Our records show that as of the above date the following items are outstanding:

| Date | | Description | Charges | Payments | Balance Due |
|------|------|------|------|------|------|
| 4/1/2020 | AAA | BASE RENT | 5,833.33 | 0.00 | 5,833.33 |
| 4/1/2020 | CAM | CAM | 1,082.18 | 0.00 | 1,082.18 |
| 4/1/2020 | INS | INSURANCE | 172.36 | 0.00 | 172.36 |
| 4/1/2020 | SPR | SPRINKLER | 58.33 | 0.00 | 58.33 |
| 4/1/2020 | TAX | REAL ESTATE TAX | 880.79 | 0.00 | 880.79 |
| 4/1/2020 | WAT | WATER/SEWER | 620.08 | 0.00 | 620.08 |
| | | | | **Total Due** | **8,647.07** |

We would appreciate your prompt attention to this matter.  If you have any questions, please call our office at the above number.

Sincerely,

David Vacca

# Allentown Towne Center Allentown, Pa. L.P.

*270 Commerce Drive, Rochester, New York 14623-3506*

*(585) 359-3000, Fax: (585) 359-4690*

April 27, 2020

Ned Bolcar
Re: Saucon Fitness LLC d/b/a Orange Theory Fitness
9 Beechwood Court
Warren, NJ 07059

**U.S. FIRST CLASS MAIL**

Dear Guarantor,

Our records indicate a delinquent balance owed on your rental account of **$8,647.07**. Pursuant to Section 22.01 of the Lease, Tenant is in default for non-payment and hereby has ten (10) days to cure.

In the event said default is not cured, Owner may take self-help action to recover the space, in addition to all other rights afforded to it under the Lease and at law, including, but not limited to, commencing litigation against all responsible parties under the Lease.

Please be further advised that, pursuant to Section 22.04 of the Lease, Tenant is responsible for all of Owner's costs, expenses and attorney fees in pursuing its rights under the Lease.

Please contact me at the above number if you have any questions.

Owner reserves all rights under the Lease, at law and in equity.

Very truly yours,
ALLENTOWN TOWNE CENTER ALLENTOWN, PA. L.P.

David Vacca

Cc:    Legal Department
       Tenant File

**Allentown Center**
PO Box 93070

Rochester, NY, 14692

4/27/2020

Orange theory Fitness
Brian Bolcar
4713 West Tighlman Street
Allentown, PA  18104

| | |
|---|---|
| Day Due: | 1 |
| # Days to Delinquency: | 5 |
| Last Payment: | 8,647.07 |
| Payment Date: | 4/1/2020 |

Re:  Lease ALL-003081 at Allentown Center

Dear Tenant:

We are writing to inform you that your account is currently past due.  Our records show that as of the above date the following items are outstanding:

| Date | Description | | Charges | Payments | Balance Due |
|---|---|---|---|---|---|
| 4/1/2020 | AAA | BASE RENT | 5,833.33 | 0.00 | 5,833.33 |
| 4/1/2020 | CAM | CAM | 1,082.18 | 0.00 | 1,082.18 |
| 4/1/2020 | INS | INSURANCE | 172.36 | 0.00 | 172.36 |
| 4/1/2020 | SPR | SPRINKLER | 58.33 | 0.00 | 58.33 |
| 4/1/2020 | TAX | REAL ESTATE TAX | 880.79 | 0.00 | 880.79 |
| 4/1/2020 | WAT | WATER/SEWER | 620.08 | 0.00 | 620.08 |
| | | | | **Total Due** | **8,647.07** |

We would appreciate your prompt attention to this matter.  If you have any questions, please call our office at the above number.

Sincerely,

David Vacca

# Allentown Towne Center Allentown, Pa. L.P.

*270 Commerce Drive, Rochester, New York 14623-3506*
*(585) 359-3000, Fax: (585) 359-4690*

April 27, 2020

Michael DeGaetano
Re: Saucon Fitness LLC d/b/a Orange Theory Fitness
2761 Milan St.
Easton, PA 18045

**U.S. FIRST CLASS MAIL**

Dear Guarantor,

Our records indicate a delinquent balance owed on your rental account of **$8,647.07**. Pursuant to Section 22.01 of the Lease, Tenant is in default for non-payment and hereby has ten (10) days to cure.

In the event said default is not cured, Owner may take self-help action to recover the space, in addition to all other rights afforded to it under the Lease and at law, including, but not limited to, commencing litigation against all responsible parties under the Lease.

Please be further advised that, pursuant to Section 22.04 of the Lease, Tenant is responsible for all of Owner's costs, expenses and attorney fees in pursuing its rights under the Lease.

Please contact me at the above number if you have any questions.

Owner reserves all rights under the Lease, at law and in equity.

Very truly yours,
ALLENTOWN TOWNE CENTER ALLENTOWN, PA. L.P.

David Vacca

Cc:     Legal Department
        Tenant File

Case 6:20-cv-06488-EAW   Document 1-2   Filed 07/09/20   Page 50 of 83

**Allentown Center**
PO Box 93070

Rochester, NY, 14692

4/27/2020

Orange theory Fitness
Brian Bolcar
4713 West Tighlman Street
Allentown, PA  18104

| | | |
|---|---|---|
| Day Due: | | 1 |
| # Days to Delinquency: | | 5 |
| Last Payment: | 8,647.07 | |
| Payment Date: | 4/1/2020 | |

Re:  Lease ALL-003081 at Allentown Center

Dear Tenant:

We are writing to inform you that your account is currently past due.  Our records show that as of the above date the following items are outstanding:

| Date | | Description | Charges | Payments | Balance Due |
|---|---|---|---|---|---|
| 4/1/2020 | AAA | BASE RENT | 5,833.33 | 0.00 | 5,833.33 |
| 4/1/2020 | CAM | CAM | 1,082.18 | 0.00 | 1,082.18 |
| 4/1/2020 | INS | INSURANCE | 172.36 | 0.00 | 172.36 |
| 4/1/2020 | SPR | SPRINKLER | 58.33 | 0.00 | 58.33 |
| 4/1/2020 | TAX | REAL ESTATE TAX | 880.79 | 0.00 | 880.79 |
| 4/1/2020 | WAT | WATER/SEWER | 620.08 | 0.00 | 620.08 |
| | | | **Total Due** | | **8,647.07** |

We would appreciate your prompt attention to this matter.  If you have any questions, please call our office at the above number.

Sincerely,

David Vacca

# Allentown Towne Center Allentown, Pa. L.P.

*270 Commerce Drive, Rochester, New York 14623-3506*
*(585) 359-3000, Fax: (585) 359-4690*

May 15, 2020

Saucon Fitness LLC d/b/a Orange Theory Fitness
4713 W. Tilghman St.
Allentown, PA 18104

**U.S. FIRST CLASS MAIL**
**CERTIFIED MAIL (RETURN RECEIPT REQUESTED) 7017 1000 0000 2542 3897**

Dear Tenant,

Our records indicate a delinquent balance owed on your rental account of **$21,113.95**. Pursuant to Section 22.01 of the Lease, Tenant is in default for non-payment and hereby has ten (10) days to cure.

In the event said default is not cured, Owner may take self-help action to recover the space, in addition to all other rights afforded to it under the Lease and at law, including, but not limited to, commencing litigation against all responsible parties under the Lease.

Please be further advised that, pursuant to Section 22.04 of the Lease, Tenant is responsible for all of Owner's costs, expenses and attorney fees in pursuing its rights under the Lease.

Please contact me at the above number if you have any questions.

Owner reserves all rights under the Lease, at law and in equity.

Very truly yours,
ALLENTOWN TOWNE CENTER ALLENTOWN, PA. L.P.

David Vacca

Cc:     Legal Department
        Tenant File

**Allentown Center**

PO Box 93070

Rochester, NY, 14692

5/15/2020

Orange theory Fitness
Brian Bolcar
4713 West Tighlman Street
Allentown, PA  18104

Day Due:                         1
# Days to Delinquency:      5
Last Payment:   8,647.07
Payment Date:   4/1/2020

Re:  Lease ALL-003081 at Allentown Center

Dear Tenant:

We are writing to inform you that your account is currently past due.  Our records show that as of the above date the following items are outstanding:

| Date | | Description | Charges | Payments | Balance Due |
|------|---|-------------|---------|----------|-------------|
| 4/1/2020 | AAA | BASE RENT | 5,833.33 | 0.00 | 5,833.33 |
| 4/1/2020 | CAM | CAM | 1,082.18 | 0.00 | 1,082.18 |
| 4/1/2020 | INS | INSURANCE | 172.36 | 0.00 | 172.36 |
| 4/1/2020 | SPR | SPRINKLER | 58.33 | 0.00 | 58.33 |
| 4/1/2020 | TAX | REAL ESTATE TAX | 880.79 | 0.00 | 880.79 |
| 4/1/2020 | WAT | WATER/SEWER | 620.08 | 0.00 | 620.08 |
| 5/1/2020 | AAA | BASE RENT | 5,833.33 | 0.00 | 5,833.33 |
| 5/1/2020 | CAM | CAM | 1,082.18 | 0.00 | 1,082.18 |
| 5/1/2020 | INS | INSURANCE | 172.36 | 0.00 | 172.36 |
| 5/1/2020 | LAT | LATE CHARGE | 729.17 | 0.00 | 729.17 |
| 5/1/2020 | SPR | SPRINKLER | 58.33 | 0.00 | 58.33 |
| 5/1/2020 | TAX | REAL ESTATE TAX | 880.79 | 0.00 | 880.79 |
| 5/1/2020 | WAT | WATER/SEWER | 627.58 | 0.00 | 627.58 |
| 5/1/2020 | YEC | YEAR END CAM | 1,257.37 | 0.00 | 1,257.37 |
| 5/1/2020 | YEI | YEAR END INS | 939.71 | 0.00 | 939.71 |
| 5/1/2020 | YET | YEAR END TAXES | 886.06 | 0.00 | 886.06 |

NYSCEF DOC. NO. 4

INDEX NO. E2020003327

RECEIVED NYSCEF: 05/22/2020

Case 6:20-cv-06488-EAW   Document 1-2   Filed 07/09/20   Page 53 of 83

5/15/2020
Orange theory Fitness
Continued

**Total Due**          **21,113.95**

We would appreciate your prompt attention to this matter.  If you have any questions, please call our office at the above number.

Sincerely,

David Vacca

# Allentown Towne Center Allentown, Pa. L.P.

*270 Commerce Drive, Rochester, New York 14623-3506*
*(585) 359-3000, Fax: (585) 359-4690*

May 15, 2020

Ned Bolcar
Re: Saucon Fitness LLC d/b/a Orange Theory Fitness
9 Beechwood Court
Warren, NJ 07059

### U.S. FIRST CLASS MAIL

Dear Guarantor,

Our records indicate a delinquent balance owed on your rental account of **$21,113.95**. Pursuant to Section 22.01 of the Lease, Tenant is in default for non-payment and hereby has ten (10) days to cure.

In the event said default is not cured, Owner may take self-help action to recover the space, in addition to all other rights afforded to it under the Lease and at law, including, but not limited to, commencing litigation against all responsible parties under the Lease.

Please be further advised that, pursuant to Section 22.04 of the Lease, Tenant is responsible for all of Owner's costs, expenses and attorney fees in pursuing its rights under the Lease.

Please contact me at the above number if you have any questions.

Owner reserves all rights under the Lease, at law and in equity.

Very truly yours,
ALLENTOWN TOWNE CENTER ALLENTOWN, PA. L.P.

David Vacca

Cc:     Legal Department
        Tenant File

**Allentown Center**

PO Box 93070

Rochester, NY, 14692

5/15/2020

Orange theory Fitness
Brian Bolcar
4713 West Tighlman Street
Allentown, PA  18104

| | |
|---|---|
| Day Due: | 1 |
| # Days to Delinquency: | 5 |
| Last Payment: | 8,647.07 |
| Payment Date: | 4/1/2020 |

Re:  Lease ALL-003081 at Allentown Center

Dear Tenant:

We are writing to inform you that your account is currently past due.  Our records show that as of the above date the following items are outstanding:

| Date | | Description | Charges | Payments | Balance Due |
|---|---|---|---|---|---|
| 4/1/2020 | AAA | BASE RENT | 5,833.33 | 0.00 | 5,833.33 |
| 4/1/2020 | CAM | CAM | 1,082.18 | 0.00 | 1,082.18 |
| 4/1/2020 | INS | INSURANCE | 172.36 | 0.00 | 172.36 |
| 4/1/2020 | SPR | SPRINKLER | 58.33 | 0.00 | 58.33 |
| 4/1/2020 | TAX | REAL ESTATE TAX | 880.79 | 0.00 | 880.79 |
| 4/1/2020 | WAT | WATER/SEWER | 620.08 | 0.00 | 620.08 |
| 5/1/2020 | AAA | BASE RENT | 5,833.33 | 0.00 | 5,833.33 |
| 5/1/2020 | CAM | CAM | 1,082.18 | 0.00 | 1,082.18 |
| 5/1/2020 | INS | INSURANCE | 172.36 | 0.00 | 172.36 |
| 5/1/2020 | LAT | LATE CHARGE | 729.17 | 0.00 | 729.17 |
| 5/1/2020 | SPR | SPRINKLER | 58.33 | 0.00 | 58.33 |
| 5/1/2020 | TAX | REAL ESTATE TAX | 880.79 | 0.00 | 880.79 |
| 5/1/2020 | WAT | WATER/SEWER | 627.58 | 0.00 | 627.58 |
| 5/1/2020 | YEC | YEAR END CAM | 1,257.37 | 0.00 | 1,257.37 |
| 5/1/2020 | YEI | YEAR END INS | 939.71 | 0.00 | 939.71 |
| 5/1/2020 | YET | YEAR END TAXES | 886.06 | 0.00 | 886.06 |

Case 6:20-cv-06488-EAW   Document 1-2   Filed 07/09/20   Page 56 of 83

5/15/2020
Orange theory Fitness
Continued


**Total Due**          **21,113.95**


We would appreciate your prompt attention to this matter.  If you have any questions, please call our office at the above number.

Sincerely,



David Vacca

Case 6:20-cv-06488-EAW   Document 1-2   Filed 07/09/20   Page 57 of 83

# Allentown Towne Center Allentown, Pa. L.P.

*270 Commerce Drive, Rochester, New York 14623-3506*
*(585) 359-3000, Fax: (585) 359-4690*

May 15, 2020

Brian Bolcar
Re: Saucon Fitness LLC d/b/a Orange Theory Fitness
780 Fallon Grove Way
Raleigh, NC 27608

**U.S. FIRST CLASS MAIL**

Dear Guarantor,

Our records indicate a delinquent balance owed on your rental account of **$21,113.95**. Pursuant to Section 22.01 of the Lease, Tenant is in default for non-payment and hereby has ten (10) days to cure.

In the event said default is not cured, Owner may take self-help action to recover the space, in addition to all other rights afforded to it under the Lease and at law, including, but not limited to, commencing litigation against all responsible parties under the Lease.

Please be further advised that, pursuant to Section 22.04 of the Lease, Tenant is responsible for all of Owner's costs, expenses and attorney fees in pursuing its rights under the Lease.

Please contact me at the above number if you have any questions.

Owner reserves all rights under the Lease, at law and in equity.

Very truly yours,
ALLENTOWN TOWNE CENTER ALLENTOWN, PA. L.P.

David Vacca


Cc:     Legal Department
        Tenant File

**Allentown Center**

PO Box 93070

Rochester, NY, 14692

5/15/2020

Orange theory Fitness
Brian Bolcar
4713 West Tighlman Street
Allentown, PA  18104

Day Due:                          1
# Days to Delinquency:    5
Last Payment:   8,647.07
Payment Date:   4/1/2020

Re:  Lease ALL-003081 at Allentown Center

Dear Tenant:

We are writing to inform you that your account is currently past due.  Our records show that as of the above date the following items are outstanding:

| Date | | Description | Charges | Payments | Balance Due |
|------|------|------------|--------:|---------:|------------:|
| 4/1/2020 | AAA | BASE RENT | 5,833.33 | 0.00 | 5,833.33 |
| 4/1/2020 | CAM | CAM | 1,082.18 | 0.00 | 1,082.18 |
| 4/1/2020 | INS | INSURANCE | 172.36 | 0.00 | 172.36 |
| 4/1/2020 | SPR | SPRINKLER | 58.33 | 0.00 | 58.33 |
| 4/1/2020 | TAX | REAL ESTATE TAX | 880.79 | 0.00 | 880.79 |
| 4/1/2020 | WAT | WATER/SEWER | 620.08 | 0.00 | 620.08 |
| 5/1/2020 | AAA | BASE RENT | 5,833.33 | 0.00 | 5,833.33 |
| 5/1/2020 | CAM | CAM | 1,082.18 | 0.00 | 1,082.18 |
| 5/1/2020 | INS | INSURANCE | 172.36 | 0.00 | 172.36 |
| 5/1/2020 | LAT | LATE CHARGE | 729.17 | 0.00 | 729.17 |
| 5/1/2020 | SPR | SPRINKLER | 58.33 | 0.00 | 58.33 |
| 5/1/2020 | TAX | REAL ESTATE TAX | 880.79 | 0.00 | 880.79 |
| 5/1/2020 | WAT | WATER/SEWER | 627.58 | 0.00 | 627.58 |
| 5/1/2020 | YEC | YEAR END CAM | 1,257.37 | 0.00 | 1,257.37 |
| 5/1/2020 | YEI | YEAR END INS | 939.71 | 0.00 | 939.71 |
| 5/1/2020 | YET | YEAR END TAXES | 886.06 | 0.00 | 886.06 |

5/15/2020
Orange theory Fitness
Continued

**Total Due**          **21,113.95**

We would appreciate your prompt attention to this matter.  If you have any questions, please call our office at the above number.

Sincerely,


David Vacca

## Allentown Towne Center Allentown, Pa. L.P.

*270 Commerce Drive, Rochester, New York 14623-3506*
*(585) 359-3000, Fax: (585) 359-4690*

May 15, 2020

Michael DeGaetano
Re: Saucon Fitness LLC d/b/a Orange Theory Fitness
2761 Milan St.
Easton, PA 18045

**U.S. FIRST CLASS MAIL**

Dear Guarantor,

Our records indicate a delinquent balance owed on your rental account of **$21,113.95**. Pursuant to Section 22.01 of the Lease, Tenant is in default for non-payment and hereby has ten (10) days to cure.

In the event said default is not cured, Owner may take self-help action to recover the space, in addition to all other rights afforded to it under the Lease and at law, including, but not limited to, commencing litigation against all responsible parties under the Lease.

Please be further advised that, pursuant to Section 22.04 of the Lease, Tenant is responsible for all of Owner's costs, expenses and attorney fees in pursuing its rights under the Lease.

Please contact me at the above number if you have any questions.

Owner reserves all rights under the Lease, at law and in equity.

Very truly yours,
ALLENTOWN TOWNE CENTER ALLENTOWN, PA. L.P.

David Vacca

Cc:     Legal Department
        Tenant File

**Allentown Center**

PO Box 93070

Rochester, NY, 14692

5/15/2020

Orange theory Fitness
Brian Bolcar
4713 West Tighlman Street
Allentown, PA  18104

Day Due:            1
# Days to Delinquency:   5
Last Payment:  8,647.07
Payment Date:  4/1/2020

Re:  Lease ALL-003081 at Allentown Center

Dear Tenant:

We are writing to inform you that your account is currently past due.  Our records show that as of the above date the following items are outstanding:

| Date | | Description | Charges | Payments | Balance Due |
|------|---|-------------|---------|----------|-------------|
| 4/1/2020 | AAA | BASE RENT | 5,833.33 | 0.00 | 5,833.33 |
| 4/1/2020 | CAM | CAM | 1,082.18 | 0.00 | 1,082.18 |
| 4/1/2020 | INS | INSURANCE | 172.36 | 0.00 | 172.36 |
| 4/1/2020 | SPR | SPRINKLER | 58.33 | 0.00 | 58.33 |
| 4/1/2020 | TAX | REAL ESTATE TAX | 880.79 | 0.00 | 880.79 |
| 4/1/2020 | WAT | WATER/SEWER | 620.08 | 0.00 | 620.08 |
| 5/1/2020 | AAA | BASE RENT | 5,833.33 | 0.00 | 5,833.33 |
| 5/1/2020 | CAM | CAM | 1,082.18 | 0.00 | 1,082.18 |
| 5/1/2020 | INS | INSURANCE | 172.36 | 0.00 | 172.36 |
| 5/1/2020 | LAT | LATE CHARGE | 729.17 | 0.00 | 729.17 |
| 5/1/2020 | SPR | SPRINKLER | 58.33 | 0.00 | 58.33 |
| 5/1/2020 | TAX | REAL ESTATE TAX | 880.79 | 0.00 | 880.79 |
| 5/1/2020 | WAT | WATER/SEWER | 627.58 | 0.00 | 627.58 |
| 5/1/2020 | YEC | YEAR END CAM | 1,257.37 | 0.00 | 1,257.37 |
| 5/1/2020 | YEI | YEAR END INS | 939.71 | 0.00 | 939.71 |
| 5/1/2020 | YET | YEAR END TAXES | 886.06 | 0.00 | 886.06 |

5/15/2020
Orange theory Fitness
Continued

**Total Due**      **21,113.95**

We would appreciate your prompt attention to this matter.  If you have any questions, please call our office at the above number.

Sincerely,


David Vacca

Case 6:20-cv-06488-EAW   Document 1-2   Filed 07/09/20   Page 63 of 83

MONROE COUNTY CLERK'S OFFICE

THIS IS NOT A BILL. THIS IS YOUR RECEIPT.

Receipt # 2421876

Book    Page    CIVIL

Return To:
DALE A. WORRALL

No. Pages: 2

Instrument: AFFIDAVIT OF SERVICE

Control #:        202006251035
Index #:          E2020003327

Date: 06/25/2020

Allentown Towne Center Allentown, Pa. Limited Partnership

Time: 6:47:29 PM

Saucon Fitness LLC
Bolcar, Brian
Bolcar, Ned
Bolcar, Carolyn
DeGaetano, Michael

Total Fees Paid:                    $0.00

Employee:

State of New York

MONROE COUNTY CLERK'S OFFICE
WARNING – THIS SHEET CONSTITUTES THE CLERKS
ENDORSEMENT, REQUIRED BY SECTION 317-a(5) &
SECTION 319 OF THE REAL PROPERTY LAW OF THE
STATE OF NEW YORK. DO NOT DETACH OR REMOVE.

JAMIE ROMEO

MONROE COUNTY CLERK

INDEX #: E2020003327
DATE FILED: 5/22/2020                                JOB #: 91449
ATTORNEY: HARRIS BEACH PLLC
              100 WALL STREET NEW YORK NY 10005 (212)687-0100

SUPREME COURT OF THE STATE OF NEW YORK          MONROE COUNTY

ALLENTOWN TOWNE CENTER ALLENTOWN, PA.
LIMITED PARTNERSHIP,
270 COMMERCE DRIVE
ROCHESTER, NEW YORK 14623-3506,
Plaintiff(s)
- against -
SAUCON FITNESS LLC D/B/A ORANGE THEORY FITNESS,
BRIAN BOLCAR, NED BOLCAR, CAROLYN BOLCAR AND
MICHAEL DEGAETANO,
Defendant(s)

STATE OF NEW YORK:
COUNTY OF ALBANY:      ss:

STEF MARIE, BEING DULY SWORN DEPOSES AND SAYS DEPONENT IS NOT A PARTY TO THIS ACTION AND IS OVER THE AGE OF
EIGHTEEN YEARS AND RESIDES IN THE STATE OF NEW YORK.

That on 06/05/2020, 01:00PM at 99 WASHINGTON AVENUE, 6TH FLOOR, ALBANY, NEW YORK 12231, deponent served a SUMMONS
AND COMPLAINT WITH THE INDEX NUMBER AND DATE OF FILING ENDORSED THEREON; NOTICE OF ELECTRONIC FILING upon
SAUCON FITNESS LLC D/B/A ORANGE THEORY FITNESS, a defendant in the above captioned matter.

Deponent served NANCY DOUGHERTY, a person authorized by the NEW YORK Secretary of State to accept service of process, with 1
copy of the above described papers and the statutory fee of $40.00 pursuant to section 304 of the NY LIMITED LIABILITY COMPANY LAW.

DEPONENT DESCRIBES THE INDIVIDUAL SERVED AS FOLLOWS:
Sex F    Approximate age 60    Approximate height 5'03"    Approximate weight 123    Color of skin WHITE    Color of hair BROWN

Sworn to before me on 06/10/2020
JILL DOCHERTY  NO. 01DO6373160
NOTARY PUBLIC, STATE OF NEW YORK
QUALIFIED IN ALBANY COUNTY
COMMISSION EXPIRES ON APRIL 2, 2022

                                                    X  S. Marie
                                                       STEF MARIE

ALL NEW YORK PROCESS SERVERS, INC.
1 SOUTH WASHINGTON STREET SUITE #410 ROCHESTER, NY 14614 (585)423-9347

MONROE COUNTY CLERK'S OFFICE          THIS IS NOT A BILL. THIS IS YOUR RECEIPT.

Receipt # 2421880

Book    Page    CIVIL

Return To:                           No. Pages: 2
DALE A. WORRALL

Instrument: AFFIDAVIT OF SERVICE

Control #:        202006251039
Index #:          E2020003327

Date: 06/25/2020

Allentown Towne Center Allentown, Pa. Limited Partnership          Time: 6:49:10 PM

Saucon Fitness LLC
Bolcar, Brian
Bolcar, Ned
Bolcar, Carolyn
DeGaetano, Michael

Total Fees Paid:                     $0.00

Employee:

State of New York

MONROE COUNTY CLERK'S OFFICE
WARNING – THIS SHEET CONSTITUTES THE CLERKS
ENDORSEMENT, REQUIRED BY SECTION 317-a(5) &
SECTION 319 OF THE REAL PROPERTY LAW OF THE
STATE OF NEW YORK. DO NOT DETACH OR REMOVE.

JAMIE ROMEO

MONROE COUNTY CLERK

## AFFIDAVIT OF SERVICE

**SUPREME COURT OF THE STATE OF NEW YORK COUNTY OF MONROE**

Index Number: E2020003327
Date Filed: 05/22/2020

Plaintiff(s):
**ALLENTOWN TOWNE CENTER ALLENTOWN, PA. LIMITED PARTNERSHIP,**
vs
Defendant(s):
**SAUCON FITNESS LLC D/B/A ORANGE THEORY FITNESS, BRIAN BOLCAR, NED BOLCAR, CAROLYN BOLCAR AND MICHAEL DEGAETANO,**

STATE OF NORTH CAROLINA
COUNTY OF JOHNSTON SS.:

**JENNIFER ADAMS**, the undersigned, being duly sworn, deposes and says that I was at the time of service over the age of eighteen and not a party to this action. I reside in the State of North Carolina.

On 06/06/2020 at 7:52 AM, deponent served the within **SUMMONS AND VERIFIED COMPLAINT WITH THE INDEX NUMBER AND DATE OF FILING ENDORSED THEREON; NOTICE OF ELECTRONIC FILING** on **BRIAN BOLCAR** at **780 FALLON GROVE WAY, RALEIGH, NC 27608** in the manner indicated below:

**INDIVIDUAL:** by delivering thereat a true copy of each to said recipient personally; deponent knew the person so served to be the person described herein by deponent asking the person if he or she is the named Recipient and the person responding that he or she is in fact the person named in this action as the Recipient.

**Description:**
Gender: **Male**    Race/Skin: **CAUCASIAN**   Age: **66**  Weight: **200 Lbs**  Height: **6'1"**   Hair: **GRAY**      Glasses:**No**     Other:

I asked the person spoken to whether defendant was in the active military service in the military service or financially dependent upon any one who is in the military service of the United States or of the State of New York in any capacity whatever and received a negative reply. The source of my information and belief are the conversations above narrated. Upon information and belief I aver that the recipient is not in the military service of New York State or the United States as that term is defined in either the State or in the Federal statutes.

Subscribed and Sworn to before me on June 16, 2020.

_Laura A. Berry_

LAURA A BERRY
Notary Public
Johnston County, North Carolina
My Commission Expires
November 7, 2023

x _Jennifer Adams_
**JENNIFER ADAMS**

Job #: 91460

MONROE COUNTY CLERK'S OFFICE

THIS IS NOT A BILL. THIS IS YOUR RECEIPT.

Receipt # 2421881

Book    Page    CIVIL

Return To:
DALE A. WORRALL

No. Pages: 2

Instrument: AFFIDAVIT OF SERVICE

Control #:        202006251040
Index #:          E2020003327

Date: 06/25/2020

Allentown Towne Center Allentown, Pa. Limited Partnership

Time: 6:50:21 PM

Saucon Fitness LLC
Bolcar, Brian
Bolcar, Ned
Bolcar, Carolyn
DeGaetano, Michael

Total Fees Paid:                    $0.00

Employee:

State of New York

MONROE COUNTY CLERK'S OFFICE
WARNING – THIS SHEET CONSTITUTES THE CLERKS
ENDORSEMENT, REQUIRED BY SECTION 317-a(5) &
SECTION 319 OF THE REAL PROPERTY LAW OF THE
STATE OF NEW YORK. DO NOT DETACH OR REMOVE.

JAMIE ROMEO

MONROE COUNTY CLERK

# AFFIDAVIT OF SERVICE

## SUPREME COURT OF THE STATE OF NEW YORK COUNTY OF MONROE

Index Number: E2020003327
Date Filed: 05/22/2020

Plaintiff(s):
ALLENTOWN TOWNE CENTER ALLENTOWN, PA. LIMITED PARTNERSHIP,
vs
Defendant(s):
SAUCON FITNESS LLC D/B/A ORANGE THEORY FITNESS, BRIAN BOLCAR, NED BOLCAR, CAROLYN BOLCAR AND MICHAEL DEGAETANO,

STATE OF NEW JERSEY
COUNTY OF MORRIS SS.:

ANTHONY IAVARONE, the undersigned, being duly sworn, deposes and says that I was at the time of service over the age of eighteen and not a party to this action. I reside in the State of New Jersey.

On 06/05/2020 at 5:03 PM, deponent served the within SUMMONS AND VERIFIED COMPLAINT WITH THE INDEX NUMBER AND DATE OF FILING ENDORSED THEREON; NOTICE OF ELECTRONIC FILING on NED BOLCAR at 9 BEECHWOOD COURT, WARREN, NJ 07059 in the manner indicated below:

INDIVIDUAL: by delivering thereat a true copy of each to said recipient personally; deponent knew the person so served to be the person described herein by deponent asking the person if he or she is the named Recipient and the person responding that he or she is in fact the person named in this action as the Recipient.

Description:
Gender: Male    Race/Skin: CAUCASIAN    Age: 46 - 55 Yrs.    Weight: 201-250 Lbs.    Height: 5' 4" - 5' 8"    Hair: BROWN
Glasses: No    Other:

I asked the person spoken to whether defendant was in the active military service or financially dependent upon any one who is in the military service of the United States or of the State of New York in any capacity whatever and received a negative reply. The source of my information and belief are the conversations above narrated. Upon information and belief I aver that the recipient is not in the military service of New York State or the United States as that term is defined in either the State or in the Federal statutes.

Subscribed and Sworn to before me on 6|11, 2020.

X _____
ANTHONY IAVARONE

Job #: 91458

MONROE COUNTY CLERK'S OFFICE                    THIS IS NOT A BILL. THIS IS YOUR RECEIPT.

Receipt # 2421882

Book    Page    CIVIL

Return To:                                      No. Pages:  2
DALE A. WORRALL

Instrument: AFFIDAVIT OF SERVICE

Control #:          202006251041
Index #:            E2020003327

Date: 06/25/2020

Allentown Towne Center Allentown, Pa. Limited Partnership        Time: 6:51:33 PM

Saucon Fitness LLC
Bolcar, Brian
Bolcar, Ned
Bolcar, Carolyn
DeGaetano, Michael

Total Fees Paid:                    $0.00

Employee:

State of New York

MONROE COUNTY CLERK'S OFFICE
WARNING – THIS SHEET CONSTITUTES THE CLERKS
ENDORSEMENT, REQUIRED BY SECTION 317-a(5) &
SECTION 319 OF THE REAL PROPERTY LAW OF THE
STATE OF NEW YORK. DO NOT DETACH OR REMOVE.

JAMIE ROMEO

MONROE COUNTY CLERK

# AFFIDAVIT OF SERVICE

## SUPREME COURT OF THE STATE OF NEW YORK COUNTY OF MONROE

Index Number: **E2020003327**
Date Filed: **05/22/2020**

Plaintiff(s):
**ALLENTOWN TOWNE CENTER ALLENTOWN, PA. LIMITED PARTNERSHIP,**
vs
Defendant(s):
**SAUCON FITNESS LLC D/B/A ORANGE THEORY FITNESS, BRIAN BOLCAR, NED BOLCAR, CAROLYN BOLCAR AND MICHAEL DEGAETANO,**

STATE OF NEW JERSEY
COUNTY OF MORRIS SS.:

**ANTHONY IAVARONE**, the undersigned, being duly sworn, deposes and says that I was at the time of service over the age of eighteen and not a party to this action. I reside in the State of New Jersey.

On **06/05/2020** at **5:03 PM**, deponent served the within **SUMMONS AND VERIFED COMPLAINT WITH THE INDEX NUMBER AND DATE OF FILING ENDORSED THEREON; NOTICE OF ELECTRONIC FILING** on **CAROLYN BOLCAR** at **9 BEECHWOOD COURT, WARREN, NJ 07059** in the manner indicated below:

**SUITABLE AGE:** by delivering thereat a true copy of each to **NED BOLCAR, HUSBAND/CO-OCCUPANT**, of **CAROLYN BOLCAR**, a person of suitable age and discretion. Said premises is **CAROLYN BOLCAR**'s usual place of residence within the State of New Jersey.

On **06/10/2020**, deponent enclosed a copy of same in a first class postpaid envelope bearing the words "Personal & Confidential" properly addressed to defendant and defendant's last known residence, at **9 BEECHWOOD COURT, WARREN, NJ 07059** and deposited said envelope in an official depository under the exclusive care and custody of the U.S. Postal Service within New York State. The envelope did not indicate on the outside thereof, by return address or otherwise, that the communication was from an attorney or concerned an action against the defendant.

**Description:**
Gender: **Male**   Race/Skin: **CAUCASIAN**   Age: **46 - 55 Yrs.**   Weight: **201-250 Lbs.**   Height: **5' 4" - 5' 8"**   Hair: **BROWN**
Glasses:**No**   Other:

I asked the person spoken to whether defendant was in the active military service or financially dependent upon any one who is in the military service of the United States or of the State of New York in any capacity whatever and received a negative reply. The source of my information and belief are the conversations above narrated. Upon information and belief I aver that the recipient is not in the military service of New York State or the United States as that term is defined in either the State or in the Federal statutes.

Subscribed and Sworn to before me on 6/17, 20 20

X _____
**ANTHONY IAVARONE**

Job #: 91459

LAUREN IAVARONE
MY COMMISSION EXPIRES
NOTARY
PUBLIC
11-20-2020
STATE OF NEW JERSEY

MONROE COUNTY CLERK'S OFFICE                    THIS IS NOT A BILL. THIS IS YOUR RECEIPT.

Receipt # 2421884

Book    Page    CIVIL

Return To:                              No. Pages: 2
DALE A. WORRALL

Instrument: AFFIDAVIT OF SERVICE

Control #:          202006251043
Index #:            E2020003327

Date: 06/25/2020

Allentown Towne Center Allentown, Pa. Limited Partnership       Time: 6:52:44 PM

Saucon Fitness LLC
Bolcar, Brian
Bolcar, Ned
Bolcar, Carolyn
DeGaetano, Michael

Total Fees Paid:                      $0.00

Employee:

State of New York

MONROE COUNTY CLERK'S OFFICE
WARNING – THIS SHEET CONSTITUTES THE CLERKS
ENDORSEMENT, REQUIRED BY SECTION 317-a(5) &
SECTION 319 OF THE REAL PROPERTY LAW OF THE
STATE OF NEW YORK. DO NOT DETACH OR REMOVE.

JAMIE ROMEO

MONROE COUNTY CLERK

## AFFIDAVIT OF SERVICE

### SUPREME COURT OF THE STATE OF NEW YORK COUNTY OF MONROE

Index Number: E2020003327
Date Filed: 05/22/2020

Plaintiff(s):
**ALLENTOWN TOWNE CENTER ALLENTOWN, PA. LIMITED PARTNERSHIP,**
vs
Defendant(s):
**SAUCON FITNESS LLC D/B/A ORANGE THEORY FITNESS, BRIAN BOLCAR, NED BOLCAR, CAROLYN BOLCAR AND MICHAEL DEGAETANO,**

State of PENNSYLVANIA
County of MONTGOMERY ss.:

SHERI CURTIN, the undersigned, being duly sworn, deposes and says that I was at the time of service over the age of eighteen and not a party to this action. I reside in the State of Delaware.

On **06/09/2020** at **8:52 PM**, **posted** for MICHAEL DEGAETANO by attaching a true copy of the SUMMONS AND VERIFIED COMPLAINT WITH THE INDEX NUMBER AND DATE OF FILING ENDORSED THEREON; NOTICE OF ELECTRONIC FILING with the date and hour of service endorsed thereon by me, to a conspicuous place on the property at the address of: 2761 MILAN STREET, EASTON, PA 18045.

**06/05/2020** 1:30 PM |**2761 MILAN STREET, EASTON, PA 18045** *Location is in a condominium complex with security doors.  There is a doorbell system that can ring each individual unit.  Several attempts to ring the list of residents, all resulted in no response.  No residents coming in or out and no place to leave a call tag.  Deponent confirmed with leasing office  and also provided deponent an access key to the unit.  Deponent was able to get to the individual unit, knocked on door, and received no response.
**06/06/2020** 7:49 AM |**2761 MILAN STREET, EASTON, PA 18045** *No answer to multiple rings to unit.
**06/06/2020** 2:47 PM |**2761 MILAN STREET, EASTON, PA 18045** *No answer at door.
**06/08/2020** 4:12 PM |**2761 MILAN STREET, EASTON, PA 18045** *Client requested that the Respondent was called at two numbers provided (cell #917-603-1184) and received no answer, however his voice mail set up for Michael DeGaetano and received an auto reply "Sorry, I'm on a call.  Can I call you right back?"  and Home Number (570-788-3734) received a message from Verizon that this number is not in service.
**06/08/2020** 5:22 PM |**2761 MILAN STREET, EASTON, PA 18045** *No answer at door. Respondent returned voice mail, stating he is not currently in the area and is in the Poconos and will be leaving to go to Cleveland, Ohio tonight.  Respondent also stated that during the conversation that his name should have been removed from the documents over a year ago as he is no longer in partnership with Orange Theory Fitness and is no longer an agent for the lease in effect.
**06/09/2020** 8:52 PM |**2761 MILAN STREET, EASTON, PA 18045** *Documents posted to common mail area for apartment unit #2761.

Subscribed and Sworn to before me on 6/24, 20 20

x _Sheri L Curtin_
**SHERI CURTIN**

Job #: 91457

Commonwealth of Pennsylvania - Notary Seal
Michele M. Harris, Notary Public
Montgomery County
My commission expires August 10, 2024
Commission number 1067314
Member, Pennsylvania Association of Notaries

MONROE COUNTY CLERK'S OFFICE

THIS IS NOT A BILL. THIS IS YOUR RECEIPT.

Receipt # 2421887

Book    Page    CIVIL

Return To:
DALE A. WORRALL

No. Pages: 2

Instrument: AFFIDAVIT OF SERVICE

Control #:        202006251046
Index #:          E2020003327

Date: 06/25/2020

Allentown Towne Center Allentown, Pa. Limited Partnership

Time: 6:55:51 PM

Saucon Fitness LLC
Bolcar, Brian
Bolcar, Ned
Bolcar, Carolyn
DeGaetano, Michael

Total Fees Paid:                          $0.00

Employee:

State of New York

MONROE COUNTY CLERK'S OFFICE
WARNING – THIS SHEET CONSTITUTES THE CLERKS
ENDORSEMENT, REQUIRED BY SECTION 317-a(5) &
SECTION 319 OF THE REAL PROPERTY LAW OF THE
STATE OF NEW YORK. DO NOT DETACH OR REMOVE.

JAMIE ROMEO

MONROE COUNTY CLERK

STATE OF NEW YORK
SUPREME COURT   COUNTY OF MONROE

---

Allentown Towne Center Allentown, Pa.
Limited Partnership,

                                        Plaintiff,

            -vs-

Saucon Fitness LLC d/b/a Orange Theory Fitness,
Brian Bolcar, Ned Bolcar, Carolyn Bolcar and
Michael DeGaetano,

                                        Defendants.

---

**AFFIDAVIT OF MAILING**


Index No.: E2020003327

| STATE OF NEW YORK | ) |
|---|---|
| COUNTY OF MONROE | ) ss: |

    Karen Trost, being duly sworn, deposes and says that she resides in the of Henrietta, County of Monroe, State of New York, that she is over the age of eighteen years, and is an Administrative Assistant for the law firm of Harris Beach PLLC, attorneys for the Plaintiff. That on the 17th day of June, 2020 before 6:00 p.m. in the Town of Perinton, County of Monroe and State of New York, deponent served a copy of the foregoing **Summons and Verified Complaint with Notice of Electronic Filing** via first-class mail, bearing the legend "PERSONAL AND CONFIDENTIAL" and containing no visible information on the outside of the envelope that the communication is from an attorney or concerns an alleged debt. Said mailing was addressed to the address designated by a person for that purpose, by depositing a true copy thereof, properly and securely enclosed in a sealed wrapper, with full postage prepaid thereon, in a U.S. Postal depository maintained under the exclusive care and custody of the United States Postal Service within that state, directed to:

        Saucon Fitness LLC d/b/a Orange Theory Fitness
        2761 Milan St
        Easton, PA  18045

                                         Karen Trost

Sworn to before me this
_____ day of June, 2020

_____
Notary Public

317145

LORI A. PALMER
Notary Public, State of New York
No. 01PA4848797
Qualified in Monroe County
Commission Expires May 31, 2023

HARRIS BEACH ⸝⸍
ATTORNEYS AT LAW

MONROE COUNTY CLERK'S OFFICE

THIS IS NOT A BILL. THIS IS YOUR RECEIPT.

Receipt # 2421889

Book   Page   CIVIL

Return To:
DALE A. WORRALL

No. Pages: 2

Instrument: AFFIDAVIT OF SERVICE

Control #:        202006251048
Index #:          E2020003327

Date: 06/25/2020

Allentown Towne Center Allentown, Pa. Limited Partnership

Time: 6:57:06 PM

Saucon Fitness LLC
Bolcar, Brian
Bolcar, Ned
Bolcar, Carolyn
DeGaetano, Michael

Total Fees Paid:                    $0.00

Employee:

State of New York

MONROE COUNTY CLERK'S OFFICE
WARNING – THIS SHEET CONSTITUTES THE CLERKS
ENDORSEMENT, REQUIRED BY SECTION 317-a(5) &
SECTION 319 OF THE REAL PROPERTY LAW OF THE
STATE OF NEW YORK. DO NOT DETACH OR REMOVE.

JAMIE ROMEO

MONROE COUNTY CLERK

STATE OF NEW YORK
SUPREME COURT   COUNTY OF MONROE

Allentown Towne Center Allentown, Pa.
Limited Partnership,

                    Plaintiff,

      -vs-

Saucon Fitness LLC d/b/a Orange Theory Fitness,
Brian Bolcar, Ned Bolcar, Carolyn Bolcar and
Michael DeGaetano,

                    Defendants.

**AFFIDAVIT OF MAILING**

Index No.:  E2020003327

STATE OF NEW YORK    )
COUNTY OF MONROE    ) ss:

       Karen Trost, being duly sworn, deposes and says that she resides in the of Henrietta, County of Monroe, State of New York, that she is over the age of eighteen years, and is an Administrative Assistant for the law firm of Harris Beach PLLC, attorneys for the Plaintiff.  That on the 15th day of June, 2020 before 6:00 p.m. in the Town of Perinton, County of Monroe and State of New York, deponent served a copy of the foregoing **Summons and Notice of Electronic Filing** via first-class mail, bearing the legend "PERSONAL AND CONFIDENTIAL" and containing no visible information on the outside of the envelope that the communication is from an attorney or concerns an alleged debt.  Said mailing was addressed to the address designated by a person for that purpose, by depositing a true copy thereof, properly and securely enclosed in a sealed wrapper, with full postage prepaid thereon, in a U.S. Postal depository maintained under the exclusive care and custody of the United States Postal Service within that state, directed to:

          Brian Bolcar
          780 Fallon Grove Way
          Raleigh, NC 27608

                                        Karen Trost

Sworn to before me this
_16_ day of June, 2020

Notary Public

317145

LORI A. PALMER
Notary Public, State of New York
No. 01PA4848797
Qualified in Monroe County
Commission Expires May 31, 20_23_

HARRIS BEACH ℠
ATTORNEYS AT LAW

MONROE COUNTY CLERK'S OFFICE                    THIS IS NOT A BILL. THIS IS YOUR RECEIPT.

Receipt # 2421890

Book    Page    CIVIL

Return To:                                      No. Pages: 2
DALE A. WORRALL

Instrument: AFFIDAVIT OF SERVICE

Control #:        202006251049
Index #:          E2020003327

Date: 06/25/2020

Allentown Towne Center Allentown, Pa. Limited Partnership          Time: 6:58:29 PM

Saucon Fitness LLC
Bolcar, Brian
Bolcar, Ned
Bolcar, Carolyn
DeGaetano, Michael

Total Fees Paid:                    $0.00

Employee:

State of New York

MONROE COUNTY CLERK'S OFFICE
WARNING – THIS SHEET CONSTITUTES THE CLERKS
ENDORSEMENT, REQUIRED BY SECTION 317-a(5) &
SECTION 319 OF THE REAL PROPERTY LAW OF THE
STATE OF NEW YORK. DO NOT DETACH OR REMOVE.

JAMIE ROMEO

MONROE COUNTY CLERK

STATE OF NEW YORK
SUPREME COURT   COUNTY OF MONROE

Allentown Towne Center Allentown, Pa.
Limited Partnership,

                              Plaintiff,

          -vs-

Saucon Fitness LLC d/b/a Orange Theory Fitness,
Brian Bolcar, Ned Bolcar, Carolyn Bolcar and
Michael DeGaetano,

                              Defendants.

**AFFIDAVIT OF MAILING**

Index No.: E2020003327

STATE OF NEW YORK        )
COUNTY OF MONROE         ) ss:

          Karen Trost, being duly sworn, deposes and says that she resides in the of Henrietta, County of Monroe, State of New York, that she is over the age of eighteen years, and is an Administrative Assistant for the law firm of Harris Beach PLLC, attorneys for the Plaintiff.  That on the 15th day of June, 2020 before 6:00 p.m. in the Town of Perinton, County of Monroe and State of New York, deponent served a copy of the foregoing **Summons and Notice of Electronic Filing** via first-class mail, bearing the legend "PERSONAL AND CONFIDENTIAL" and containing no visible information on the outside of the envelope that the communication is from an attorney or concerns an alleged debt.  Said mailing was addressed to the address designated by a person for that purpose, by depositing a true copy thereof, properly and securely enclosed in a sealed wrapper, with full postage prepaid thereon, in a U.S. Postal depository maintained under the exclusive care and custody of the United States Postal Service within that state, directed to:

          Ned Bolcar
          9 Beechwood Court
          Warren, NJ 07059

                                        _Karen Trost_
                                        Karen Trost

Sworn to before me this
_16_ day of June, 2020

_____
Notary Public

LORI A. PALMER
Notary Public, State of New York
No. 01PA4848797
Qualified in Monroe County
Commission Expires May 31, 20_23_

317145

HARRIS BEACH PLLC
ATTORNEYS AT LAW

Case 6:20-cv-06488-EAW   Document 1-2   Filed 07/09/20   Page 79 of 83

MONROE COUNTY CLERK'S OFFICE            THIS IS NOT A BILL. THIS IS YOUR RECEIPT.

Receipt # 2421892

Book    Page    CIVIL

Return To:                              No. Pages: 2
DALE A. WORRALL
                                        Instrument: AFFIDAVIT OF SERVICE

                                        Control #:       202006251051
                                        Index #:         E2020003327

                                        Date: 06/25/2020

Allentown Towne Center Allentown, Pa. Limited Partnership    Time: 6:59:49 PM

Saucon Fitness LLC
Bolcar, Brian
Bolcar, Ned
Bolcar, Carolyn
DeGaetano, Michael

Total Fees Paid:                     $0.00

                                        Employee:

State of New York

MONROE COUNTY CLERK'S OFFICE
WARNING – THIS SHEET CONSTITUTES THE CLERKS
ENDORSEMENT, REQUIRED BY SECTION 317-a(5) &
SECTION 319 OF THE REAL PROPERTY LAW OF THE
STATE OF NEW YORK. DO NOT DETACH OR REMOVE.

JAMIE ROMEO

MONROE COUNTY CLERK

STATE OF NEW YORK
SUPREME COURT   COUNTY OF MONROE

Allentown Towne Center Allentown, Pa.
Limited Partnership,

**AFFIDAVIT OF MAILING**

                          Plaintiff,

Index No.: E2020003327

          -vs-

Saucon Fitness LLC d/b/a Orange Theory Fitness,
Brian Bolcar, Ned Bolcar, Carolyn Bolcar and
Michael DeGaetano,

                          Defendants.

STATE OF NEW YORK      )
COUNTY OF MONROE      ) ss:

          Karen Trost, being duly sworn, deposes and says that she resides in the of Henrietta, County of Monroe, State of New York, that she is over the age of eighteen years, and is an Administrative Assistant for the law firm of Harris Beach PLLC, attorneys for the Plaintiff.  That on the 15th day of June, 2020 before 6:00 p.m. in the Town of Perinton, County of Monroe and State of New York, deponent served a copy of the foregoing **Summons and Notice of Electronic Filing** via first-class mail, bearing the legend "PERSONAL AND CONFIDENTIAL" and containing no visible information on the outside of the envelope that the communication is from an attorney or concerns an alleged debt.   Said mailing was addressed to the address designated by a person for that purpose, by depositing a true copy thereof, properly and securely enclosed in a sealed wrapper, with full postage prepaid thereon, in a U.S. Postal depository maintained under the exclusive care and custody of the United States Postal Service within that state, directed to:

          Carolyn Bolcar
          9 Beechwood Court
          Warren, NJ 07059

                                        _____
                                        Karen Trost

Sworn to before me this
_16th_ day of June, 2020

_____
Notary Public

317145

LORI A. PALMER
Notary Public, State of New York
No. 01PA4848797
Qualified in Monroe County
Commission Expires May 31, 20 2 3

HARRIS BEACH PLLC
ATTORNEYS AT LAW

Case 6:20-cv-06488-EAW   Document 1-2   Filed 07/09/20   Page 81 of 83

MONROE COUNTY CLERK'S OFFICE

THIS IS NOT A BILL. THIS IS YOUR RECEIPT.

Receipt # 2421902

Book   Page   CIVIL

Return To:
DALE A. WORRALL

No. Pages: 2

Instrument: AFFIDAVIT OF SERVICE

Control #:        202006251061
Index #:          E2020003327

Date: 06/25/2020

Allentown Towne Center Allentown, Pa. Limited Partnership

Time: 7:03:16 PM

Saucon Fitness LLC
Bolcar, Brian
Bolcar, Ned
Bolcar, Carolyn
DeGaetano, Michael

Total Fees Paid:                        $0.00

Employee:

State of New York

MONROE COUNTY CLERK'S OFFICE
WARNING – THIS SHEET CONSTITUTES THE CLERKS
ENDORSEMENT, REQUIRED BY SECTION 317-a(5) &
SECTION 319 OF THE REAL PROPERTY LAW OF THE
STATE OF NEW YORK. DO NOT DETACH OR REMOVE.

JAMIE ROMEO

MONROE COUNTY CLERK

STATE OF NEW YORK
SUPREME COURT   COUNTY OF MONROE

Allentown Towne Center Allentown, Pa.
Limited Partnership,

**AFFIDAVIT OF MAILING**

                              Plaintiff,

Index No.: E2020003327

              -vs-

Saucon Fitness LLC d/b/a Orange Theory Fitness,
Brian Bolcar, Ned Bolcar, Carolyn Bolcar and
Michael DeGaetano,

                              Defendants.

STATE OF NEW YORK      )
COUNTY OF MONROE      ) ss:

      Karen Trost, being duly sworn, deposes and says that she resides in the of Henrietta, County of Monroe, State of New York, that she is over the age of eighteen years, and is an Administrative Assistant for the law firm of Harris Beach PLLC, attorneys for the Plaintiff. That on the 17th day of June, 2020 before 6:00 p.m. in the Town of Perinton, County of Monroe and State of New York, deponent served a copy of the foregoing **Summons and Notice of Electronic Filing** via first-class mail, bearing the legend "PERSONAL AND CONFIDENTIAL" and containing no visible information on the outside of the envelope that the communication is from an attorney or concerns an alleged debt. Said mailing was addressed to the address designated by a person for that purpose, by depositing a true copy thereof, properly and securely enclosed in a sealed wrapper, with full postage prepaid thereon, in a U.S. Postal depository maintained under the exclusive care and custody of the United States Postal Service within that state, directed to:

      Michael DeGaetano
      2761 Milan St
      Easton, PA  18045

                           Karen Trost

Sworn to before me this
_18th_ day of June, 2020

Notary Public

317145

LORI A. PALMER
Notary Public, State of New York
No. 01PA4848797
Qualified in Monroe County
Commission Expires May 31, 2023

HARRIS BEACH PLLC
ATTORNEYS AT LAW

# AFFIDAVIT OF MAILING

## SUPREME COURT OF THE STATE OF NEW YORK COUNTY OF MONROE

**Index Number:E2020003327**
**Date Filed:05/22/2020**

**Plaintiff(s): ALLENTOWN TOWNE CENTER ALLENTOWN, PA. LIMITED PARTNERSHIP,**

**vs**

**Defendant(s): SAUCON FITNESS LLC D/B/A ORANGE THEORY FITNESS, BRIAN BOLCAR, NED BOLCAR, CAROLYN BOLCAR AND MICHAEL DEGAETANO,**

STATE OF NEW YORK
COUNTY OF MONROE SS:

LISA M. NEWFROCK, being duly sworn, deposes and says I am not a party to this action and I am over the age of eighteen years and resides in the State of New York, County of Monroe.

That on **06/11/2020** I deposited copy of the **SUMMONS AND VERIFIED COMPLAINT WITH THE INDEX NUMBER AND DATE OF FILING ENDORSED THEREON; NOTICE OF ELECTRONIC FILING** on **MICHAEL DEGAETANO** in this action on those defendant(s) listed below, in a postpaid envelope properly addressed to **MICHAEL DEGAETANO** at **2761 MILAN STREET, EASTON, PA 18045**, the Respondent.

Deponent deposited said envelope in an official depository under the exclusive care and custody of the US Postal Service within the State of New York. The envelopes bore the legend "Personal and Confidential" and did not indicate on the outside thereof, by return address or otherwise, that the communication was from an attorney or concerned an action against the Respondent.

The foregoing statements are true, under penalty of perjury.

Sworn to before me on **June 10, 2020**

Deponent Signature _LISA M. NEWFROCK_
LISA M. NEWFROCK

*Nichole S. Cotton*
*Notary Public, State of New York*
*No. 01CO6293030*
*Qualified in Monroe County*
*Commission Expires 11/18/2021*

*Job #:91457*